No. 14-2800

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff-Appellee,    )
                                   )
     v.                            )
                                   )
WESLEY P. COONCE, JR.,             )
                                   )
            Defendant-Appellant.   )
                                   )

---

On Appeal from the United States District Court
for the Western District of Missouri
No. 10-03029

---

# APPELLANT'S OPENING BRIEF

---

Shane P. Cantin, Esq.                Barry J. Fisher, Esq.
Erica Mynarich, Esq.                 Federal Public Defender Office
Carver, Cantin & Mynarich            39 North Pearl Street, 5th Floor
901 St. Louis St., Suite 1600        Albany, NY 12207
Springfield, MO 65806                (518) 650-9031 Tel.
(417) 831-6363 Tel.                  (518) 436-1780 Fax
(417) 831-7373 Fax                   barry_fisher@fd.org
shane@c2glaw.com

*Attorneys for Defendant-Appellant Wesley P. Coonce, Jr.*

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

In 2010, a federal grand jury in the Western District of Missouri indicted Appellant Wesley P. Coonce, Jr., and codefendant Charles Hall for the killing of Victor Castro, a fellow inmate in a mental-health unit at the Medical Center for Federal Prisoners in Springfield, Missouri. The two-count indictment charged both defendants with murder in the United States' special territorial jurisdiction under 18 U.S.C. § 1111, and Coonce with murder by a life-sentenced prisoner under 18 U.S.C. § 1114. (A.44-47.6 [ad.1-6]).[1] The government noticed its intent to seek the death penalty against both defendants. (A.48-54 [ad.7-14]).

After a 2014 trial, the jury returned guilty verdicts against both defendants on all counts. (A.435-37). Following a joint sentencing hearing under the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3593, the jury returned death verdicts (A.556, 569, 580 [ad.50, 63, 74]), and the district court (Fenner, J.) imposed death sentences for both defendants.[2] (A.598, 602 [ad.77]).

Because of the novelty and complexity of Coonce's claims and the importance of this appeal, he respectfully requests 30 minutes for oral argument.

---

[1] "A." denotes items in Coonce's record appendix, and "ad." items also in his addendum. "Tr." denotes transcripts; because pretrial transcripts are each separately numbered, citations to those also include the date.

[2] Hall's separate appeal to this Court was docketed as No. 14-2472.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT. . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     Although he shows early promise and struggles to adapt, Wesley
Coonce's brutal childhood leaves him "absolutely broken" by age 12
and on a "collision course" for "extremely serious" problems.. . . . . . . . . . 6

     A.    Wesley is born into a chaotic, abusive, and impoverished family
and, as a very young child, suffers violence, sexual abuse, and
extreme isolation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.    Four-year old Wesley is sent to a psychiatric hospital and then a
series of other institutions over the next six years.  In between, he
is returned to his alcoholic, substance-abusing mother, who whips
him with a belt, withdraws him from school, and keeps him locked
in the basement... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.    Dispatched to live with his mentally-ill, sex-offender father,
10-year old Wesley endures more physical and psychological
cruelty... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     D.    11-year old Wesley enters the Texas juvenile system.  Shuttled
through a dozen different state institutions and foster families,
he receives help sporadically and too late, and his psychological
condition and behavior deteriorate.  At age 17, he throws a rock
at a youth detention officer and is sent to adult prison.. . . . . . . . . . . 19

II.     Released into the community at age 20 with no supervision or assistance, Wesley suffers traumatic brain damage in a car crash, unsuccessfully pursues psychiatric treatment, and commits several impulsive assaults. Finally, after being free only 18 months, he kidnaps and rapes a woman, and is sent to federal prison for life.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.    As a sex offender, Coonce is repeatedly victimized in the BOP, and cycled from one prison to another.  He commits some disciplinary infractions, almost all relatively minor.  He also continues to mutilate and try to kill himself, and receives frequent mental-health treatment.. . . . 26

IV.     The killing of fellow Medical Center inmate Victor Castro. . . . . . . . . . . . 29

        A.      Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        B.      At the Medical Center, Coonce becomes acquainted with Hall, an older, much smarter, and dominant inmate who has long been obsessively thinking of murdering someone.. . . . . . . . . . . . . . . . . . . 30

        C.      Enlisting Coonce as his accomplice, Hall plans the murder, luring Castro to his own cell, and tricking him into agreeing to be tied up. Coonce's role, if any, in the planning is questionable and disputed.. 35

                1.      Hall's statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                2.      Bevan Foo's testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

                3.      Video recordings of the participants on the day of the murder.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

                4.      Coonce's statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        D.      Hall directs Castro to lie on the floor, then binds, gags, and blindfolds him, while Coonce stands by and at one point briefly leaves the cell and then returns.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      E.      After Coonce stomps or kicks Castro a couple of times, 200-pound Hall stands on Castro's neck for several minutes, suffocating and killing him. Whether Coonce also stood on Castro's neck and caused his death is questionable and disputed.................... 45

            1.     Hall's statements...................................... 45

            2.     Forensic and other corroborating evidence. .............. 47

            3.     Coonce's statements.................................. 51

      F.      There is also uncertainty and dispute over whether Castro may have lost consciousness quickly or instead struggled and suffered for a prolonged period.. ...................................... 53

V.     After the crime, while housed in isolation where the BOP can keep him indefinitely, Coonce hurts no one and, indeed, receives no disciplinary infraction in the two years preceding trial while properly medicated. Nonetheless, the prosecution persuades jurors to find that he will probably commit future violence in prison if spared.................... 55

VI.    Four years after her brother is killed, Castro's sister tells the jury that she and her family forgive Coonce.. ............................... 57

VII.   After jurors deliberate for a full day and take an overnight recess, they agree on death verdicts for both defendants... ........................ 58

SUMMARY OF ARGUMENT......................................... 59

ARGUMENT................................................... 63

I.     The Court should remand for a hearing on whether Coonce is "mentally retarded" and thus exempt from execution under 18 U.S.C. § 3596 and <u>Hall v. Florida</u>... ............................................. 63

      A.      Introduction.......................................... 63

B. On the first criterion of Coonce's claim, significantly subaverage intellectual functioning, he pled sufficient facts — most important, his valid 71 IQ score on the most reliable instrument used by experts in the field.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C. Extensive evidence of Coonce's adaptive deficits, which the court had heard and his motion flagged, also supported the need for an Atkins hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

D. Coonce made the necessary showing that his mental retardation arose during the developmental period, the third criterion of the legal definition, notwithstanding that it traced back to the traumatic brain damage he suffered at age 20.. . . . . . . . . . . . . . . . . 79

II. The government improperly urged jurors to dismiss Coonce's retardation-level IQ even as mitigation based on his refusal to submit to pretrial competency testing and the unavailability of any "blood test" for intelligence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

III. As a result of the prosecutor's improper presentation and the court's refusal to give a key instruction, the jury also dismissed Coonce's brain damage as mitigation though it was effectively undisputed.. . . . . . . . . . . 97

A. Records showed and both sides' experts agreed that Coonce had suffered traumatic brain damage that caused permanent cognitive impairment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

B. Prosecutors nevertheless urged jurors to dismiss this evidence because Coonce was at fault for the car crash where he sustained his brain injury and for being in prison to suffer the assault that accentuated some symptoms. In conjunction with the court's refusal to give a key instruction, this led the jury to ignore Coonce's brain damage as mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

C. The prosecution's fault arguments contravened precedent and violated the Eighth Amendment.. . . . . . . . . . . . . . . . . . . . . . . . . . . 103

IV.    The court violated Coonce's Fifth Amendment right against self-
       incrimination by authorizing prosecution psychiatrist Dietz to obtain
       and present a detailed confession to prove his conduct during the crime.. 106

       A.    Over objection, the court authorized Dietz to interrogate Coonce
             about murdering Castro and then present his videotaped
             confession at sentencing, not to address his mental condition
             but simply to prove the aggravating details of his criminal
             conduct.................................................... 107

       B.    The court erred by refusing to confine Dietz to obtaining and
             using statements from Coonce for the "limited rebuttal purpose"
             allowed by the Fifth Amendment and Rule 12.2................ 117

       C.    Coonce's sentencing defense was manifestly prejudiced by the
             prosecution's use of his videotaped statements about the crime.... 124

V.     The court admitted unreliable and misleading forensic evidence about
       Coonce's role in the offense, an important contested issue at the
       sentencing hearing.. .......................................... 130

       A.    The court erred in refusing to strike FBI Agent McClain's
             incompetent testimony that an abrasion on the victim's chest
             matched the sole of Coonce's boot.. ....................... 132

       B.    The Court plainly erred in admitting evidence and argument
             that DNA from the victim found on Coonce's boot had
             been tested and "presumptively" determined to be blood........ 138

       C.    The errors in admitting unreliable and misleading testimony and
             argument about footwear comparison and blood testing require
             reversal of Coonce's death sentences.. ..................... 144

VI.    The court unfairly skewed the jury instructions on future violence in
       favor of the government......................................... 145

A.   In both the instructions and verdict form, the court articulated the government's theory and summarized its evidence on the issue of Coonce's future BOP conduct, but made no mention of the contrary defense theory, let alone the evidence supporting it. . . . . 146

B.   The court doubly erred in delivering such skewed instructions.. . . 150

    1.   One-sided summarizing of the future-violence evidence.. . . 150

    2.   Refusal to instruct on the defense theory on future violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

C.   The court's biased summary of the government's future-violence evidence and its refusal to even instruct on Coonce's theory on this key issue require reversal of his death sentence.. . . . . . . . . . . 157

VII.   The government loaded its presentation on the future-violence aggravating factor with misleading, improper evidence and argument. . . 160

A.   Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

B.   The government improperly encouraged jurors to impose death because it would be too costly or administratively inconvenient to keep Coonce in solitary confinement. . . . . . . . . . . . . . . . . . . . . . . 163

C.   The government misled jurors to think that, if not sentenced to death, Coonce would be returned, possibly very soon, to an open-population setting, perhaps even at the nearby Medical Center. . . . 168

D.   The prosecutors effectively invited jurors to speculate that the BOP would act negligently or incompetently by returning Coonce to a setting like the Medical Center in which he would commit violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

E.    The government impermissibly turned Coonce's mental illness, a mitigating factor, into an aggravating one, by telling jurors that it meant he would be incurably violent and thus deserved execution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

F.    The government bookended its tainted presentation on Coonce's dangerousness by inaccurately and improperly characterizing a death sentence as the only way to keep him isolated. . . . . . . . . . . . 179

G.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

VIII.  By removing Coonce from the courtroom before delivering a mid-sentencing-hearing instruction suggesting that protesters outside the courthouse might pose a risk to jurors, the court violated his right to presence and potentially prejudiced the jurors' perception of his dangerousness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

IX.    The court violated Coonce's confrontation rights by admitting extensive testimonial hearsay from his BOP records accusing him of various prison misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

X.     The government improperly put a thumb on the death side of the scale by presenting the jury over and over and over again with a young woman's graphic, inflammatory account of being kidnapped and raped by Coonce 14 years earlier, and by urging the jury to use that one crime to establish multiple, redundant aggravating factors. . . . . . . . . . . . . . . . 199

XI.    The court erred by refusing to strike the aggravating factor of Coonce's probable future violence in federal prison because such predictions are unreliable, unsupported, incoherent, and uncorrectable. . . . . . . . . . . . . 207

XII.   The court erred by refusing to voir dire about areas of bias critical to Coonce's case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

A. The court inexplicably declined to ask potential jurors about personal connections and attitudes highly likely to bias them, though even the government agreed that most of the questions were appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

 1. Whether any juror's close relative or friend had worked at the prison where the murder occurred or at any other correctional institution, including as a guard. . . . . . . . . . . 214

 2. Whether any juror, his or her spouse, another close relative, or a close friend had ever been sexually abused.. . . 218

 3. Whether any juror knew someone with brain damage, or had an opinion about expert mental-health testimony for a criminal defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

B. The court's unreasonable refusal to explore these important subjects on voir dire violated Coonce's Fifth Amendment right to due process and his Sixth Amendment right to an impartial jury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

XIII. By unreasonably refusing to question veniremembers privately about their death-penalty views, the court hamstrung the defense's efforts to seat a fair and impartial jury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

XIV. By rejecting Coonce's request for a sentencing hearing separate from his codefendant's, the court violated his Fifth and Eighth Amendment rights to due process and individualized sentencing.. . . . . . . . . . . . . . 231

XV. The Court erroneously refused to instruct that the "reasonable doubt" standard governed jurors' decision whether aggravating factors sufficiently outweighed mitigating ones.. . . . . . . . . . . . . . . . . . . . . . . . . 240

XVI. Coonce was sentenced to death through an unconstitutionally arbitrary process impermissibly influenced by geography.. . . . . . . . . . . . . . . . . . . . 243

A.      The Constitution forbids imposing death sentences on "a capriciously selected random handful" out of the thousands of death-eligible offenders.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

B.      98% of eligible federal offenders avoid the death penalty, and there is no legitimate explanation for the tiny handful of otherwise disparate death sentences, like Coonce's, that result.. . . 249

C.      The explanation for Coonce's death sentences appears to be, in large part, the happenstance of where he was prosecuted.. . . . . . . 255

D.      Coonce's death sentences should be set aside because they violate the Eighth Amendment and due process, particularly given the absence of any appellate mechanism to correct for such arbitrariness.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Federal Cases

Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . 168

Apprendi v. New Jersey, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . 6, 241, 242

Arizona v. Fulminante, 499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . 127, 128

Atkins v. Virginia, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Ayers v. Belmontes, 549 U.S. 7 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Barefoot v. Estelle, 463 U.S. 880 (1983).. . . . . . . . . . . . . . . . . . . . 4, 207, 208, 209

Basham v. United States, 109 F. Supp. 3d 753 (D.S.C. 2013). . . . . . . . . . . . . . 231

Bell v. Ohio, 438 U.S. 637 (1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 104

Blair v. Armontrout, 916 F.2d 1310 (8th Cir. 1990).. . . . . . . . . . . . . . . . . . . 3, 167

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . 3, 172

Boatright v. United States, 105 F.2d 737 (8th Cir. 1939). . . . . . . . . . . . . . . . . 152

Bobby v. Bies, 556 U.S. 825 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Brewer v. Quarterman, 550 U.S. 286 (2007).. . . . . . . . . . . . . . . . . . . . . . . . 2, 104

Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . 168

Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 97

Brumfield v. Cain, 135 S. Ct. 2269 (2015). . . . . . . . . . . . . . . . . . 1, 65, 71, 73, 75,
78, 79

Buchanan v. Kentucky, 483 U.S. 402 (1987). . . . . . . . . . . . . 2, 118, 119, 120, 121

Caldwell v. Mississippi, 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . 180, 181

California v. Brown, 479 U.S. 538 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985). . . . . . . . . . . . 74

Clark v. Arizona, 548 U.S. 735 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Collins v. Auger, 577 F.2d 1107 (8th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . 136

Concrete Pipe and Products v. Construc. Laborers Pension Trust,
    508 U.S. 602. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 212

Cordova v. Collins, 953 F.2d 167 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . 104

Crawford v. Washington, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . 194, 196

Crosby v. United States, 506 U.S. 255 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 185

Darden v. Wainwright, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Davis v. Washington, 547 U.S. 813 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Delo v. Lashley, 507 U.S. 272 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Diaz v. United States, 223 U.S. 442 (1912). . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

Doyle v. Ohio, 426 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 95

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 172

Edwards v. Scroggy, 849 F.2d 204 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . 168

Estelle v. Smith, 451 U.S. 454 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117, 124

Evans v. Muncy, 498 U.S. 927 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 213

Furman v. Georgia, 408 U.S. 238 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Gardner v. Florida, 430 U.S. 349 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Gibbs v. Frank, 387 F.3d 268 (3d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 121

Glossip v. Gross, 135 S. Ct. 2726 (2015). . . . . . . . . . . . . . . . . . . . . . . . 247, 248

Godfrey v. Georgia, 446 U.S. 420 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 200

Goode v. Branker, 2009 WL 8545584 (E.D.N.C. Oct. 21, 2009). . . . . . . . . . . . 144

Green v. Georgia, 442 U.S. 95 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Greenway v. Schriro, 653 F.3d 790 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 70

Gregg v. Georgia, 428 U.S. 153 (1976). . . . . . . . . . . . . . . . . . . . . . . . . 6, 246, 260

Hall v. Florida, 134 S. Ct. 1986 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Harrison v. United States, 392 U.S. 219 (1968). . . . . . . . . . . . . . . . . . . . . . . . 197

Hitchcock v. Dugger, 481 U.S. 393 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . 2, 104

Hurst v. Florida, 136 S. Ct. 616 (2016). . . . . . . . . . . . . . . . . . 6, 66, 196, 241, 242

Irvin v. Dowd, 366 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 228

Jackson v. Norris, 615 F.3d 959 (8th Cir. 2010). . . . . . . . . . . . . . . 65, 66, 78, 79, 85

Johnson v. Mississippi, 486 U.S. 578 (1988). . . . . . . . . . . . . . . . . . 3, 97, 137, 171

Johnson v. United States, 860 F. Supp. 2d 663 (N.D. Iowa 2012). . . . . . . . . . . . 231

Jones v. United States, 527 U.S. 373 (1999). . . . . . . . . . . . . . . . . 204, 205, 249, 261

Jurek v. Texas, 428 U.S. 262 (1976). . . . . . . . . . . . . . . . . . . . . 4, 174, 208, 209, 261

Kansas v. Carr, 136 S. Ct. 633 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233, 234

Kansas v. Cheever, 134 S. Ct. 596 (2013). . . . . . . . . . . . . . . . 2, 118, 119, 120, 124

Kentucky v. Stincer, 482 U.S. 730 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

Larson v. Tansy, 911 F.2d 392 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . 188

Littlejohn v. Trammel, 704 F.3d 817 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . 105

Long v. Butler, 809 F.3d 299 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . 138

Lott v. Colvin, 772 F.3d 546 (8th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Mathews v. United States, 485 U.S. 58 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 155

McCleskey v. Kemp, 481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . 6, 246, 247

McDonnell v. United States, 455 F.2d 91 (8th Cir. 1972). . . . . . . . . . . . . . . 2, 135

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). . . . . . . . . . . . . . . . . . . 194

Miller v. Alabama, 132 S. Ct. 2455 (2012). . . . . . . . . . . . . . . . . . . . . . . . . 88, 213

Miller v. Lockhart, 65 F.3d 676 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 168

Mills v. Maryland, 486 U.S. 367 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Mitchell v. United States, 526 U.S. 314 (1999). . . . . . . . . . . . . . . . . . . . . . . . . 117

Mitchell v. United States, 2010 WL 3895691 (D. Ariz.
    Sept. 30, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

Montgomery v. Louisiana, 136 S. Ct. 718 (2016). . . . . . . . . . . . . . . . . . . . . . . . 213

Moore v. Texas, 136 S. Ct. 2407 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Morgan v. Illinois, 504 U.S. 719 (1992). . . . . . . . . . . . . . . . 224, 225, 226, 227, 231

Mu'Min v. Virginia, 500 U.S. 415 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Muhammad v. Secretary, Fla. Dept. of Corr., 733 F.3d 1065 (11th Cir. 2013). . 195

Ohio v. Clark, 135 S. Ct. 2173 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Ortiz v. United States, 664 F.3d 1151 (8th Cir. 2011). . . . . . . . . . . . . . . . . 65, 81

Parker v. Dugger, 498 U.S. 308 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Penry v. Lynaugh, 487 U.S. 1233 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Penry v. Lynaugh, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 83, 103

Pope. v. United States, 372 F.2d 710 (8th Cir. 1967). . . . . . . . . . . . . . . . . . . . 123

Powell v. Texas, 492 U.S. 680 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Proffitt v. Florida, 428 U.S. 242 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir. 1982). . . . . . . . . . . . . . . . . . 195

Pulley v. Harris, 465 U.S. 37 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260, 261

Quercia v. United States, 289 U.S. 466 (1933). . . . . . . . . . . . . . . . . . . . . . . 3, 151

Ring v. Arizona, 536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . 6, 155, 196, 241, 242

Rita v. United States, 551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

Robertson v. Cockrell, 325 F.3d 243 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . 104

Rogers v. United States, 422 U.S. 35 (1975). . . . . . . . . . . . . . . . . . . . . . 3, 185, 186

Roper v. Simmons, 543 U.S. 551 (2005). . . . . . . . . . . . . . . . . . . . . . . 89, 177, 253

Rosales-Lopez v. United States, 451 U.S. 182 (1981). . . . . . . . . . . . . . 5, 225, 231

Sampson v. United States, 724 F.3d 150 (1st Cir. 2013). . . . . . . . . . . . . . . . 5, 220

Sasser v. Hobbs, 735 F.3d 833 (8th Cir. 2013). . . . . . . . . . . . . . . . 1, 64, 73, 74, 75

Sasser v. Norris, 553 F.3d 1121 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . 65, 66, 73

Satterwhite v. Texas, 486 U.S. 249 (1988). . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . 171, 209

Simpson v. Norris, 490 F.3d 1029 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 65

Skaggs v. Otis Elevator Co., 164 F.3d 511 (10th Cir. 1998).. . . . . . . . . . . . . 5, 220

Skipper v. South Carolina, 476 U.S. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 156

Smith v. Ryan, 813 F.3d 1175 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . 92

Smith v. Ryan, ___ F.3d ___, 2016 WL 3034147 (9th Cir. May 26, 2016). . . . . 195

Starr v. United States, 153 U.S. 614 (1894). . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Sumner v. Shuman, 483 U.S. 66 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Szabo v. Walls, 313 F.3d 392 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 195

Tennard v. Dretke, 542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . . . . . . . 2, 103, 104

Tennessee Protection & Advocacy, Inc. v. Wells, 371 F.3d 342
    (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85

Tison v. Arizona, 481 U.S. 137 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

Tucker v. Kemp, 762 F.2d 1496 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . 3, 175

Tucker v. Louisiana, 136 S. Ct. 1801 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . 248

Turner v. Bowen, 856 F.2d 695 (4th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 84

<u>Turner v. Murray</u>, 476 U.S. 28 (1986).. . . . . . . . . . . . . . . . . . . . . . 129, 226, 227

<u>Union Pac. R. v. U.S. Dep't of Homeland Sec.</u>, 738 F.3d 885 (8th Cir. 2013). . . 91

<u>United Paperworkers Int'l Union v. Champion Int'l Corp.</u>, 81 F.3d 798
   (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

<u>United States v. Aguayo-Delgado</u>, 220 F.3d 926 (8th Cir. 2000). . . . . . . . . . . 241

<u>United States v. Allen</u>, 247 F.3d 741 (8th Cir. 2001). . . . . . . . . . . . . . . . . . 213

<u>United States v. Anderson</u>, 783 F.3d 727 (8th Cir. 2015). . . . . . . . . . . . . . . . 262

<u>United States v. Aquart</u>, 2010 WL 3211074 (D. Conn. Aug. 13, 2010).. 5, 232, 233

<u>United States v. Baker</u>, 432 F.3d 1189 (11th Cir. 2005). . . . . . . . . . . . . . . . . 262

<u>United States v. Barnette</u>, 2010 WL 2085312 (W.D.N.C. May 20, 2010) .. . . . . 231

<u>United States v. Barnette</u>, 211 F.3d 803 (4th Cir. 2000). . . . . . . . . . . . . . . . . 128

<u>United States v. Bear Runner</u>, 502 F.2d 908 (8th Cir. 1974). . . . . . . . . . . . . 5, 225

<u>United States v. Beyle</u>, 782 F.3d 159 (4th Cir. 2015). . . . . . . . . . . . . . . . . . . 257

<u>United States v. Bodkins</u>, 2005 WL 1118158 (W.D. Va. 2005). . . . . . . . . . . . . 195

<u>United States v. Bordeaux</u>, 400 F.3d 548 (8th Cir. 2005). . . . . . . . . . . . . . . . 187

<u>United States v. Brandom</u>, 479 F.2d 830 (8th Cir. 1973). . . . . . . . . . . . . . . . 3, 152

<u>United States v. Byers</u>, 740 F.2d 1104 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . 118

<u>United States v. Campbell</u>, 764 F.3d 880 (8th Cir. 2014). . . . . . . . . . 135, 167, 200

<u>United States v. Candelario-Santana</u>, 916 F. Supp. 2d 191 (D.P.R. 2013). . . . . . 66

<u>United States v. Caro</u>, 597 F.3d 608 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . 175

United States v. Carter, 528 F.2d 844 (8th Cir. 1975).. . . . . . . . . . . . . . . . . . 3, 151

United States v. Cassel, 668 F.2d 969 (8th Cir. 1982). . . . . . . . . . . . 224, 225, 226

United States v. Catalan-Roman, 376 F. Supp. 2d 96
   (D.P.R. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 233, 234, 237, 239

United States v. Concepcion Sablan, 555 F. Supp. 2d 1205
   (D. Colo. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 194

United States v. Cunningham, 694 F.3d 372 (3d Cir. 2012).. . . . . . . . . . . . . . 202

United States v. Dale, 614 F.3d 942 (8th Cir. 2010).. . . . . . . . . . . . . . . . . . . 190

United States v. Davis, 611 F. Supp. 2d 472 (D. Md. 2009).. . . . . . . . . . . . 66, 77

United States v. Dunmore, 446 F.2d 1214 (8th Cir. 1971). . . . . . . . . . . . . . 3, 152

United States v. Ebron, 683 F.3d 105 (5th Cir. 2012).. . . . . . . . . . . . . . . . . . 231

United States v. Fell, 2014 WL 3697810
   (D. Vt. July 24, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 218, 219, 220 231

United States v. Fields, 483 F.3d 313 (5th Cir. 2007).. . . . . . 4, 137, 171, 189, 194,
                                                               195, 197

United States v. Fields, 516 F.3d 923 (10th Cir. 2008).. . . . . . . . . . . . . . . . . 208

United States v. Fontanez, 878 F.2d 33 (2d Cir. 1989).. . . . . . . . . . . . . . . . . 188

United States v. Frazier, 408 F.3d 1102 (8th Cir. 2005). . . . . . . . . . . . . . 95, 122

United States v. Gagnon, 470 U.S. 522 (1985).. . . . . . . . . . . . . . . . . . 187, 188

United States v. Hammer, 25 F. Supp. 2d 518 (M.D. Pa. 1998). . . . . . . . . . . . 204

United States v. Hardy, 644 F. Supp. 2d 749 (E.D. La. 2008). . . . . . . . . . . . . . 66

United States v. Hardy, 762 F. Supp. 2d 849 (E.D. La. 2010). . . . . . . . . . . . . 74, 77

United States v. Henderson, 442 F. Supp. 2d 159 (S.D.N.Y. 2006). . . . . 6, 232, 233

United States v. Jeremiah, 446 F.3d 805 (8th Cir. 2006). . . . . . . . . . . . . . 248, 260

United States v. Jiménez-Benceví, 934 F. Supp. 2d 360 (D.P.R. 2013). . . . . . . . . 66

United States v. Johnson, 223 F.3d 665 (7th Cir. 2000). . . . . . . . . . . . . . . 155, 156

United States v. Johnson, 378 F. Supp. 2d 1051 (N.D. Iowa 2005). . . . . . . . . . 195

United States v. Johnson, 383 F. Supp. 2d 1145 (D. Iowa 2005). . . . . . . . . . . . 122

United States v. Johnson, 495 F.3d 951 (8th Cir. 2007). . . . . . . . . . . . . . . . . . 189

United States v. Jones, 722 F.2d 528 (9th Cir. 1983). . . . . . . . . . . . . . . . . . 5, 223

United States v. Jordan, 357 F. Supp. 2d 889 (E.D. Va. 2005). . . . . . . . . . . . . . 195

United States v. Koskela, 86 F.3d 122 (8th Cir. 1996). . . . . . . . . . . . . . . . . 3, 185

United States v. Lee, 274 F.3d 485 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . 234

United States v. Martin, 740 F.2d 1352 (6th Cir. 1984). . . . . . . . . . . . . . . . . . 153

United States v. Martin, 777 F.3d 984 (8th Cir. 2015). . . . . . . . . . . . . . . . 185, 186

United States v. Martinez, 277 F.3d 517 (4th Cir. 2002). . . . . . . . . . . . . . . . . . 262

United States v. Mason, 982 F.2d 325 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . 232

United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996). . . . . . . . . . . 4, 105, 204

United States v. Mesteth, 528 F.2d 333 (8th Cir. 1976). . . . . . . . . . . . . . . 185, 186

United States v. Mills, 446 F. Supp. 2d 1115 (C.D. Cal. 2006). . . . 4, 189, 193, 194

United States v. Montgomery, 635 F.3d 1074 (8th Cir. 2011). . . . . . . . . . . . . . . 135

United States v. Montgomery, 2014 WL 1516147
   (W.D. Tenn. Jan. 28, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

United States v. Moussaoui, 591 F.3d 263 (4th Cir. 2010). . . . . . . . . . . . . . . . . 257

United States v. Mundy, 539 F.3d 154 (2d Cir. 2008. . . . . . . . . . . . . . . . 150, 153

United States v. Nelson, 347 F.3d 701 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . 225

United States v. Nelson, 570 F.2d 258 (8th Cir. 1978). . . . . . . . . . . . . . 3, 185, 186

United States v. Neumann, 887 F.2d 880 (8th Cir. 1989). . . . . . . . . . . . . . . . . . 151

United States v. O'Driscoll, 2003 WL 1402091 (M.D. Pa. Mar. 7, 2003). . . . . . 231

United States v. O'Neill, 767 F.2d 780 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . 217

United States v. O'Reilly, 2010 WL 653188 (E.D. Mich. Feb. 19, 2010). . . . . . 120

United States v. Olano, 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . 97, 144, 181

United States v. Ortiz, 315 F.3d 873 (8th Cir. 2002). . . . . . . . . . . . . . . . 5, 228, 234

United States v. Peoples, 250 F.3d 630 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . 136

United States v. Pepper, 570 F.3d 958 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . 167

United States v. Portman, 599 F.3d 633 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . 177

United States v. Purkey, 428 F.3d 738 (8th Cir. 2005). . . . . . . . . 203, 205, 207, 241

United States v. Ramos-Caraballo, 375 F.3d 797 (8th Cir. 2004). . . . . . . . . . . . 202

United States v. Regan, 221 F. Supp. 2d 661 (E.D. Va. 2002). . . . . . . . . . . . . . 257

United States v. Reifsteck, 535 F.2d 1030 (8th Cir. 1976). . . . . . . . . . . . . . . 2, 121

United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009). . . . . . . . . . . . . . 173, 231

United States v. Sablan, 2014 WL 7335210 (E.D. Cal. Dec. 19, 2014). . . . . . . 215

United States v. Salad, 959 F. Supp. 2d 865 (E.D. Va. 2013). . . . . . . . . . . . . 66, 77

United States v. Sales, 25 F.3d 709 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . 241

United States v. Sampson, 486 F.3d 13 (1st Cir. 2007). . . . . . . . . . . . . . . . . 247

United States v. Sampson, 820 F. Supp. 2d 151 (D. Mass. 2011). . . . . . . . . . . 231

United States v. Sampson, 335 F. Supp 2d. 166 (D. Mass. 2004). . . . . . . . . . . 200

United States v. Sinisterra, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . 180

United States v. Slagg, 651 F.3d 832 (8th Cir. 2011). . . . . . . . . . . . . . . . . . . 155

United States v. Stabler, 490 F.2d 345 (8th Cir. 1974). . . . . . . . . . . . . . . . . 2, 135

United States v. Stitt, 552 F.3d 345 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 81

United States v. Stitt, 760 F. Supp. 2d 570 (E.D. Va. 2010). . . . . . . . . . . . . . 4, 195

United States v. Taylor, 293 F. Supp. 2d 884 (N.D. Ind. 2003). . . . . . . . 5, 232, 233

United States v. Taylor, 320 F. Supp. 2d 790 (N.D. Ind. 2004). . . . . . . . . . . . 119

United States v. Taylor, 814 F.3d 340 (6th Cir. 2016). . . . . . . . . . . . . . . . . . . 159

United States v. Tipton, 90 F.3d 861 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . 204

United States v. Treatman, 524 F.2d 320 (8th Cir. 1975). . . . . . . . . . . . . . . . . 185

United States v. Troya, 733 F.3d 1125 (11th Cir. 2013). . . . . . . . . . . . . . . . . . 120

United States v. Umana, 750 F.3d 320 (4th Cir. 2014). . . . . . . . . . . . . . . . 194, 195

United States v. Umana, 762 F.3d 413 (4th Cir. 2013). . . . . . . . . . . . . . . 4, 189, 194

United States v. Umana, 2010 WL 1052271 (W.D.N.C. Mar. 19, 2010). . . . . . . 66

United States v. Varsalona, 710 F.2d 418 (8th Cir. 1983). . . . . . . . . . . . . . . 4, 202

United States v. Walker, 1 F.3d 423 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . 202

United States v. Warman, 578 F.3d 320 (6th Cir. 2009). . . . . . . . . . . . . . . . . 262

United States v. Watts, 553 F.3d 603 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . 244

United States v. Watson, 2007 WL 4591860 (E.D. Mich. Dec. 28, 2007). . . . . . 204

United States v. Williams, 1 F. Supp. 3d 1124 (D. Haw. 2014). . . . . . . . . . . . . 66

United States v. Williams, 2013 WL 4518215 (D. Haw. Aug. 26, 2013). . . . . . . 143

United States v. Williams, 731 F. Supp. 2d 1012
    (D. Haw. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 120

United States v. Wilson, 922 F. Supp. 2d 334 (E.D.N.Y. 2013). . . . . . . . . . . . . 66

United States v. Wilson, ___ F. Supp. 2d ___, 2016 WL 1060245
    (E.D.N.Y. Mar. 15, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Wright, 536 F.3d 819 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . 225

United States v. Young, 613 F.3d 735 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . 145

United States. v. Harris-Thompson, 751 F.3d 590 (8th Cir. 2014). . . . . . . . . . . 151

Van Tran v. Colson, 764 F.3d 594 (6th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . 80

Wade v. United States, 441 F.2d 1046 (D.C. Cir. 1971). . . . . . . . . . . . . . . . . . 188

Wainwright v. Greenfield, 474 U.S. 284 (1986). . . . . . . . . . . . . . . . . . . . . . . 2, 95

Walton v. Arizona, 497 U.S. 639 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Wiggins v. Smith, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Williams v. New York, 337 U.S. 241 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . 197, 249

Zant v. Stephens, 462 U.S. 862 (1983). . . . . . . . . . . . . . . . . . . . . . . 3, 176, 179, 245

**State Cases**

Coble v. State, 330 S.W.3d 253 (Tex. Cr. App. 2010). . . . . . . . . . . . . . . . . . . . . 211

Commonwealth v. Vandivner, 962 A.2d 1170 (Pa. 2009). . . . . . . . . . . . . . . 87, 90

Commonwealth v. Duffey, 855 A.2d 764 (Pa. 2004). . . . . . . . . . . . . . . . . . . . 2, 96

Evans v. State, 808 So. 2d 92 (Fla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Ex parte Van Alstyne, 239 S.W.3d 815 (Tex. Cr. App. 2007). . . . . . . . . . . . . . . 75

Grandison v. State, 670 A.2d 398 (Md. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 195

Johnson v. State, 132 So. 3d 616 (Miss. App. 2013). . . . . . . . . . . . . . . . . . . . . 229

Lewis v. State, 970 P.2d 1158 (Okl. Cr. App. 1998). . . . . . . . . . . . . . . . . . . . . . 121

Miller v. State, 373 So. 2d 882 (Fla. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Oats v. State, 181 So. 3d 457 (Fla. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Pitchford v. State, 45 So. 3d 216 (Miss. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 195

Rodgers v. State, 948 So. 2d 655 (Fla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 195

Russeau v. State, 171 S.W.3d 871 (Tex. Cr. App. 2005). . . . . . . . . . . . . . . . . . 195

Shepard v. Bowe, 442 P.2d 238 (Or. 1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Smith v. State, 357 S.W.3d 322 (Tenn. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . 75

State ex rel. Clayton v. Griffith, 457 S.W. 3d 735 (Mo. 2015). . . . . . . . . . . . . 86, 91

State v. Anderson, 996 So. 2d 973 (La. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . 87, 91

State v. Bell, 603 S.E.2d 93 (N.C. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

State v. Bush, 442 S.E.2d 437 (W. Va. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 121

State v. Carr, 331 P.3d 544 (Kan. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 195, 239

State v. Carter, 813 N.E. 2d 78 (Ohio. App. 2004). . . . . . . . . . . . . . . . . . . . . . . 75

State v. Fukusaku, 946 P.2d 32 (Haw. 1997). . . . . . . . . . . . . . . . . . . . . . . . 2, 143

State v. Moody, 573 A.2d 716 (Conn. 1990). . . . . . . . . . . . . . . . . . . . . . . . 2, 143

State v. Steele, 921 So. 2d 538 (Fla. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

State v. Strode, 217 P.3d 310 (Wash. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 229

State v. Strode, 232 S.W.3d 1 (Tenn. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Tarver v. State, 940 So. 2d 312 (Ala. Cr. App. 2004). . . . . . . . . . . . . . . . . . . . . 75

**Federal Constitution, Statutes, Rules, Regulations
and Legislative Material**

U.S. Const. amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

18 U.S.C. § 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

18 U.S.C. § 1114. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248, 260

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 157, 212, 250

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . i, 130, 146, 147, 155, 157,
171, 199, 241, 249

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3596. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 63, 65, 66, 81

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82, 83

28 U.S.C. § 1254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 15002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Fed. R. App. P. 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Fed. R. Crim. P. 12.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Fed. R. Crim. P. 52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 144, 181

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

20 C.F.R., Pt. 404, Subpt. P, app. 1, § 12.05 (1986). . . . . . . . . . . . . . . . . . 84

28 C.F.R., Pt. 541, Subpt. D, § 541.40-50. . . . . . . . . . . . . . . . . . . . . . . . . . . 172, 173

134 Cong. Rec. H7259-02, 1988 WL 175612 (Sept. 8, 1988). . . . . . . . . . 82, 83, 89

50 Fed. Reg. 35038 (Aug. 28, 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

**State Statutes**

Colo. Rev. Stat. Ann. § 18-1.3-1101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Fla. Stat. § 775.082. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

Ga. Code Ann. § 17-7-131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83, 86

Ind. Code Ann. § 35-36-9-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Ky. Stat. Ann. § 532.130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Md. Code Crim. L. Ann. § 2-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

N.M. Stat. Ann. § 31-20A-2.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Neb. Rev. Stat. § 28-105.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Nev. Rev. Stat. Ann. § 174.098. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

S.C. Code Ann. § 16-3-20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Utah Code Ann. § 77-15a-102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Wyo. Stat. Ann. § 8-1-102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**Miscellaneous**

AAIDD, <u>The Death Penalty and Intellectual Disability</u>, (Polloway ed. 2015). . . . 87

AAIDD, <u>Intellectual Disability: Definition, Classification, and
Systems of Supports</u>, (11th ed. 2010). . . . . . . . . . . . . . . . . . . . . 63, 74, 78, 81, 87

ABA, Recommendation and Report on the Death Penalty and Persons with
    Mental Disabilities, 30 Ment. & Phys. Disab. L. Rep. 668 (2006). . . . . . . . . . . 92

APA, Diagnostic and Statistical Manual of Mental Disorders
    (DSM-5) (5th ed. 2013). . . . . . . . . . . . . . . . 63, 72, 73, 74, 75, 78, 79, 86, 87, 88

APA, Manual of Diagnosis and Professional Practice in Mental
    Retardation (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Binelli, Inside America's Toughest Federal Prison, New York Times
    (Mar. 26, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Blacks Law Dictionary, (10th Ed. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

Blume, Garvey & Johnson, Future Dangerousness in Capital
    Cases: Always "At Issue," 86 Cornell L. Rev. 397 (2001). . . . . . . . . . . . . . . . 157

Brooks, Guilty By Reason of Insanity: Why a Maligned Defense
    Demands a Constitutional Right of Inquiry on Voir Dire,
    20 Geo. Mason L. Rev. 1183 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Carter, A Practice-Oriented Guide to Complex Death Penalty Litigation,
    (Mar. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

Congressional Research Service, Capital Punishment: An Overview of
    Federal Death Penalty Statutes, (Jan. 5, 2005). . . . . . . . . . . . . . . . . . . . . . . . 250

Constanzo & Constanzo, Jury Decision Making in the Capital Penalty Phase,
    16 Law & Hum. Behav. 185 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Criminal Pattern Jury Instructions, Tenth Circuit. . . . . . . . . . . . . . . . . . . . . . . . . 205

Cunningham, Reidy & Sorensen, Assertions of "Future Dangerousness"
    at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison
    Misconduct and Violence, 32 Law and Hum. Behav. 46 (2008). . . . . . . 209, 210

Cunningham, Sorensen & Reidy, <u>Capital Jury Decision-Making:</u>
   <u>The Limitations of Predictions of Future Violence</u>, 15 Psychol., Pub.
   Policy & L. 223 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157, 158, 159, 210

<u>Death Penalty Information Center Website</u>, www.dpic.org. . . . . . . . . . . . 251, 252

Douglass, <u>Confronting Death: Sixth Amendment Rights at</u>
   <u>Capital Sentencing</u>, 105 Colum. L. Rev. 1967 (2005). . . . . . . . . . . . . . . . . . 189

Ellis & Luckasson, <u>Mentally Retarded Criminal Defendants</u>,
   53 Geo. Wash.L. Rev. 414 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Federal Bureau of Prisons, <u>BOP Director Names Warden for AUSP Thomson</u>,
   (Aug. 28, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

<u>Federal Death Penalty Resource Counsel Website</u>,
   www.capdefnet.org\fdprc. . . .   159, 227, 232, 234, 251, 254, 255, 256, 258, 259

Federal Judicial Center, <u>Benchbook for United States District</u>
   <u>Court Judges</u> (6th ed. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

<u>Jurywork Systematic Techniques</u> (Nov. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Kamin & Marceau, <u>Waking the *Furman* Giant</u>, 48 U.C. Davis L. Rev.
   981 (Feb. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

Little, <u>The Federal Death Penalty: A History and Some Thoughts About</u>
   <u>the Department of Justice's Role</u>, 26 Ford. Urb. L.J. 347 (1999). . . . . . . . . . . 250

Miller v. Alabama, *Amicus* Brief of American Psychological Association,
   2012 WL 174239 (Jan. 17, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Mize, <u>On Better Jury Selection: Spotting UFO Jurors Before They Enter</u>
   <u>the Jury Room</u>, Am. Judges' Ass'n, 5 Court Review 10 (Spring 1999). . . . . . 228

<u>Model Death Penalty Jury Instructions</u>, Eighth Circuit. . . . . . . . . . . . . . . . 153, 155

Mulroy, <u>Execution by Accident: Evidentiary and Constitutional
Problems with the "Childhood Onset" Requirement in *Atkins* Claims</u>,
37 Vt. L. Rev. 591 (Spring 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 85, 90, 91, 92

Nietzel & Dillehay, <u>The Effects of Variations in Voir Dire Procedures in
Capital Murder Trials</u>, 6 Law & Hum. Behav. 1 (1982). . . . . . . . . . . . . . . . . 228

Penry v. Lynaugh, Petition for Writ of Certiorari, 1987 WL 955346
(Dec. 30, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Requarth, <u>Neuroscience is Changing the Debate Over What Role
Age Should Play in the Courts</u>, Newsweek (Apr. 18, 2016). . . . . . . . . . . . . . . . 88

Springfield-Greene County Library District, <u>Historical Postcards of
Springfield, Missouri</u>, www.thelibrary.org . . . . . . . . . . . . . . . . . . . . . . . . . . 215

<u>United States Attorneys' Criminal Resource Manual</u> (2011). . . . . . . . . . . . . . . . 250

United States Government Accountability Office, <u>Bureau of Prisons:
Management of New Prison Activations Can Be Improved</u> (Aug. 2014). . . . . 166

Weinstein, <u>The Power and Duty of Federal Judges to Marshall and
Comment on the Evidence in Jury Trials and Some Suggestions on
Charging Juries</u>, 118 F.R.D. 161 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 150, 151

Weis, <u>Federal judge who regrets murder sentence backs legislation to
allow 'second-look review'</u>, ABA Journal (Jan. 25, 2016). . . . . . . . . . . . . . . 213

World Atlas, <u>Murder Capital of the U.S.</u> (2015). . . . . . . . . . . . . . . . . . . . . . . . . 257

Wright *et al.*, 21A <u>Fed. Prac. & Proc. Evid.</u> (2d ed. 2012). . . . . . . . . . . . . . . . . 150

# JURISDICTIONAL STATEMENT

Coonce appeals from a judgment of conviction and sentence of death entered on July 18, 2014, by the United States District Court for the Western District of Missouri (Fenner, J.). (A.597 [ad.76]). He filed a timely notice of appeal on July 31, 2014. (A.605). The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. §§ 3595, 3742, and 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

## Issues Involving Coonce's Intellectual Disability and Brain Damage

1.  Did the court err by summarily denying, without an evidentiary hearing, Coonce's claim that he is intellectually disabled and thus exempt from execution, where he made a *prima facie* showing on all three prongs of his claim under federal law?

18 U.S.C. § 3596(c)
Brumfield v. Cain, 135 S. Ct. 2269 (2015)
Hall v. Florida, 134 S. Ct. 1986 (2014)
Sasser v. Hobbs, 735 F.3d 833 (8th Cir. 2013)

2.  Did the prosecutors improperly persuade sentencing jurors to dismiss Coonce's retardation-level IQ even as mitigation because he exercised his right not to speak to a pretrial competency evaluator and because there is no "blood test" for intelligence?

Doyle v. Ohio, 426 U.S. 610 (1976)

1

<u>Wainwright v. Greenfield</u>, 474 U.S. 284 (1986)
<u>Commonwealth v. Duffey</u>, 855 A.2d 764 (Pa. 2004)

3.      Did the prosecutors improperly persuade sentencing jurors to dismiss

Coonce's traumatic brain damage as mitigation because he was at fault for the car

crash where he sustained it?

<u>Tennard v. Dretke</u>, 542 U.S. 274 (2004)
<u>Brewer v. Quarterman</u>, 550 U.S. 286 (2007)
<u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987)
<u>Bell v. Ohio</u>, 438 U.S. 637 (1978)

**Issues Involving Coonce's Lesser Role in the Offense**

4.      Did the court violate Coonce's Fifth Amendment privilege against

self-incrimination by authorizing a prosecution psychiatrist to interrogate him

about his conduct during the crime and then present his confession to support the

government's case for a death sentence?

<u>Kansas v. Cheever</u>, 134 S. Ct. 596 (2013)
<u>Buchanan v. Kentucky</u>, 483 U.S. 402 (1987)
<u>United States v. Reifsteck</u>, 535 F.2d 1030 (8th Cir. 1976)
Federal Rule of Criminal Procedure 12.2

5.      Did the court admit unreliable, misleading testimony about footwear

comparisons and blood testing that bore on Coonce's role in the crime?

<u>United States v. Stabler</u>, 490 F.2d 345 (8th Cir. 1974)
<u>McDonnell v. United States</u>, 455 F.2d 91 (8th Cir. 1972)
<u>State v. Moody</u>, 573 A.2d 716 (Conn. 1990)
<u>State v. Fukusaku</u>, 946 P.2d 32 (Haw. 1997)

## Issues Involving the Aggravating Factor of
## Future Violence in Federal Prison

6.      Did the court unfairly skew in favor of the government the jury

instructions on whether Coonce would probably engage in future violence in

federal prison?

Quercia v. United States, 289 U.S. 466 (1933)
United States v. Carter, 528 F.2d 844 (8th Cir. 1975)
United States v. Brandom, 479 F.2d 830 (8th Cir. 1973)
United States v. Dunmore, 446 F.2d 1214 (8th Cir. 1971)

7.      Was the government's sentencing presentation on whether the BOP

could safely manage Coonce in the future tainted by various misleading and

inadmissible evidence and arguments?

Johnson v. Mississippi, 486 U.S. 578 (1988)
Zant v. Stephens, 462 U.S. 862 (1983)
Blair v. Armontrout, 916 F.2d 1310 (8th Cir. 1990)
Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006)
Tucker v. Kemp, 762 F.2d 1496 (11th Cir. 1985) (*en banc*)

8.      By removing Coonce from the courtroom and delivering an

instruction suggesting that protesters outside the courthouse posed a risk to the

sentencing jurors, did the court violate Coonce's right to presence and prejudice

the jurors' perception of his dangerousness?

Rogers v. United States, 422 U.S. 35 (1975)
United States v. Nelson, 570 F.2d 258 (8th Cir. 1978)
United States v. Koskela, 86 F.3d 122 (8th Cir. 1996)

9.     Did the court violate Coonce's Sixth Amendment right to
confrontation by admitting testimonial hearsay from his BOP records accusing him
of various institutional misconduct?

United States v. Umana, 762 F.3d 413 (4th Cir. 2013) (five-judge dissent from
        denial of *en banc* review)
United States v. Fields, 483 F.3d 313 (5th Cir. 2007) (Benavides, J., dissenting in
        part)
United States v. Mills, 446 F. Supp. 2d 1115 (C.D. Cal. 2006)
United States v. Concepcion Sablan, 555 F. Supp. 2d 1205 (D. Colo. 2007)
United States v. Stitt, 760 F. Supp. 2d 570 (E.D. Va. 2010)

10.    Did the court err by allowing the government to inflame the jury with
multiple versions of a young woman's graphic account of being kidnapped and
raped by Coonce 12 years earlier, and to urge the jury to use that crime to establish
four different aggravating factors?

Godfrey v. Georgia, 446 U.S. 420 (1980)
United States v. Varsalona, 710 F.2d 418 (8th Cir. 1983)
United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996)

11.    Did the court erroneously refuse to strike the aggravating factor of
future violence in federal prison as unconstitutional, since empirical studies have
demonstrated that such predictions are unreliable, unsupported, incoherent, and
uncorrectable?

Barefoot v. Estelle, 463 U.S. 880 (1983)
Jurek v. Texas, 428 U.S. 262 (1976)
Concrete Pipe and Products v. Construc. Laborers Pension Trust, 508 U.S. 602
        (1993)

<u>Evans v. Muncy</u>, 498 U.S. 927 (1990) (Marshall, J., dissenting from denial of
    certiorari)

## Issues Involving Jury Selection

12.    Did the court err by refusing to voir dire about several areas of likely

bias critical to Coonce's case, such as whether any prospective juror had been

sexually abused or had a family member working at a correctional facility?

<u>United States v. Bear Runner</u>, 502 F.2d 908 (8th Cir. 1974)
<u>Sampson v. United States</u>, 724 F.3d 150 (1st Cir. 2013)
<u>Skaggs v. Otis Elevator Co.</u>, 164 F.3d 511 (10th Cir. 1998)
<u>United States v. Jones</u>, 722 F.2d 528 (9th Cir. 1983)

13.    By unreasonably refusing to question veniremembers privately about

their death-penalty views as is generally done in other federal capital trials, did the

court undermine Coonce's ability to seat an impartial sentencing jury?

<u>Irvin v. Dowd</u>, 366 U.S. 717 (1961)
<u>United States v. Ortiz</u>, 315 F.3d 873 (8th Cir. 2002)
<u>Rosales-Lopez v. United States</u>, 451 U.S. 182 (1981)

## Issues Involving the Jury's Sentencing Decision

14.    By departing from prevailing practice and insisting on a joint capital-

sentencing hearing, rather than a separate one for each defendant, did the court

deprive Coonce of his Fifth and Eighth Amendment rights to due process and

individualized sentencing?

<u>United States v. Taylor</u>, 293 F. Supp. 2d 884 (N.D. Ind. 2003)
<u>United States v. Aquart</u>, 2010 WL 3211074 (D. Conn. Aug. 13, 2010)

United States v. Henderson, 442 F. Supp. 2d 159 (S.D.N.Y. 2006)
United States v. Catalan-Roman, 376 F. Supp. 2d 96 (D.P.R. 2005)

15.     Did the court err by refusing to instruct jurors that the reasonable-

doubt standard governed their decision whether aggravating factors sufficiently

outweighed mitigating ones?

Hurst v. Florida, 136 S. Ct. 616 (2016)
Ring v. Arizona, 536 U.S. 584 (2002)
Apprendi v. New Jersey, 530 U.S. 466 (2000)

**Issue Involving the Constitutionality of
the Federal Death Penalty Act As Applied**

16.     Was Coonce's death sentence unconstitutionally arbitrary where the

district of his prosecution increased his chance of receiving the death penalty more

than seven-fold, and thus geography predicted the outcome more than any

aggravating consideration, including that he was convicted of a prison murder?

Furman v. Georgia, 408 U.S. 238 (1972)
Gregg v. Georgia, 428 U.S. 153 (1976) (Joint Opinion of Stewart, Powell &
        Stevens, JJ.)
Hall v. Florida, 134 S. Ct. 1986 (2014)
McCleskey v. Kemp, 481 U.S. 279 (1987)

**STATEMENT OF FACTS**

**I.     Although he shows early promise and struggles to adapt, Wesley
        Coonce's brutal childhood leaves him "absolutely broken" by age 12
        and on a "collision course" for "extremely serious" problems.**

The sentencing evidence showed that Wesley Coonce was "born into" a life

of "chaos and trauma" that "last[ed] his whole childhood" and left him "absolutely broken" by age 12. (Tr.1760, 3826). By all accounts, when very young, Wesley showed affection, spark, and hope. And he struggled to adapt to each of the many institutions and foster families through which he was cycled, from age 4 when he was committed to a psychiatric hospital. But, as one relative told jurors, given the odds, Wesley ultimately "didn't stand a chance." (Tr.3136). Even the prosecution psychiatrist agreed that the mental problems that would later contribute to his criminal conduct were substantially caused by his "abusive home" and "sad, tragic childhood." (Tr.5055-57).

The evidence of Wesley's horrendous upbringing came from numerous lay witnesses who had been close to him and his family; thousands of pages of psychological, medical, institutional and child welfare records that grimly documented his tragic descent; and several defense experts who reviewed this evidence, including a clinical social worker, a neuropsychologist, and a forensic psychiatrist.

The government for the most part accepted this account, and its own evidence largely echoed the defense's portrait. Calling Wesley's childhood "chaotic and traumatic," the prosecution psychiatrist testified that he suffered "quite awful" maternal neglect and "pervasive" abuse from both parents.

(Tr.5008).  The prosecutor acknowledged in summation that Wesley's "childhood was marked by chaos, abuse, both physical and sexual, as well as neglect and abandonment" and that he "suffered from mental and emotional impairments from a very young age."  (Tr.5252).  And all or most of the jurors found those mitigating factors, as well as that "[t]he chaotic and abusive life" he endured as a young child "increased his risk for emotional and mental disturbances in his adult life."[3] (A.551-53, 564-66 [ad.45-46, 58-59]).

A.    **Wesley is born into a chaotic, abusive, and impoverished family and, as a very young child, suffers violence, sexual abuse, and extreme isolation.**

The clinical social worker who closely examined Wesley's family aptly characterized his parents' union as "a perfect storm."  When they married, his father Wesley Coonce, Sr. ("Senior") was 21 and his mother Linda 17.  Because Senior's father espoused a bizarre religious justification for incest, Senior was molested as a child and, as a teenager, sexually abused his own sisters.  He also physically assaulted his mother and attempted suicide.  Linda, molested by her school bus driver and other men as a child, carried similar scars.  And her violent,

_____

[3] By contrast, codefendant Hall enjoyed a relatively normal family life with "every bit of love and care that anybody could have possibly given."  (Tr.1779, 4087-4133, 4311-4409, 5064-65.  See also A.576-79 [ad.70-73]: verdict form reflecting that only mitigators found for Hall were his gastrointestinal disorder and that his parents loved him).

alcoholic mother (whose other children from various men were all taken by the state) had tried to drown Linda when she was eight years old; after that, she had been sent to live with a grandmother who regularly beat her.  (Tr.3130-31, 3134-37, 3208-09, 3299-3301, 3399-3400, 3436-37, 3645-48, 3732-35; A.1192, 1298, 1593-94, 1620, 1783-86, 1843, 1846).

Problems began almost immediately after Senior and Linda were married. He was arrested for indecent exposure, and she began having sex with other men, and frequently abusing drugs and alcohol, including while pregnant with Wesley and his sister, Angela.  Senior could not hold a job, so the family relied on public assistance and moved constantly.  The couple fought all the time, often physically. And wherever they stayed, it was chaotic and stressful, with strange people coming in and out at all hours.  (Tr.2884-89, 3147-50, 3162, 3301-03, 3307, 3648-51; A.1190, 1298-99, 1595, 1619, 1702, 1704, 1764-65).

Worse, Senior engaged in sexually bizarre behavior, masturbating and putting objects into his rectum in front of the children.  He had a volcanic temper and beat Wesley almost from birth, for example once punching his two-month-old son hard in the back.  When Wesley was 3, child protective services received the first of numerous reports that the children were being hit and neglected.  But Linda managed to convince the visiting caseworker that things were O.K.  (Tr.1955-66,

3301-03, 3307, 3648-51, 3664; A.1192, 1298-99, 1595, 1619-20, 1704, 1709, 1764).

That year, Linda finally kicked Senior out and moved near her relatives in Flint, Michigan. They described Wesley then as bright, energetic, and artistic. But Linda rejected and derided him even as a toddler. She continued to drink and use drugs in the family's dirty apartment, and to party and sleep with a revolving series of men, many of whom she barely knew. She would often pass out from intoxication or urinate on the floor.[4] Sometimes Linda left Wesley with her mother, who often hit the three-year-old with a paddle or a belt, or with her brother, who abused him by picking him up by his hair. (Tr.2887-95, 2899-2901, 2907-14, 3147-50, 3418-20, 3449-51, 3464-65, 3656-61, 3907-12, 5007-09; A.1232, 1273, 1595, 1620, 1707, 1797).

At three or four, Wesley was sexually abused by a teenage neighbor; the boy forced Wesley to perform oral sex and tried to anally rape him in front of several other children. After another neighbor (to whom Wesley was close) died in a hotel fire, he started setting fires himself; as punishment, Linda burned his hand over an

---

[4] When Wesley was three or four, he swallowed some illegal drugs, possibly LSD, that had been left out, and began acting bizarrely. But Linda refused to take him to the hospital because she feared losing her public assistance. Relatives who observed Wesley afterward thought the drugs had permanently damaged his mind. (Tr.2889-94, 3149-50, 3153-61, 3164, 3657-58; A.1593).

open flame.  She also began locking him alone in the basement for long periods.

Hearing him crying and begging to be let out, his sister sometimes sneaked food

down to him.  Wesley occasionally managed to climb out the basement window;

once he was found in a neighbor's yard searching for something to eat.  He also

began acting aggressively toward his sister and animals.  (Tr.2892-95, 2899-2901,

3150, 3398-99, 3419-20, 3449-51, 3656-62, 3666, 3677, 3910-12, 5007-08;

A.1592-93, 1596, 1620, 1651-52).

> **B.** **Four-year old Wesley is sent to a psychiatric hospital and then a series of other institutions over the next six years.  In between, he is returned to his alcoholic, substance-abusing mother, who whips him with a belt, withdraws him from school, and keeps him locked in the basement.**

At age four, at the suggestion of child protective services, Wesley was sent

to an inpatient children's psychiatric hospital, the Hawthorn Center.  He was one of

the youngest patients there, and one of the smallest too —on arrival, just 37

pounds, a little over three feet tall, and described as "a cute, tiny, elfish-looking

child with longish blond hair and big eyes."  Crying, Wesley clung to his mother,

and had to be physically carried inside.  The staff found him emotionally disturbed,

anxious, and under-socialized.  In his language, gestures, and behavior, he

exhibited the classic signs of having been sexually molested.  (Tr.3358-74, 3379-

83, 3666-73, 3739; A.1242-1302, 1310-20, 1592, 1596, 1600, 1605, 1608, 1616,

11

1838, 1855).

Wesley responded positively to the therapy, structure, and attention he received at Hawthorn. He was motivated by praise, and showed a capacity for warm relationships with staff. His fire-setting stopped, his aggressiveness lessened, and he began developing some peer skills and more age-appropriate language. (Tr.3358-74, 3379-83, 3666-73; A.1242-90, 1304-20, 1604-17).

Yet the staff were frustrated in trying to involve Wesley's mother, which was crucial for such a young child. Linda repeatedly failed to attend therapy sessions or parenting classes or even return telephone calls. Nor did she follow the hospital's recommendations to enroll Wesley in a special-education preschool or herself in child-management counseling. Nonetheless, after four months, Hawthorn returned Wesley to her without considering another placement, let alone seeking to remove him from her custody. Internally, the staff acknowledged that Wesley's prognosis with his mother was poor. (Tr.2892-93, 3150-51, 3365-66, 3371, 3373-76, 3387-91, 3669-74, 3688, 3913-14; A.1260-61, 1266, 1615-17, 1838).

Wesley spent the next year and a half with Linda. Child protective services soon received another report — that she was physically abusing him and his sisters (she had recently had another child) and using her welfare money to buy drugs and

beer, and that there was violence in the home and "inappropriate sexual activity" in front of the children. Wesley's mother had removed him from school, saying she was tired of "being harassed" about his needing treatment. Not surprisingly, his behavior worsened. Again, Linda confined and isolated him inside their small, cramped apartment. Suspiciously, he suffered serious injuries there, being burned badly by a kerosene heater and crashing through a plate-glass window. Wesley escaped when he could and ran around the neighborhood; he also behaved aggressively towards his sisters and set fires. (Tr.3674-81; A.1630, 1707, 1709, 1713-14, 1722).

Finally, child protective services insisted he be re-evaluated at Hawthorn, and at age 6 he was re-admitted there. The staff saw that his earlier progress had been squandered. Now sad and depressed most of the time, Wesley cried a lot, painted all-black pictures, and kept isolated. He blamed himself, saying that he was an idiot, that he wanted to hurt or kill himself, and that he would die before he became a teenager. Wesley slept only a few hours a night, and was often found wandering outside. He acted impulsively, had dramatic mood swings and behavioral outbursts, and got along poorly with other children. Medication for ADHD did not help. (Tr.3680-89; A.1199-1241, 1303, 1620-21).

Still, with care and therapy, Wesley's aggressiveness toward other kids

decreased, and he showed warmth to the staff and feelings of remorse when he transgressed. One therapist observed that "he continues to try to conform and is disappointed by his own inability to do so." Again, the staff repeatedly implored his mother to attend family therapy, but she resisted, making excuses and showing little interest even in talking to her son on the phone. The staff held little hope that Linda would improve, and acknowledged that Wesley needed foster care or adoption; but, again, they made no effort to obtain either. (Tr.3414-15, 3680-89; A.1200-11, 1213-41, 1621, 1624).

Instead, Wesley, still just six, was transferred from the psychiatric hospital to another residential institution, the Whaley Children's Center. On intake, a psychologist noted he played with toys in self-abusive ways, admitted he hit himself when angry, and often ran his head into doors. Asked to draw his family, Wesley included only his mother and sisters because "I'm left out of this family." Confronting memories of his home life stirred up "rage and panic." He blamed himself and felt responsible for the abuse he had received. His year at Whaley followed the pattern from Hawthorn, but with less progress and more deterioration. Like many abused children, Wesley was hyperactive and engaged in risky behavior. He was soothed by bedtime stories, but during the day acted impulsively and had angry outbursts. He also engaged in inappropriate sexual play. (Tr.3406-

18, 3422-35, 3457-58; A.1632-35, 1638-39, 1642, 1648, 1838).

Meanwhile, Wesley's mother remained indifferent, uninvolved, and uncommunicative, despite continual efforts by the staff (*e.g.*, "[s]he was offered reimbursement for bus tickets, for gas money, whatever it took to get her up there, and it was still not happening . . . . she chose not to [help him]"). Wesley's psychologist was struck by the contrast with other parents, who "want[ed] their children home" and so were "making contacts," "making visits, doing whatever they can to . . . follow the program." Wesley blamed himself when his mother failed to visit or call, and his behavior worsened. (Tr.3406-18, 3422-35, 3457-58; A.1624-25, 1638-40, 1643, 1646-49, 1721, 1825-36).

His psychologist and the other Whaley staff thought that sending Wesley home carried "a high degree of risk" and were concerned for his safety. But they believed they had no choice. And so again, Wesley was returned to Linda at age eight, with no follow-up plan. (Tr.3428-29, 3452-53; A.1648, 1721, 1838).

Two months later, child protective services received yet another report. It said Linda's home was "filthy with garbage strewn throughout," and she was abusing drugs and alcohol, consorting with a neighborhood man who gave Wesley's sisters beer to drink, and leaving her son to run around at night stealing bicycles and causing damage. Linda denied the allegations and, when the

caseworker repeatedly asked to speak with Wesley, claimed he was not home. (Tr.3918, A.1717-26).

A few weeks later, Wesley was discovered by the building manager at night in the middle of the road. She initially thought he had been hit by a car; he was dirty and barely clothed, with no shirt, socks, or shoes. And he was visibly shaken, crying, and injured, with welts and bruises on his face, back, and arm. He begged the manager not to take him home, becoming hysterical at the suggestion. At first afraid to say more, he finally admitted that his mother had beaten him with a belt. The police arrived, and took him into custody. Along with child protective services, they confronted Linda, who denied abusing Wesley. This time, however, the authorities disbelieved her. They confirmed that his welt marks and abrasions had been inflicted by a belt. And they concluded that Wesley's emotional and behavioral problems owed much to Linda's abuse and neglect. (The prosecution psychiatrist here would later agree). So the agency took custody of the 8-year old boy, petitioning to terminate Linda's parental rights. Wesley would never live with his mother again.[5] (Tr.3150-51, 3214, 3459-65, 3918-20, 5135; A.1700-01, 1717-26, 1801-03, 1808, 1838).

---

[5] Wesley's sisters, Angela and Autumn, who remained with Linda, would likewise grow up damaged by their upbringing. As adults, each would bear several children, all of whom would be taken away by the state. (Tr.2919-20, 3738).

He spent the next two years institutionalized again, mostly at Christ Child House, a residential facility for abused and neglected kids. A worker there recalled Wesley as a "likeable" and "handsome little guy," whom "the staff just really loved. He was quiet most times . . . he had a sad look in his face. You could always tell he was sad." Wesley admitted wanting to hurt himself and contemplating suicide. Linda was hostile on their few calls, and he was the only child there who had no visitors. The staff explained to Wesley he would just have to accept that his mother did not want him. As state authorities prepared to terminate her parental rights (Linda, drunk, would later fail to appear at the final court hearing), they reached out to Wesley's father, then living in Texas, about taking custody, though he had barely spoken to his son in years. Sad and angry about his mother's rejection and anxious about where he would live, Wesley acted even more dangerously and impulsively, crying and climbing onto the roof, putting his fist through windows, and escaping from the facility, sometimes overnight. On one such occasion, a stranger tied him up and sodomized him. In group settings at Christ Child, he lied, stole, and sometimes threatened other children. A psychiatrist concluded that Wesley was suffering from serious depression, and that his problems were rooted in his history of molestation, abuse, and neglect, as well as his mother's rejection. (Tr.3181-3208, 3242, 3696-3702, 3718-24, 3923-31;

A.1728-29, 1731-32, 1736, 1738, 1740-41.  See also A.1838, 1848-49).

The doctor and social workers treating Wesley said he needed a highly structured setting where he could receive intensive psychiatric therapy.  Instead, state authorities inexplicably chose to ship him off to Texas to live with his father, Senior — again without considering whether this was suitable or attempting to arrange any follow-up services.  (Tr.3191-3208, 3696-3702, 3718-24, 3739-43, 3923-31; A.1728-29, 1731-32, 1736, 1738, 1740-41).

### C.    Dispatched to live with his mentally-ill, sex-offender father, 10-year old Wesley endures more physical and psychological cruelty.

Wesley, now 10, moved into the small mobile home shared by his father, Senior's wife Pebble, and their new baby.  After Linda had kicked him out seven years earlier, Senior was hospitalized for mental problems and convicted of robbery and indecent exposure, serving several years in prison.  In the Texas town where he now lived, he was known as "very crazy," "really . . . weird," with views that were "far out in left field and outer space."  Senior claimed to be an end-times prophet, went into trances, and twisted the Bible to force his wife to do bizarre things like sew her own dresses out of sackcloth.  He also continued exposing himself sexually to strangers in public, and had sex with prostitutes in his home.  When Wesley arrived, Senior cruelly disciplined him.  He made the boy sit shirtless in front of a frigid air conditioner and write or quote scripture verses for

18

hours.  And he lashed Wesley with a belt, once inflicting 75 blows.  Senior also

constantly berated and belittled his son.  Senior's wife Pebble tried to protect

Wesley, but without success.  He started running away and committing petty

crimes, like stealing bicycles and mail; once, he shot at someone with a BB gun.

Finally, Wesley drove and wrecked a neighbor's car; arrested, he begged police not

to take him home.  He had just turned 11.  (The prosecution psychiatrist agreed he

stole the car to escape his father's violence).  Sitting on a bench in juvenile court,

Pebble told Wesley there was nothing she could do to help.  He slid away from her

and began to cry.[6]  (Tr.2660-64, 3068-3073, 3229-43, 3317, 3741-42, 3935, 5135-

36; A.1728-29, 1746-52).

> **D.**    **11-year old Wesley enters the Texas juvenile system.  Shuttled
> through a dozen different state institutions and foster families, he
> receives help sporadically and too late, and his psychological
> condition and behavior deteriorate.  At age 17, he throws a rock
> at a youth detention officer and is sent to adult prison.**

Following the joyriding incident, and after about a year with Senior, Wesley

---

[6] A local psychologist who evaluated Wesley for his Texas school —
meeting him only twice and apparently reviewing none of his institutional records
— opined, from Wesley's disruptive behaviors, that he was oppositional and
manipulative; dismissed the significance of his having suffered physical and sexual
abuse, mocking the 10-year-old boy for having a "chip on his shoulder" and
"present[ing] himself as a victim"; and recommended he be disciplined more
harshly and consistently.  (Tr.2667-69; A.1566-68, 1571-74).  At sentencing, a
psychiatrist familiar with Wesley's entire history condemned that evaluation as
shoddy and misdirected.  (Tr.3931-34).

entered the Texas juvenile system at age 11.  For the next six years, he was

uprooted every few months and cycled through a series of progressively more

restrictive placements, including juvenile detention centers, youth shelters, and

state schools, as well as a few brief stints with foster families.  During that time, he

received varying psychological diagnoses, including PTSD, depression, and

conduct disorder.  He also incurred more juvenile arrests, for running away,

stealing a gun from a car, joyriding, and theft.  Confined in state institutions as a

young teen, he engaged in sexually inappropriate behavior, playing with his penis

in front of nurses and talking sexually to the staff, and was punished for destroying

property, fighting, and trying to escape.  (Tr.1943-44, 2664-67, 3094-3106, 3742-

46, 5025-27; A.1510-17, 1851-53, 1856-57).

Witnesses from one foster family who had him when he was 12, the

Schindlers, remembered Wesley as a scared, under-socialized boy, affectionate and

eager to please, who seemed to thrive with them, at least for a while.  He fit in with

their two sons, and they enjoyed sports, church groups, and family vacations

together.  But Wesley's history of profound physical and sexual abuse had left him

fearful, depressed, prone to nightmares and bed-wetting, untrusting, unable to

control his emotions, and inappropriately sexual at school and at home.  He

returned to his runaway behavior and, locked out of the home one night, punched a

glass door, seriously injuring himself, and made a threat toward his foster mother. The family reluctantly called state officials, who returned him to a juvenile institution.[7]  (Tr.3468-80, 3499-3520, 3550-89, 3820, 3938-44; A.1810-13, 1851).

 The clinical social worker who closely examined Wesley's background agreed that, when he arrived at the Schindlers, his history of trauma and institutionalization had left him "so badly broken that nothing would change him," and that he was already on a "collision course" for "extremely serious" problems to come.  (Tr.3824-27).

By the time Wesley was 16, and housed at a juvenile prison in Texas, he had begun cutting his own body, a classic behavior abused children use to manage their anxiety.  He was placed in restraints to stop him from pulling the sutures out of the wounds and banging his head against the cell door, and pepper-sprayed when he misbehaved toward others.  He swung between depression and mania, and was diagnosed with a severe mood disorder.  (Tr.3748-50, 3947-54; A.1517-18, 1558, 1560, 1563, 1853, 1857).

One night Wesley absconded with another juvenile.  During the search for

---

[7] Nonetheless, the Schindlers were touched by Wesley; they kept in contact with him through the years, and he wrote them often.  After Mrs. Schindler and her husband visited him at the Medical Center on the eve of their testimony, she told jurors they still saw in him a capacity for love and goodness, and great remorse for the conduct that had brought him to this point.  (Tr.3512-19, 3586-88, 3617).

them, he threw a rock off the roof, hitting a detention officer in the chest and mildly injuring him. Convicted of assault, Wesley was sentenced to three years incarceration, and disappeared into the adult prison system in Texas, at age 17. There, he made dozens of attempts to mutilate his body (inserting objects into his penis, cutting himself, banging his head against the wall, burning his leg, biting himself, and ripping out sutures), attempted suicide by hanging multiple times, and was diagnosed with a major depressive mental illness. (Tr.1792-1805, 2355-56, 3955-58; A.811-12, 816, 1517-18, 1547-50, 1552-55, 1687).

## II. Released into the community at age 20 with no supervision or assistance, Wesley suffers traumatic brain damage in a car crash, unsuccessfully pursues psychiatric treatment, and commits several impulsive assaults. Finally, after being free only 18 months, he kidnaps and rapes a woman, and is sent to federal prison for life.

When Coonce finished serving his three-year sentence, he was released from state prison in Texas without supervision or even a referral for any assistance, and went back to live with his father and stepmother Pebble. (Tr.3750-51, 3958-59). The family's pastor described his "emotional level" at that time as "stunted"; since he could not get over his past experiences, "he came across [as] very immature and acting out of a lot of pain." (Tr.3075).

Two months after his release, Coonce suffered a severe brain injury in a high-speed auto collision. He broke multiple bones in his face, suffered bleeding

on his brain, and was in a coma when paramedics arrived. Subsequent testing

revealed traumatic brain damage that had dropped his IQ from average into the

mentally-retarded range and caused significant impairments in attention, reasoning,

and memory. Dramatic changes in Wesley's behavior were also noticed; he

became easily confused in ordinary conversations, could not remember things, and

had even greater difficulty controlling his emotions and impulses. (Tr.2959-67,

2971, 3959-61; A.1427-54, 1576-77, 1579-83, 1818-19). See Points I-III, *post*

(discussing court's erroneous failure to order hearing on intellectual disability and

prosecutor's misconduct in persuading jury to ignore brain damage and IQ even as

mitigation).

Over the next year, Pebble and Coonce's girlfriend Ashley Stiles tried to

help him get treatment from local hospitals and mental-health clinics. He often

showed up agitated or aggressive, sometimes after cutting himself or overdosing.

Several times he was hospitalized for a day or two. But ultimately nothing came of

it, either because Coonce had difficulty following up or because, when helped to

do so, his lack of health insurance or criminal record made him ineligible for

further care. (Tr.3244-47, 3285-92, 3753-54, 3962-65, 4711-14; A.1322-43, 1345-

1424, 1579-83, 1579-83, 1585-90, 1686-87, 1858-59, 1867-68).

Soon after the car crash, Coonce's father was imprisoned again, this time for

molesting and threatening to kill a little girl who attended the family's church. Coonce and his stepmother Pebble began an incestuous sexual relationship after she got drunk one evening and began flirting with him; it lasted for a few months until their pastor intervened to stop it. (Tr.3075-80, 3247-48, 3276-78, 3310-15, 3751-52; A.1743-44, 1755-56, 1772-81. See also A.1758-62). Not long after the collision, Coonce also approached a neighborhood 13-year old girl, Heather Larson, on her front porch. He tried to get her to accompany him; when she declined, he grabbed her, tore her shirt, and allegedly tried to unbutton her pants. After she kicked him in the groin, Coonce punched her, then fled when she screamed. (Tr.1845-52, 1899-1905; A.736-41, 744-45, 785-91).

Several months later, Coonce confronted his girlfriend Ashley when he found her kissing another man just a few days after she had aborted Coonce's child. In a jealous fit, he tried to kick the man in the head and assault Ashley, threatened her, and trashed her house. (Tr.1806-10, 1813-21; A.691-712). Five months later, at Pebble's home, Coonce again got upset with Ashley and tried to hit her. When Pebble stepped between them, he shoved, choked, and punched his stepmother until she almost blacked out. After waiting two weeks, Pebble reluctantly reported the incident, saying that Coonce needed help but was violent and she feared him. Police charged Coonce with assault and issued an arrest

24

warrant.  (Tr.1852-62; A.747-62; Gov. Ex. #281).

A few days later, just after he learned of the warrant (and that he would probably be returning to prison in Texas), Coonce and his stepmother were in the parking lot of a Christian facility for troubled youth in Ft. Worth, Texas.  Pebble was trying to convince him to seek help there, but he kept telling her, "it's too late."  (Tr.3270-71).  At some point after they separated, Coonce approached a young woman, Laurel Simmons, as she was getting into her pickup truck with groceries.  He told her he had a knife, grabbed the keys, pushed her inside, and told her to start driving.  Initially he said he just wanted her truck and money, and would drop her when they left town.  But, instead, as they kept driving for the next 13 hours, several times Coonce had her remove her clothes, raped her, and made her sodomize him.  During the drive, Coonce called his stepmother on Simmons' phone, told her about the abduction, and promised not to hurt the young woman.  But he also made statements to Simmons (*e.g.*, that he had nothing to lose, that the police would never take him alive, *etc.*), which, together with the sexual assaults, left her terrified he would kill her.  Coonce told her they were going to Michigan, where his mother lived.  Eventually, in Missouri, she managed to jump out, run inside a gas station, and yell for help.  Coonce fled in her truck, and was later arrested in Michigan, near his mother's home.  He pled guilty in federal court to

kidnapping and carjacking, and was sentenced to life imprisonment. (Tr.1870, 1895-98, 1907-20, 2100-10; A.736-68, 770-80, 792-808, 819-833). <u>See also</u> Point IX, *post* (arguing that prosecution improperly presented victim's inflammatory account over and over and used it to support duplicative aggravating factors).[8]

### III. As a sex offender, Coonce is repeatedly victimized in the BOP, and cycled from one prison to another. He commits some disciplinary infractions, almost all relatively minor. He also continues to mutilate and try to kill himself, and receives frequent mental-health treatment.

Coonce entered the BOP in 2002, about eight years before Castro's killing. During that period, he was frequently threatened and attacked by other prisoners once they learned that he had committed a sex offense. At USP Florence, for example, guards found him on the floor in a pool of blood, where he had been laying for about an hour. His cellmate, an Aryan Brotherhood member, had stomped his head and face into a bloody pulp, reportedly at the gang's direction after they learned of Coonce's background. Later, in a recreation cage at USP Tucson, he was beaten up by two members of the Mexican Mafia, another prison gang, for the same reason. More often, inmates would threaten Coonce so he would have to be placed in protective custody and ultimately transferred. But at

---

[8] Among these was the statutory aggravator that Coonce had two or more convictions for attempted or inflicted serious bodily injury, the other conviction involving the rock-throwing incident when he was 17. (A.548, 561 [ad.42, 55]).

each new prison, the same pattern would repeat itself.  (Tr.2291-95, 2298-2303, 2308-13, 3968; A.1100-11, 1656-60, 1668-74, 1676-85, 1688, 1788, 1790, 1871-85).

Before Castro's killing, Coonce also received some BOP disciplinary charges, about five a year.[9]  Almost all involved relatively minor misconduct and, where they resulted in findings against Coonce, the sanctions were quite mild. Most of the infractions were for things like insolence, being out of bounds, destroying property, or disobeying orders.  Once, for example, Coonce cursed at a guard who confiscated some stamps from him.  Other times he would get angry at a guard and try to spit or throw something through his cell door's food slot.  Some of the disciplinary charges were for inappropriate sexual behavior, like making lewd remarks or gestures to women staffers walking by his cell, masturbating in front of them, and once grabbing at a female officer's breast.  A handful involved conflicts with fellow inmates, usually minor scuffles or quick brawls in which no one was seriously hurt and it was unclear who started it or why.  And finally, a surprising number of the disciplinaries stemmed from attempting to harm *himself*. (Tr.2111-2162, 2173-2219, 2431-2448, 5034-35; A.885-1174, 1522).  See also

---

[9] In Point IX, *post,* Coonce argues that the court violated his confrontation rights by allowing the government to prove these acts with BOP records containing testimonial (sometimes double or even triple) hearsay.

Point IX, *post*.

The constant threats Coonce faced in the BOP, combined with the damaging effects of his childhood trauma and brain damage, made him increasingly anxious, fearful, hyper-reactive, and impulsive, and exacerbated his depression and mood swings. They also spurred him to more frequent and serious self-mutilation and suicidal behavior. For example, a guard once found him lying in a pool of his own blood, unresponsive and barely breathing, having slashed his wrists with a razor blade. (He left a suicide note apologizing to his family, saying he loved them, and expressing regret for his "very sick and serious mistake" in sexually assaulting Simmons). Like some earlier evaluators in Texas, several BOP psychologists found him to be suffering from a major mental illness, such as bipolar or depressive disorder.[10] A few months before his emergency transfer to the Medical Center (because he was repeatedly cutting his wrists), another psychologist attributed his problems to his "fear . . . that there is no safe place for him." At Springfield, Coonce told evaluators that if he ever thought he might be transferred back to an "unsafe" location like a USP, he would kill himself rather than face

_____

[10] Prosecution psychiatrist Dietz acknowledged Coonce's long history of serious self-mutilation and suicide attempts, but believed it largely reflected efforts to manipulate others. (Tr.5038-43). Dietz diagnosed Coonce as suffering from borderline and anti-social personality disorder. (Tr.5028, 5038, 5051-54).

inevitable further attacks from other inmates.  (Tr. 2314-26, 2353-58, 3966-74, 5034-35; A.1036, 1661-67, 1672-74, 1682-84, 1688-89, 1859-61).

## IV.    The killing of fellow Medical Center inmate Victor Castro

### A.    Introduction

Just after 6:30 p.m. on January 26, 2010, codefendant Hall, followed by Coonce, entered Castro's cell in a mental-health unit at the Medical Center, where all three men were prisoners.  Hall and Coonce had previously discussed killing Castro.  Inside the cell, Hall told Castro to lie on his back, which he did.  After Coonce briefly left, Hall taped Castro's wrists behind his back.  After Coonce returned, Hall tied Castro's ankles, stuffed a rag in his mouth, and used another to blindfold him.  Coonce kicked or stomped twice near Castro's right collarbone, leaving him injured but still conscious and breathing.  Then Hall, who weighed 200 pounds, stood on the center of Castro's neck with all his weight, cutting off Castro's breathing and killing him.  At some point during the attack, Coonce again briefly left the cell before returning.

These basic facts about the crime were proven by the government.  There were, however, evidentiary uncertainties and sharp disputes, at both trial and sentencing, about other circumstances of the murder that critically bore on Coonce's culpability, several aggravating factors, and whether he should be

sentenced to die. Those centered, most significantly, around the following questions:

• Did Hall take the lead in planning the killing, luring Castro, and tricking him into agreeing to be tied up, or were he and Coonce equal participants in the conception and preparations?

• Did Hall alone actually cause Castro's death, making Coonce an aider and abetter, or did Hall and Coonce take turns standing on Castro's neck until he died, making Coonce a joint principal?

• Might Castro have lost consciousness relatively quickly, or did he struggle against the attack and suffer for a prolonged time?

**B.     At the Medical Center, Coonce becomes acquainted with Hall, an older, much smarter, and dominant inmate who has long been obsessively thinking of murdering someone.**

As discussed, from his earliest years through his transfer to the Medical Center a little less than a year before Castro's killing, Coonce's crimes in the community and institutional misconduct followed a consistent pattern: Owing to his intellectual disability and other mental impairments and his horrendous upbringing, Coonce was easily frustrated and impulsive, sexually inappropriate and aggressive, self-harming and frequently suicidal, and prone to sudden outbursts, verbal and physical harassment, and brawls. But his assaultive behavior was generally spontaneous, not planned, and directed at someone who had just angered or interfered with him. And, in his past incidents, Coonce had never tried to kill, come close to killing, or displayed a desire to kill anyone. <u>See</u> Sections II-III, *ante*.

30

But at the Medical Center, Coonce met someone who fit a much different profile: Charles Hall.

At 38, Hall was a decade older than Coonce and had been incarcerated in the BOP several years longer.  (Tr.4424; A.625, 660, 1456-57, 1462-63).  He was also far more clever than the brain-damaged, intellectually-disabled Coonce (see Section I, *ante*), boasting an IQ 30 points higher, and what a veteran BOP psychologist characterized as "one of the most sophisticated understandings of the legal system" he had encountered.  Another psychologist who had known him well characterized Hall as "intellectually gifted."  (Tr.4113, 4175, 4271-73, 4335-36, 4419, 4445).

Unlike Coonce, Hall also had a dominant personality, especially in the mental-health unit at Springfield.  Another inmate there described him as a "leader-type," and Coonce, by contrast, as "immature."[11]  (Tr.1377-78).  Characterizing his own relationship with Coonce to authorities after the murder, Hall said: "You know that I am a leader and not a follower."  (Tr.1198).  And when investigators

---

[11] Coonce had long been described by others as a follower.  For example, when he was at a juvenile detention facility at age 17, his teacher recorded her great concern about this, noting that other students often entertained themselves by talking him into doing things that got him into trouble.  (Tr.3749-50).

came to re-interview Coonce a month after the killing, he called Hall his "attorney" and directed questions to him. (Tr.1547). Even four years later, during trial, Hall manipulated Coonce into opposing his counsel's efforts to highlight for the jury Hall's more culpable role in the murder. (A.427-29; Tr.1429-31).

All this harkened to the Supreme Court's observation that "in group settings," intellectually disabled individuals like Coonce often "are followers rather than leaders." Atkins v. Virginia, 536 U.S. 304, 318 (2002).

Just as important, although Hall had been involved in far fewer known assaults or conflicts than Coonce, he had a long and intensifying history of thinking obsessively about homicide — and, more recently, actually plotting and attempting to kill someone.

Hall had entered federal prison in the late 1990's, because of a series of letters and phone calls from jail. In them, he vividly threatened to kill the U.S. Attorney for Maine, an FBI agent, and a court reporter (*e.g.*, "I will . . . get someone . . . to kill you or someone close to you," "I hope your death is a long and painful one") as well as a federal judge to whom he had no connection (*e.g.*, "you scum bags should have your balls cut off"), and vowed to murder others by blowing up federal buildings and bombing the airport in the state capital and President Bush's nearby vacation home  (*e.g.*, "Let's watch the body count rise").

He also solicited a friend to kill another prosecutor (*e.g.*, "When it's done I'll be able to verify it by your people placing a tag on his body."). (Tr.1958-2003, 2059-85; A.836-884, 1484-86).

Evidence about Hall's subsequent years in the BOP repeatedly described him having "homicidal fantasies" — in other words, thinking obsessively about murder. Those fantasies were not directed at any specific person with whom Hall had an issue, but more generally at those who happened to be around him.

Thus, soon after entering the BOP, Hall told another inmate, for no apparent reason: "I would like nothing better than to slit your throat and gut you out." Six years before Castro's killing, Hall "very matter-of-factly" informed a BOP psychologist of his propensity for "homicidal ideation" and his feelings of intense aggression, "although toward no specific target." Around the same time, Hall wrote to another BOP psychologist that he was experiencing "many homicidal thoughts and ideations." He also described having killed someone in Maine by disemboweling them — so vividly that the FBI launched a full investigation. Two years later, Hall reported his "homicidal tendencies" to a prison lieutenant, and told a staff psychologist that thoughts of choking random individuals were waking him at night. Two years after, Hall confessed to a prison psychiatrist that he was still having "intense" thoughts about "killing someone," which "sexually aroused" him.

And a year before the capital crime, yet another BOP employee reported that Hall was still "attempting to address/deal with his homicidal ideation." (Tr.2224-44, 2405-11, 4425-26, 4248, 5079-81; A.644-45, 1175-83, 1184-86, 1486-88, 1492).

Summing all this up, his own expert said Hall had "consistently and persistently endorsed homicidal ideas." (Tr.4801). And Hall's own attorney acknowledged his years of intensifying "homicidal thoughts" and fantasies, and that his expressions of those to BOP staff were genuine and sincere, and should have been "heeded." (Tr.2405-07, 4405, 4787-88, 5318-19).

Moreover, two years before he met Coonce, Hall had actually tried to murder another convict. He confessed to a prison psychiatrist, that, after becoming sexually aroused one day by thoughts of homicide, "I wrapped my hands around his throat and squeezed," but the victim struggled free. Hall's avowed "intent was to choke him to death" and if he was "on the open unit today, that would be my intent and goal." Hall had no reason to target that inmate, except that (like Castro) he was mentally ill and vulnerable and thus unlikely to fight back. (Tr.2232, 2234-35, 2424-25, 2472-74, 2500, 2546; A.644-45, 1176-83, 1487-88).

**C.** **Enlisting Coonce as his accomplice, Hall plans the murder, luring Castro to his own cell, and tricking him into agreeing to be tied up. Coonce's role, if any, in the planning is questionable and disputed.**

**1.** **Hall's statements**.

Hall gave a series of detailed confessions and incriminating statements about Castro's murder. (A.1487-91, 1535-39). His attorney did not challenge their credibility, but rather embraced them as showing that "from day one . . . Hall has told the government exactly what his involvement in this killing was." (Tr.1696, 1776-77. See also Tr.724, 1258, 1566, 5146-47, 5310).

Hall consistently admitted that, while he had discussed with Coonce the plan to kill Castro, he himself conceived and was the driving force behind it. On the evening of the murder, Hall made clear in his written statement that he had targeted Castro mainly because he was a ready victim; Hall never had any run-ins with Castro, and told the FBI case agent that if Castro had not been available, "I would have randomly selected another inmate and killed him." (Tr.1481-82; A.660. See also Tr.4028). Later that night, Hall said to a psychologist that he had murdered Castro "to calm himself down," and the next day told a nurse he had "dreamed about the murder all night long and it was a euphoric feeling." (Tr.825, 1131).

Two months after, as the agent testified, Hall said to him that originally "Castro was not actually the intended target . . . that he was going to target . . . staff

35

members, kill them," but it did not come to fruition, "so he had to settle on killing Mr. Castro." (Tr.1494). And shortly before trial, Hall told the prosecution psychiatrist that, a few days prior to the killing, "I made up my mind that I was going to do something to [Castro] and figured out exactly what I was going to do." He confirmed that if Castro had not been available, he would have randomly killed someone else. (A.1489, 1491, 1535, 1539, 1541). Hall added that (in the psychiatrist's words) Coonce was "ambivalent" about murdering Castro and he did not really think "that Coonce's heart was fully in it." (Tr.5057-58).

## 2. Bevan Foo's testimony.

Additional government evidence filled in the picture of Hall's leading role in the run-up to the murder. Inmate Bevan Foo, a friend of Hall's, testified that a week or two before the killing, Hall had confided that "we're going to do something that they've never seen here before." He asked Foo not to share this with Coonce. (Tr.1356-57, 1377, 1384-85). Hall spoke to Foo again before the day of the killing, saying that he and Coonce "were going to tie up Inmate Castro and pay him money to make it look like he's a hostage so they can get cable TV." (Coonce also might have joined in that conversation, but Foo could not remember clearly.). (Tr.1357-58, 1388, 1395).

On the afternoon of the murder, Hall privately told Foo that he and Coonce

36

were going to bind Castro's wrists and ankles with medical tape that Hall used to secure his colostomy bag. (Hall actually showed Foo the tape, and inquired whether it would be strong enough). Then, said Hall, they would gag Castro, in case he screamed, and kill him. After dinner, Foo overheard a conversation between Hall — again, without Coonce — and Castro as they were watching television. Castro was under the impression he would be paid $50 to pretend to be a hostage. Castro and Hall discussed when would be the best time to execute this scheme, and they agreed it would be after the "pill line" that evening, when inmates received their medications. Castro later approached, and said, "let's do it now," but Hall told him they should wait. (Tr.1358-61, 1389-96, 1480).

### 3. Video recordings of the participants on the day of the murder.

Hall's confessions and Foo's testimony, including his account of Hall's fake hostage scheme, were further corroborated by video recordings showing the various participants' interactions in the hours preceding Castro's killing. (Tr.4603-04, 4607-08, 4611-12, 4620-21). Those revealed Hall, not Coonce, initiating a series of close, private conversations with Castro— "setting him up" to be killed, as the prosecutors aptly called it.[12] In the last such conversation, Hall alone

---

[12] A little after 10 a.m., Hall approached Castro in the unit's common area and spoke with him briefly, putting his hand on Castro's chest. Soon after, Coonce

approached Castro after he sat down to watch T.V. in the unit's common area, and they spoke; Hall gestured upwards, and Castro nodded in agreement. (Tr.4588-4619, 5228-29).

A short time later, at 6:30 p.m., Castro left the common area, climbed the stairs, walked along the second-floor tier, and entered his cell. Three minutes after that, Hall traced the same route, with Coonce following closely in his footsteps, and the two men entered Castro's cell. (Tr.1498-1501, 1551, 4617-19; Gov. Ex. #85).

Relying on this evidence, Coonce's counsel argued for a life sentence because of Coonce's "role in the current offense" relative to Hall's, explaining: "[Y]ou all saw the video. You saw who was palling around with Victor Castro trying to . . . put him to sleep, to garner false confidence in Castro. You saw the

---

entered, but Castro left and walked past him. A few minutes later, Castro returned and Hall joined him at a table. After sitting and talking together for about six minutes, Hall and Castro shook hands, and Hall stepped away. Just after 11 a.m., Hall approached Castro, and again they walked and spoke together, with Hall putting a friendly arm over Castro's shoulder. A little over an hour later, while Hall and Castro again were talking, Coonce entered the picture, but simply passed them by. Three hours after, at 4 p.m., Hall was talking with, touching, and gesturing towards Castro; when Coonce appeared, he again walked around them. (An hour and a half later, just before 5:30 p.m., Castro walked up to Coonce, talked to him for a few seconds, and left; Hall immediately buttonholed Coonce.). Just before 6 p.m. a little more than half an hour before the killing, Hall was walking with his arm over Coonce's shoulder when Castro came in and engaged Hall, while Coonce again departed. (Tr.1551, 4588-4619).

multiple contacts . . . . Wesley wasn't the one who was putting his arm around Mr.

Castro.  He wasn't the one who was orchestrating the events" leading up to the

killing.  (Tr.5289).

### 4.   Coonce's statements

In contrast to Hall's counsel who embraced his client's confessions,

Coonce's attorneys vigorously argued that Coonce had falsely inflated his role in

the crime to investigators and the prosecution psychiatrist.  Thus they told jurors at

the very outset of the trial:

> Of the different statements and confessions that Mr. Coonce made, do
> you believe all of them? . . . Are there reasons to have some questions
> about his motive, about the reliability of these admissions, these
> statements?  . . . . Comparing the statements to statements of other
> individuals or the other evidence or the videotape, why are there
> contradictions in some of these things?
>
> . . . . When Mr. Coonce says these things, what is going on in his life
> and why is he saying these things?  What is his motive?  Are these
> statements all reliable?

(Tr.717.  See also Tr.1690-91).  Similarly, in his sentencing opening, counsel said

Coonce had exaggerated his "responsibility for the killing of Mr. Castro" because

his history of being targeted as a sex offender in the BOP compelled him to try to

hide how much of a "weak . . . follower" he really is.  (Tr.1774-75).

Though Coonce tried to claim equal credit with Hall for the crime, he could

not actually tell investigators much about planning or preparing for Castro's

killing.  In his signed statement to an FBI investigator hours after Castro's death,

Coonce said: "Earlier this evening, I decided to do something to somebody."  He

claimed that, the previous day, some billiard balls had gone missing from the

recreation room and other prisoners blamed him and Hall for removing them.

Because he was "having a bad day," and to "save face in front of my fellow

inmates," Coonce decided to "take it out" on someone.  He supposedly chose

Castro because Castro had previously reported him for a minor infraction and then

refused to fight Coonce over it.  (Tr.1052-53, A.625.  See also A.1481, 1531).

This sketchy story contradicted the other evidence discussed above,

including Hall's statements, Foo's testimony, the video recordings of Hall's

interactions with Castro, and Hall's longstanding obsession with homicide.  Nor

did anything in prison officials' testimony or records corroborate the claimed

incident with the billiard balls or any prior clash between Coonce and Castro.[13]

_____

[13] When Coonce had called out from his cell soon after the killing, he
parroted Hall (Tr.957), attributing it to Castro being a "snitch."  (Tr.855).  The
prosecutors suggested that this referred to an incident more than two years before
(not involving Coonce or Hall) in which Castro was rewarded for helping an
officer who was in a physical struggle with another inmate.  (A.647-48).  And they
convinced the jury to find the aggravating factor that both defendants had "acted to
obstruct justice or to retaliate" because of Castro's "assistance to prison officials."
(A.550-51, 563-64, 576 [ad.44-45, 57-58, 70]).  But Coonce never indicated he
even knew of that incident.  And even the prosecution psychiatrist did not cite it as
a motive.  (A.1480-81; Tr. 5060-63).

Thus, not surprisingly, later in the very same statement, Coonce contradicted his own claim about the billiard-ball incident the day before: "Two or three days ago, [Hall] and I discussed the assault on Castro. We discussed how to do it, when to do it, and how to avoid being seen by officers." (Tr.1052-54; A.625). Notably, Coonce said nothing about who initiated these discussions, or who came with the ideas for how and when to commit the killing and whom to target.

A month after his initial statement, when Coonce was re-interviewed by the FBI, he alluded for the first time to the hostage plan Foo had revealed, telling the agent "he thinks that [Hall] may have offered Mr. Castro $50 to let him be tied up." But Coonce did not know any more about the scheme. (Tr.1491).

This subject came up again when Coonce spoke to prosecution psychiatrist Dietz four years later. Coonce reiterated that Hall had been talking about the crime for two or three days beforehand. But, pressed about what they discussed, Coonce struggled to answer. (A.1480, 1528-29). He again recalled that Hall had offered Castro $50 to pretend to be a hostage, but, asked to explain and give details, he was ignorant: "I'm not sure all what – I'm not sure what was the – idea or the plan . . . . So I'm not sure – I'm not – yeah, that – that's – I didn't – I'm not sure what they talked about when I wasn't in there but that's – that's – that's the word I got from Hall." (A.1481, 1530).

Toward the end of Dietz's questioning, Coonce tried to paint his role in the planning as equal to or greater than Hall's. Thus, asked to describe himself as a "follower" or a "leader" in the crime, he said:

> Honestly, no matter what he says or what anybody says, no. We were both – we're both just as guilty as together. He was not calling the shots, I wasn't calling the shots . . . . there was no – there was no leader or no follower. And that's – that's – the I – I don't care what he says. It don't matter what he says, there was no leader. We both decided together what was gonna happen and that's what happened . . . .
>
> Now Hall's probably gonna say it was his idea . . . . But, but I ain't going to say it was my, it was our decision, we decided to get Castro. I'm going to say it like that, we both decided to get Castro.

(A.1481, 1533).

Coonce also told Dietz that he had initially wanted to seek revenge against his counselor for denying him a social visit, and that he, Hall, and another prisoner, Budell, were "going to get her," but on the appointed morning, Budell "got caught with the knives, so we, we, what we did was, is we just said okay, Hall said, Hall, what do we do now? I said now, we can't, two people can't get her because there's too much of a chance that somebody catching us doing it. So I said let's get Castro." The psychiatrist then asked, "So it was your idea?," to which Coonce responded: "Yeah." (A.1481, 1532).

Though it was undisputed that the counselor had previously angered Coonce

by denying his visit, no evidence corroborated his claim about the other inmate, Budell, and there being a conspiracy and weapons to murder the counselor. Moreover, as trial counsel argued, there was good reason to doubt Coonce's story that *he* chose Castro as the target in response to a question from Hall. Coonce had never mentioned these things to investigators, and could provide Dietz with no details. Moreover, the assertion contradicted all the evidence of Hall's dominant role, including Hall's statements (embraced by his counsel), Foo's testimony, and the video recordings.

Nonetheless, relying significantly on Coonce's statements to Dietz — which this brief argues were elicited and admitted in violation of the Fifth Amendment, see Point IV, *post* — the prosecutors argued at sentencing that he and Hall were equally responsible for planning the murder, including the fake hostage scheme. (Tr.5228-29, 5257). And the jury appears to have accepted that argument, finding the "substantial planning" aggravating factor for both defendants, and unanimously rejecting Coonce's mitigating factors of a lesser role in the murder and susceptibility to the influence of others. (A.549, 554, 562, 567 [ad.43, 48, 56, 61, 68]).

> **D.**     **Hall directs Castro to lie on the floor, then binds, gags, and blindfolds him, while Coonce stands by and at one point briefly leaves the cell and then returns.**

The defendants' accounts of what happened in Castro's cell in the few minutes between their arrival and the attack largely corresponded with each other, and were supported by physical and forensic evidence.

Here again, Hall was the prime mover.  After the cell door was shut, he directed Castro to turn around.  Hall then used his own medical tape to bind Castro's wrists behind his back, and had Castro lie face up on the floor.  Having run out of tape, Hall bound Castro's ankles with shoelaces Coonce had brought. Castro did not resist, thinking this was all part of Hall's fake hostage plan.[14]  After immobilizing Castro, Hall pulled out two rags, stuffed one into Castro's mouth to gag him, and blindfolded him with the other.[15]  (Tr.1053, 1069, 1480, 1494-95, 1543-44; A.625, 660, 1523-24, 1530, 1535-36.  See also Tr.1364).

---

[14] Hall denied the hostage plan to investigators, claiming that Castro was surprised to see them and asked, "what's going on?"  But Hall never explained why, if no such plan existed, Castro submitted to being hog-tied without a struggle. (Tr.1480-81, 1494; A.660).  Nor did Hall explain the video evidence of his conversations "setting up" Castro, as the government accurately characterized them.  (Tr.5228-29).  Hall's counsel too avoided these issues at both trial and sentencing.

[15] Coonce told investigators that Hall had bound, gagged, and blindfolded Castro, but used the term "we" in describing this conduct to the prosecution psychiatrist.  (A.625, 1523-24).

44

During this process, Coonce apparently stood by doing nothing. At one point, less than a minute after the defendants had entered Castro's cell, video cameras recorded Coonce leaving Hall alone with Castro, walking down the stairs, exiting the unit, and then reentering it and returning to Castro's cell. He was gone a little less than a minute. Coonce said that when he returned, Hall had taped Castro's wrists. (Tr.1053, 1059-60, 1069, 1499-1501, 4619-20; A.625).

When Castro was later found dead, his wrists were bound behind his back with medical tape, and his ankles tied with shoelaces. A torn piece of T-shirt, presumably the gag, was on the floor, and a cloth, presumably the blindfold, lay around his neck. His wrists and ankles had ligature marks. (Tr.776-77, 813-20, 996-98, 1009-10).

E.    **After Coonce stomps or kicks Castro a couple of times, 200-pound Hall stands on Castro's neck for several minutes, suffocating and killing him. Whether Coonce also stood on Castro's neck and caused his death is questionable and disputed.**

1.    **Hall's statements**

In Hall's numerous statements about the murder, he consistently hewed to the same account of how Castro was attacked and killed: Coonce had initially kicked or stomped him around the right collarbone, injuring him, and 200-pound Hall alone then killed him by standing on Castro's neck, with all his weight, for several minutes. During that time, Coonce was out of the cell again briefly. (As

45

noted, even Hall's own counsel embraced these statements as accurate.).

A few hours after learning of the murder, as Medical Center officials were investigating, Hall got their attention, telling one, "I killed Castro," and another that he had "stood on [Castro's] neck." (Tr.860, 956-57). Later that evening, Hall elaborated in his written statement to the FBI case agent. After Hall restrained Castro and put him supine on the floor, Coonce "stomped on Castro's neck twice." But "*Castro was still breathing*," Hall confessed, "so I placed my right foot on Castro's neck and stood on it with all my weight (about 200 lbs) on my right foot. I placed my hand on the wall to balance myself and stood on Castro's neck for 5 to 10 minutes." Afterwards, Hall said he confirmed that Castro was dead by checking for a pulse and punching him in the stomach. (Tr.1480-83, 1543-44; A.660) (emphasis added). Two months after that statement, when the agent re-interviewed him, Hall repeated that he had killed Castro "by standing on his neck." (Tr.1494).

Several months later, Hall called over to his cell the BOP investigator who had witnessed his written statement, and reaffirmed that he alone had caused Castro's death: "I been straight with you from the beginning. *I killed Castro and only I killed Castro* . . . . Coonce doesn't have a hair in his ass to do" that.[16] Hall

---

[16] Hall made similar statements to a fellow inmate, Johnny Bass. Bass recounted how Hall told him that he alone killed Castro, and that Coonce's role involved "[j]ust a little kick in here and there, and that -- basically [Coonce was]

added that the unit camera would show that he was in the cell throughout the attack while Coonce left at a couple of points. (Tr.1198. <u>See also</u> 7/11/13 Tr.215) (emphasis added).

Four years later, in his videotaped interview with prosecution psychiatrist Dietz, Hall again explained that Coonce had only "stomped on [Castro's] neck once or twice, wound up hitting him *more on the chin than on the throat*." Hall repeated that, after stomping on Castro's throat a number of times, he himself "stood there . . . on [Castro's] neck with — balancing my weight until he was dead." And that he then confirmed Castro's death by checking his pulse and punching him in the stomach. Hall reiterated that Coonce was out of the cell during part of that time. (A.1535) (emphasis added).

## 2. Forensic and other corroborating evidence.

Hall's account of his and Coonce's respective conduct fit with their contrasting backgrounds — the dominant, intelligent Hall's longstanding, obsessive fantasies about murdering a random victim, versus the intellectually disabled Coonce's impulsive, non-homicidal aggression toward those who got in his way. In addition, the video recordings of the unit and the evidence discovered

---

standing at the door keeping point waiting for the cops to come." (A.1794; Tr.4652).

at the scene, during the autopsy, and through forensic testing also supported it.

The recordings showed that, after Coonce left and then returned to Castro's cell (while Hall was binding Castro's feet), the two defendants remained in Castro's cell for the next nine minutes. Then Coonce left again. He walked down the stairs to the common area, made a slashing motion across his neck — indicating to the other inmates, like Foo, who knew of the plan to kill Castro that it was being or had been carried out — went into the cell of another of those inmates, then quickly returned to Castro's cell, after being gone for less than a minute. About two minutes later, the pair, with Hall again leading the way, departed Castro's cell. (Tr.1502-03, 1550-5, 4618-23; Gov. Ex. #85).

Just over an hour after, nurses dispensing medication noticed Castro missing, and dispatched a guard, who discovered his body on his cell floor. He had visible contusions around his neck, and his lower chin was scraped and bloody. (Tr.730-31, 744-46, 775-77, 820, 1327, 1333, 1337-38; A.617, 619, 652, 654, 656).

Pathologists Stacy and Jason, who reviewed the autopsy evidence and testified for the prosecution and for Coonce, respectively, agreed that Castro died from someone standing on the center of his throat for some time, just as Hall confessed to doing. That compressed Castro's larynx, cut off air to his lungs, and

made him lose consciousness and asphyxiate. The autopsy found some bruising on the center of Castro's neck, above his larynx, and some bleeding in his trachea. But his larynx was not crushed and had no fractures. This indicated to the pathologists that the center of his neck had received sustained pressure rather than hard stomping or other repeated blows. (Tr.1327-28, 1331-33, 1337-40, 1343-50, 1610-18, 1621-26).

The autopsy also revealed other bruising on Castro's right upper chest and right lower neck. There was internal bleeding underneath. The pathologists testified that those injuries could have been caused by someone stomping on Castro's collarbone area, as Hall reported that Coonce had done a couple of times at the start of the assault. The FBI case agent testified that one of the chest abrasions appeared to "match" and "track" the sole of Coonce's boot, rather than that of Hall's shoe. (Tr.1519, 1575). See Point V.A, *post* (arguing this testimony was wrongly admitted, since testing by FBI's footwear experts was inconclusive and agent lacked any expert qualifications).

Both pathologists, however, agreed that, because those marks were not near Castro's airway, the blows that caused them were distinct and separate from the sustained pressure on his throat that cut off his breathing — and thus, as Hall had maintained, did not contribute to his death. (Tr.1327-28, 1331-33, 1337-40, 1343-

50, 1610-17, 1621-26).

Other evidence confirmed that each defendant's shoe or boot had come in contact with DNA from Castro's body, as Hall also recounted in his statements. Forensic testing of the footwear they were wearing at the time of the crime showed Castro's DNA on the outside of Hall's right shoe and Coonce's right boot, just above the instep on each. It appears there was a larger quantity on Hall's shoe than on Coonce's boot.[17] The FBI crime lab could not determine what biological substance the DNA came from, and specifically could not confirm it was blood. (A.670, 681-82; Tr.1299, 1309-15, 1593-97). The prosecution nonetheless misled jurors to think that it was blood, based on a preliminary screening test that has been recognized as unreliable. See Point V.B, *post* (arguing that this too was error). In any event, the results did not contradict Hall's account. For Coonce could have gotten Castro's blood on his boot if (as the prosecution itself suggested, Tr.1622) he initially scraped Castro's chin in stomping on him, and Hall then got more blood on his shoe when he stood on Castro's neck for several minutes.[18]

---

[17] When the FBI lab sought to conduct further testing, it found enough material on Hall's shoe to do so (A.672; noting "NEG" result), but not enough on Coonce's boot. (A.670; noting "QNS" result, meaning "Quantity Not Sufficient").

[18] The FBI crime lab reached no conclusive result when it compared Hall's and Coonce's fingerprints to latent fingerprints lifted from an area of Castro's cell wall that Coonce told investigators he might have touched during the attack.

### 3.     Coonce's statements

Prosecution psychiatrist Dietz ascribed to Coonce the "primary motives," for helping kill Castro, of "establish[ing] a reputation with other inmates" and "being permanently isolated . . . through segregation," so "he would no longer need to fear or defend against attacks" because of his "sex offense history." (Tr.5060). While Dietz cited these as motives for participating in the crime, they logically served equally well, if not more so, as motives for Coonce to falsely exaggerate his role in the murder in his various statements about who did what.

As with the crime's planning, Coonce was quick from the start to claim an equal share of the credit for actually causing Castro's death. Thus, soon after the body was discovered, Coonce yelled out from his cell to Medical Center staff, "I did it," "I killed him," "I stomped on his throat."[19] He asked the officers to "[j]ust take me out of here," meaning to an isolation cell in the facility's Special Housing Unit. (Tr.842, 854-55, 871-72, 891-92).

_____

(Tr.1487-89). Hall's expert said that her comparison excluded Hall. (Tr.1627-36). But that shed no light on who did what during the attack. No one could tell when the fingerprints were left, and countless prison employees and inmates presumably had access to the cell over time. Moreover, even if Coonce left the print, he could have done so if he touched the wall while initially stomping on Castro.

[19] Inmate Foo also thought he had heard Coonce claim credit with Hall for also standing on Castro's neck (Tr.1408), though he had trouble remembering what he heard from Hall as opposed to Coonce after the killing. (Tr.1363-64, 1395).

Later that evening, in his signed statement to an FBI agent, Coonce confirmed that, after Castro was lying on his back, "I kicked Castro in the neck a couple of times." But, contrary to Hall's account, he claimed that he also had joined with Hall in actually causing Castro's death, saying: "[Hall and I] both then stood on Castro's neck until he stopped breathing." (Tr.1052-53; A.625. See also Tr.1486-87). Coonce never explained how he and Hall could both have stood on Castro's neck at the same time. Instead, the agent added his own gloss on the statement to try to make sense of it: "I perceived that to mean that they took turns." (Tr.1061). He agreed that Coonce "was trying to claim credit for all of this." (Tr.1062-63).

Coonce said nothing more on this key point for the next four years, until his compelled interview with Dietz.[20] There, he again claimed that, after he "stomp[ed]" or "kick[ed]" Castro's neck a couple of times and injured Castro's chin in the process, it was "me and Hall," rather than Hall alone, who stood on Castro's neck. Coonce told Dietz this lasted "for a minute," after which, he left the cell briefly. "[T]hen, uh, I went back upstairs, and uh, Hall was still standing on

---

[20] In a number of letters, telephone calls, and remarks to staff and other prisoners in the intervening period, Coonce made conclusory comments, to the effect that "I" or "we" killed Castro, blamed anger or emotion for his conduct, but mentioned no details about what happened or who did what. (Tr.1079, 1181-84, 1270, 1523-24; A.622-23, 628-35, 637; Gov. Ex. #87, #89, #108, #110).

his neck, uh." (A.1523, 1529).

In summation at sentencing, the prosecution focused on Coonce's recent videotaped, expert-validated interview with the psychiatrist as the key evidence that he had not just kicked Castro a couple of times, as Coonce's counsel claimed, but also stood on Castro's neck and actually caused his death. <u>See</u> Point IV.C, *post* (discussing why it was prejudicial error for the court to license Dietz to obtain and present Coonce's confession).

### F. There is also uncertainty and dispute over whether Castro may have lost consciousness quickly or instead struggled and suffered for a prolonged period.

Prosecution pathologist Stacy volunteered that Castro could have lost consciousness in as little as 20 seconds if the person standing on his neck had compressed his carotid arteries or jugular vein.[21] Defense pathologist Jason testified that if Castro had tried to hold his breath, he might have lost consciousness in slightly over a minute. (Tr.1340, 1343-45, 1607, 1617, 1619).

_____

[21] Stacy said a picture of the sclera of Castro's eyes could shed light on this, but that there was not one. (Tr.1341). The court sustained an objection when Stacy began to testify about what the prior pathologist's report had said about the sclera. (Tr.1341). That is because Stacy had not autopsied Castro, and had announced at the outset he was testifying based on his own "independent examination" of the photographs, microscopic slides, and other forensic evidence, "excluding the report" of the original pathologist, who had died before trial. (Tr.1301-02, 1320-23, 1346). That followed Coonce's motion to exclude evidence from the report, on confrontation grounds. (A.611-15; Tr.1275-76, 1281-85).

Cross-examining Jason, the government suggested that Castro endured more prolonged suffering. Thus, invoking the FBI agent's gloss on Coonce's statement, the prosecutor asked Jason to suppose that "there were two individuals *taking turns* standing on [Castro's] neck. That . . . . would change the amount of time that it possibly would have taken for him to lose consciousness . . . . if he was able to breathe in between?" Jason agreed it would. (Tr.1619-21) (emphasis added).

Later, at sentencing, Dietz presented the jury with Coonce's videotaped confession saying that when he first stomped on the victim, Castro "was laying flat on his back," but then "his whole body, he almost sat up completely," at which point the blindfold slipped from his eyes. (A.1524; Gov. Ex. #464 at 55). In summation, the prosecutor repeatedly deployed this evidence to bolster the government's case that Castro had not lost consciousness quickly but instead struggled and suffered for minutes on end — an issue significant to the jury's view of the crime's cruelty, an aggravating factor. <u>See</u> Point IV.C, *post* (discussing how these arguments accentuated the prejudice from erroneously licensing Dietz to elicit and present Coonce's confession). For example, after noting Stacy's testimony about how quickly Castro might have lost consciousness, the prosecutor said: "We know that's not what happened here." How? Because of what "Mr. Coonce said to Dr. Dietz." (Tr.5223).

**V. After the crime, while housed in isolation where the BOP can keep him indefinitely, Coonce hurts no one and, indeed, receives no disciplinary infraction in the two years preceding trial while properly medicated. Nonetheless, the prosecution persuades jurors to find that he will probably commit future violence in prison if spared.**

Whether Coonce would, as the government alleged, "probab[ly] . . . commit criminal acts of violence" (A.526) in the BOP if not executed proved a critical, disputed issue at sentencing: Even for jurors moved by the compelling mitigation involving his childhood, see Section I, *ante*, their willingness to spare him may have depended on whether they thought he could be safely incarcerated in the future.

So what legitimate, potentially relevant evidence bore on this aggravating factor? The government, invoking the theme of "past is prologue," primarily cited his violent conduct in Texas from more than a decade before; his history of misconduct in general population in the BOP (though it was almost entirely minor and non-recent); and his participation in Castro's murder, which also occurred in such a setting. (Tr.1749-50, 5238-44, 5327-28). See Sections II-IV, *ante*. It also presented evidence that, in the months following the killing, Coonce was found with two shanks in his cell (the defense suggested these were for cutting himself, which he continued to do, see, e.g., Tr.2362-63; A.1695-98), refused to leave his cell and had to be forcibly extracted by corrections officers, and committed several

other minor disciplinary infractions. (Tr.2269-72, 2560-2610, 2618-33; A.1170-74, 1493-97; Gov. Ex. #390, #396). And the government pointed to callous or boastful comments Coonce had made about the murder, Castro, and the death penalty (Tr.5243, 5328), though Coonce's lawyers said these, like his exaggerated confessions, marked an effort by a vulnerable sex-offender to appear less weak than he really was.[22] See Section C.4, *ante*.

The defense responded with two correctional experts: Mark Bezy, a former warden at USP Terre Haute, which houses death row, and Christopher Synsvoll, the legal counsel at ADX Florence, the BOP's super-maximum, solitary-confinement institution. They described the security regime under which the BOP could, if it chose, house Coonce and keep him indefinitely (as it has done with numerous prisoners) — where he would live in complete physical isolation from

---

[22] Coonce (along with Hall) fist-bumped other inmates after the killing. Later, he told a prison psychologist that the BOP would just give him another life sentence, was overheard saying to another inmate that he liked having a solitary cell with his own shower and would be content to be sent to ADX, wrote a letter to his mother complaining he was tired of all the delay in his case and that "it didn't take this long to kill the asshole," and suggested to another prison psychologist and his sister that he would kill someone again if he did not receive the death penalty. (Tr.1120, 1183-84, 1270-71, 1512; Gov. Ex. #108, #432). Like much of what Coonce said and did in this case, the last of these remarks may have mimicked the same threat to kill again that Hall repeatedly made after Castro's murder. (Tr.825, 1133, 1178, 1529-33, 5143; A.627, 662, 666-67, 1545). See also Sections C4, E3, *ante*.

other inmates, confined alone to a spartan concrete cell almost 24/7, transported briefly each day in shackles and handcuffs to a solitary recreation cage. Under those conditions, which have been in place at ADX for a decade, there have been no killings and apparently only one serious assault.[23] Moreover, in the two years preceding trial, once he had finally started receiving proper medication for mental illness (a combination of anti-psychotics and anti-depressants), Coonce was safely managed in a similar solitary-confinement setting (in a special unit at USP Terre Haute and, later, an isolation cell at the Medical Center), receiving no disciplinary infractions. (Tr.2279, 2377-89, 2733-2822, 2872, 3974, 4533-66, 5046). See also Point VII, *post*.

Unfortunately, however, a slew of misleading and unreliable evidence, improper prosecution arguments, and imbalanced instructions combined to skew the jury toward a finding against Coonce on this aggravating factor. See Points VI-X, *post*.

## VI. Four years after her brother is killed, Castro's sister tells the jury that she and her family forgive Coonce.

Olga Castro, the victim's sister, voluntarily traveled from her home in

---

[23] In rebuttal, the government called another BOP corrections expert, Scott Dodrill, who testified that homemade weapons are found among prisoners, even at ADX, and that, if an inmate is determined to hurt himself or someone else, the BOP cannot guarantee against it. (Tr.4880-4939).

Florida to testify at sentencing. She had thought and spoken about the matter with her other, surviving brother, and they both had decided to forgive Coonce (as well as Hall). "I think of him, I pray for him, and I pray to God for him," she told the jurors. (Tr.3709, 3717).

## VII. After jurors deliberate for a full day and take an overnight recess, they agree on death verdicts for both defendants.

After the jurors deliberated for a full day and took an overnight recess, and though most or all of them found that Coonce had established several powerful mitigating factors (including that his "childhood was marked by chaos, abuse, both physical and sexual, as well as neglect and abandonment" and that he "suffered from mental and emotional impairments from a young age") they alerted the court that they had agreed on his sentence (which they later announced was death). (Tr.5358, 5368, 5375; A.544, 551-53, 564-66 [ad.45-47, 58-60]).

At that point, while the only mitigator found by more than a single juror for Hall was that he had a gastrointestinal disorder, at least one juror still held out on his sentence; thus the foreperson initially told the court they could not reach unanimity for Hall. But after being sent back to deliberate for about an hour and a half longer and asking to review some of Hall's statements again, they returned death verdicts for both defendants. (A.544, 576-79; Tr.5358-61, 5368, 5375 [ad.70-73]).

## SUMMARY OF ARGUMENT

Coonce's appeal, trained solely on his death sentences, focuses on a series of errors that prevented a fair determination of the three main issues surrounding his sentencing: his mental impairments, his comparative role in the crime, and whether if spared he could be safely managed in federal prison.

In case after case, the Supreme Court and this Court have refused to tolerate the risk that a capital defendant who is mentally retarded will be executed. Yet here, though Coonce presented evidence of his 71 IQ score and the other elements of such a claim, he never received a hearing and a chance to prove to the court that he is intellectually disabled and thus exempt from capital punishment under the FDPA and the Eighth Amendment. See Point I, *post*. Furthermore, constitutional improprieties in the government's witness examinations and arguments and the court's instructions prompted the jury to disregard, even as mitigation, Coonce's retardation-level IQ and the traumatic brain damage that caused it. See Points II-III, post.

Coonce also focused his jury case for a life sentence on substantial evidence that Hall —his older, clever, dominant, homicidally obsessed codefendant — conceived the murder, planned it, and actually caused the victim's death. But additional errors tainted the jury's consideration of Coonce's lesser role. Most

59

important, the court violated the Fifth Amendment by licensing the prosecution psychiatrist to elicit from Coonce, on the eve of trial, and present to the sentencing jury an exaggerated yet damaging videotaped confession to the crime. See Point IV, *post*. The court also admitted misleading, unreliable testimony about footwear comparisons and blood testing that bore on Coonce's role. See Point V, *post*.

Other errors skewed the jury in favor of the prosecution's questionable aggravating allegation that, if spared, Coonce would probably commit prison violence notwithstanding that he could be maintained in solitary confinement and had been free of disciplinary infractions for the last two years while so isolated and properly medicated. Worst was the court's one-sided instruction. It spelled out the prosecutors' allegation *and* the evidence they claimed supported it, but never even mentioned the defense's contrary theory, let alone any of its proof. See Point VI, *post*. In addition, the government's presentation itself improperly urged jurors to find probable future violence based on cost and administrative inconvenience, a false impression about how Coonce would be housed, speculation about future BOP incompetence, the mitigating factor of his mental illness, and an inaccurate characterization of a death sentence as the only way to keep him isolated. See Point VII, *post*. Still more errors prejudiced the future-violence finding further. These included the court's mid-sentencing instruction suggesting that protesters

60

outside the courthouse, perhaps connected with Coonce, might pose a risk to the jurors, see Point VIII, *post*, and its admitting unconfronted testimonial hearsay from Coonce's BOP records, see Point IX, *post*, as well as numerous, repetitive versions of a prior rape victim's account that served to inflame the jurors' anger and fear, see Point X, *post*.[24]

From the start of the proceedings, moreover, the court frustrated the seating of a jury that could impartially assess all these sentencing factors. It refused to inquire into several critical areas of bias, such as if anyone close to a juror had ever worked at the Medical Center or another correctional institution, or whether any juror herself had ever been sexually abused. See Point XII, *post*. And, departing from the prevailing federal practice, it insisted that veniremembers be asked sensitive questions about the death penalty in a group setting, thus polluting entire panels, including seated jurors, with various inflammatory responses. See Point XIII, *post*.

Finally, the actual imposition of a death sentence on Coonce was tainted by the court's unjustified insistence on conducting his and Hall's sentencing hearings jointly, rather than sequentially as is the standard practice, including in this circuit,

---

[24] The court also erred in refusing to strike the future-violence aggravator at the outset, because empirical studies show it is constitutionally unreliable, unsupported, incoherent, and uncorrectable. See Point XI, *post*.

see Point XIV, *post*; by its refusal to instruct the jury that near certainty, in the form of the reasonable-doubt standard, was required for a death verdict, see Point XV, *post*; and by startling, unconstitutional arbitrariness, as Coonce faced more than a *seven times greater* likelihood of a death verdict merely because he was prosecuted in the Western District of Missouri, making *where* he was charged far more predictive of a death sentence than any legitimate aggravating factor, see Point XVI, *post*.

Though Coonce's case had several such aggravators, a death verdict was hardly a foregone conclusion, and any of these serious errors may have tipped the balance. (And, of course, a hearing on intellectual disability might have demonstrated that he is legally ineligible for a death sentence). Federal juries asked to endorse capital punishment do so for fewer than half the defendants convicted of prison murders. And Coonce presented powerful mitigating evidence about his nightmarish upbringing that the jury found established several mitigating factors. Moreover, even with all the errors that placed a thumb on death's side of the scale, jurors still deliberated for a full day and took an overnight recess before agreeing on a death verdict. If Coonce receives a new sentencing at which the key issues could be fairly presented to the jury, the outcome might well prove different.

## ARGUMENT

## I.

**The Court should remand for a hearing on whether Coonce is "mentally retarded" and thus exempt from execution under 18 U.S.C. § 3596 and <u>Hall v. Florida</u>.**

**A.    Introduction**

In 1994, Congress forbade carrying out a death sentence on "a person who is mentally retarded."  18 U.S.C. § 3596(c).  Eight years later, the Supreme Court recognized a similar exemption under the Eighth Amendment.  <u>See</u> <u>Atkins v. Virginia</u>, 536 U.S. 304, 321 (2002).  Mental retardation (now usually called "intellectual disability") involves three attributes: (1) significantly sub-average intellectual functioning, (2) significant impairment in adaptive life skills, and (3) onset of the condition in "the developmental period."  <u>Hall v. Florida</u>, 134 S. Ct. 1986, 1994 (2014), <u>citing</u> American Psychiatric Association ("APA"), <u>Diagnostic and Statistical Manual of Mental Disorders</u>, at 33 (5th ed. 2013) ("DSM-5") and American Association on Intellectual and Developmental Disabilities ("AAIDD"), <u>Intellectual Disability: Definition, Classification, and Systems of Supports</u>, at 27 (11th ed. 2010) ("AAIDD Manual").

Until <u>Hall</u>, a number of courts and attorneys, and even some clinicians, had mistakenly thought that the first prong of an <u>Atkins</u> claim required an IQ test score

of 70 or below.  See Hall, 134 S. Ct. at 1996; id. at 2004 (Alito, Scalia & Thomas, JJ., & Roberts, C.J., dissenting).  See also Sasser v. Hobbs, 735 F.3d 833, 841 & n.8 (8th Cir. 2013) (hearing "understandabl[y]," though incorrectly, denied where prisoner had IQ score above 70).

Under that view, Coonce would not have qualified since his IQ score was 71.  And presumably that is why none of the mental-health experts who testified at sentencing had been asked about mental retardation, though they all agreed Coonce suffered from significant cognitive impairment.[25]  But the day after the Supreme Court in Hall rejected "[t]his rigid rule," 134 S. Ct. at 1990, Coonce called the decision to the district court's attention and asked it to bar a death sentence based on his intellectual disability.  (A.508-511.2 [ad.24-30]).  He had finished presenting his mitigation, including his 71 IQ score, and the sentencing case had yet to go to the jury.  But the government disagreed, saying only that Hall did not apply to the federal statute and that Coonce's "other . . . arguments" had been "made" and "rejected" elsewhere.   Rather than ordering a hearing or otherwise addressing the merits, the court summarily denied Coonce's motion.[26]  (Tr.4984

---

[25] It is also presumably why, five months before, Coonce's trial counsel had told the court he would not be raising an Atkins claim.  (A.265.1-265.2).

[26] Neither the government nor the court ever suggested the motion was untimely, and (even putting aside whether Hall justified the timing) nothing in the

[ad.31-33]).

A state prisoner in a federal habeas case need only make a minimal showing to be entitled to an evidentiary hearing on mental retardation. As the Supreme Court recently explained in reversing a district court's denial of such a hearing:

> It is critical to remember, however, that in seeking an evidentiary hearing, Brumfield was not obligated to show that he was intellectually disabled, or even that he would likely be able to prove as much. Rather, Brumfield needed only to raise a 'reasonable doubt' as to his intellectual disability to be entitled to an evidentiary hearing.

Brumfield v. Cain, 135 S. Ct. 2269, 2281 (2015). This Circuit too has repeatedly found error in habeas courts' failure to order evidentiary hearings on colorable Atkins claims. See, e.g., Jackson v. Norris, 615 F.3d 959 (8th Cir. 2010); Sasser v. Norris, 553 F.3d 1121 (8th Cir. 2009); Simpson v. Norris, 490 F.3d 1029 (8th Cir.

_____

law required Coonce to raise it earlier. Rather, because § 3596(c) exempts a mentally-retarded defendant from "execution," Congress meant to allow it to be raised at any time before the district court. See also Ortiz v. United States, 664 F.3d 1151, 1162-62, 1165-66 (8th Cir. 2011) (Atkins claim raised for first time in § 2255 proceeding nonetheless is granted a hearing and reviewed on the merits). Nor would a hearing here following the jury's sentencing verdict have prejudiced the government or posed a problem for the court. And, in any event, because intellectual disability makes a defendant legally ineligible for execution, this Court would need to consider Coonce's claim on its merits even had it not been timely presented to the district court. See Sasser v. Norris, 553 F.3d 1121, 1125-26 & n.4 (8th Cir. 2009) (reviewing procedurally defaulted claim of intellectual disability in habeas because, if claim is valid, petitioner is "actually innocent" of the death penalty). See also Jackson v. Norris, 615 F.3d 959, 963 & n.6 (8th Cir. 2010); Simpson v. Norris, 490 F.3d 1029, 1031, 1034 (8th Cir. 2007).

2007).  Under these decisions, a "hearing [is] warranted where a petitioner

allege[s] that he [is] mentally retarded," under the applicable legal definition.[27]

Jackson, 615 F.3d at 963, quoting Sasser, 553 F.3d at 1125.

Under that standard, and in light of Hall, Coonce unquestionably pled ample

facts on the first two criteria, intellectual and adaptive functioning, to raise an issue

about whether he is mentally retarded and thus require an evidentiary hearing

before the court.[28]  (See A.510 [ad.27]: trial counsel notes 71 IQ score and

---

[27] A federal defendant facing a capital sentence in the first instance, of course, is subject to none of the procedural barriers that a habeas petitioner faces. Indeed, counsel has identified no case in which a trial court has denied a federal defendant's claim under Section 3596 without determining whether he is, in fact, mentally retarded.  Rather, the consistent practice has been for district courts to convene an evidentiary hearing.  United States v. Williams, 1 F. Supp. 3d 1124 (D. Haw. 2014); United States v. Montgomery, 2014 WL 1516147 (W.D. Tenn. Jan. 28, 2014); United States v. Salad, 959 F. Supp. 2d 865 (E.D. Va. 2013); United States v. Jiménez-Benceví, 934 F. Supp. 2d 360 (D.P.R. 2013); United States v. Wilson, 922 F. Supp. 2d 334 (E.D.N.Y. 2013); United States v. Candelario-Santana, 916 F. Supp. 2d 191 (D.P.R. 2013); United States v. Northington, No. 07-550-05, ECF #1042 (E.D. Pa. Feb. 1, 2013); United States v. Umana, 2010 WL 1052271 (W.D. N.C. Mar. 19, 2010); United States v. Davis, 611 F. Supp. 2d 472, 474 (D. Md. 2009); United States v. Hardy, 644 F. Supp. 2d 749, 751 (E.D. La. 2008).

[28] The issue must be decided by the court, not the jury, as the district courts in the cases cited in the previous footnote have all recognized.  For that reason alone, it would not matter how the jury treated the evidence of Coonce's intellectual and adaptive deficits.  In any event, the jury was never asked to decide the issue of his mental retardation, let alone told that his eligibility for the death penalty depended on their finding.  Cf. Hurst v. Florida, 136 S. Ct. 616, 622 (2016) (jury's finding of aggravating factor was not constitutionally sufficient because

evidence of deficits in adaptive functioning).

The only possible issue, one Coonce flagged below, involves the third criterion: whether his disability arose during the developmental period, since his impairment traces to a traumatic brain injury he suffered when he was 20. Some older professional standards treat the developmental period as ending at age 18, and a number of courts have cited this without examining it, since the issue is rarely in dispute. Even Coonce's trial counsel evinced some confusion over whether it operated as a demarcation. (A.511 [ad.28]; arguing against an age-18 cutoff, though seeming unaware of support for that argument detailed below). But a close analysis of the FDPA's language and history, other federal and state statutes, current professional standards, and constitutional considerations clearly demonstrates that, as a matter of federal law, the developmental period extends at least to age 22, if not beyond. Thus, this Court, like the lower court, has before it the necessary showing on the age-of-onset criterion to warrant a hearing on Coonce's claim.

─────────────────

jury was never told that finding would make defendant death-eligible). And while the jury rejected a mitigating factor that Coonce's brain damage had lowered his IQ to 71, the court suggested (following a private, post-verdict chat with jurors) that the jury reached that result for several such mitigators because it doubted their value, not their factual truth. (Tr.5379). See also Point II, *post* (arguing that jurors may have rejected 71-IQ-score mitigator because of inadmissible evidence and prosecutorial misconduct).

**B.** **On the first criterion of Coonce's claim, significantly subaverage intellectual functioning, he pled sufficient facts — most important, his valid 71 IQ score on the most reliable instrument used by experts in the field.**

Prior to trial, Coonce underwent a thorough assessment by defense neuropsychologist Dr. Stacy Wood that included intelligence testing. (Tr.2944-3057). Wood reviewed extensive documentary evidence, and spent two four-hour sessions with him. (Tr.2951-52, 2963-75, 2990). Administering a "comprehensive battery" of multiple tests, she evaluated Coonce's "general intellectual functioning [and his] neurocognitive abilities," such as his capacity to "think, solve problems . . . memory, reasoning, attention, language, and related domains." (Tr.2951, 2982-83).

Wood assessed Coonce's intelligence using the test considered the gold standard in the field, the Wechsler-Adult Intelligence Test-IV (WAIS-IV), which scored his IQ at 71. That meant Coonce's intellectual functioning fell below 97% of the population. His performance was consistently low; even in his best areas, he still scored below 91% of the population. (Tr.2984-85, 2992; A.1823). Defense psychiatrist Richard Dudley agreed that Coonce suffered from significant "intellectual . . . deficits." (A.1869).

Wood's 71 IQ score comported with other evidence. Coonce, 34 years old at the time of trial, had displayed average intelligence as a young child, scoring

around 100 on several IQ tests.  (Tr.2953-54; A.1823).  But at age 20, he suffered a severe traumatic brain injury in a high-speed auto collision that broke multiple bones in his face, caused bleeding around his brain, and left him in a coma. Testing in following months showed permanent brain damage and a dramatic drop in intellectual functioning.  One psychologist estimated Coonce's IQ at around 79, though this was imprecise since the test he used, the Shipley Institute of Living Scale (a sort of "multiple choice vocabulary test") is "not [a] good proxy for IQ." (Tr.2959-67, 2971, 3959-61; A.1576-77, 1579-80, 1818-21).

Six years later, after Coonce was incarcerated, a BOP psychologist estimated his IQ at 77, though again without precision since he based it on a neuropsychological screening test, the RBANS, that does not measure IQ. (Tr.2972; 1820-21).[29]

In her pretrial assessment, Wood also meticulously tested for malingering. Administering four different instruments to Coonce, she found that he put appropriate effort into all the testing, there were no signs of malingering, and the results were valid.  She also noted that the BOP psychologist who had tested

_____

[29] The following year, Coonce suffered a second head injury when another prisoner attacked him.  Though milder than the first, it brought to the fore some of his previous, more overt neurological symptoms, such as headaches and memory loss.  (Tr.2987-88, 3971).  See Point III.A, post.

Coonce (several years before Castro's murder), and who happened to be a national expert on detecting malingering in forensic patients, had found that Coonce's score at the time (roughly consistent with an IQ in the 70s) was valid. (Tr.2974-78, 3013-14, 3053-55).

But in Wood's testimony (which, again, she delivered a little more than a week before the Supreme Court decided <u>Hall</u>), she seemed to assume that the law imposed a strict cutoff of 70 for intellectual disability.[30] Thus, she described someone "with an IQ of 69" as falling in the "very mild range of MR." (Tr.3007), and remarked that Coonce's 71 IQ score put him just above that, at the edge of the "borderline . . . range." (Tr.2992). This comported with how some clinicians characterized similar defendants before <u>Hall</u>. <u>See, e.g.</u>, <u>Greenway v. Schriro</u>, 653 F.3d 790, 803 (9th Cir. 2011) (expert characterized defendant's 72 IQ as "borderline").

When it denied Coonce's motion, the court had heard all this evidence, including Wood's testimony. And the motion specifically cited Wood's 71 IQ result. (A.510 [ad.27]; Tr.4984). The testimony the government later presented from its psychiatrist, Park Dietz, could not detract from Coonce's showing in

---

[30] So too did Coonce's trial counsel, who in summation told the jury that Coonce's score, if "one point lower . . . would be in the mental retardation area." (Tr.5289).

support of an Atkins hearing. In deciding whether such a hearing is necessary, the issue is whether the facts as alleged by Coonce, if true, could provide the basis for a finding of mental retardation, not whether "other evidence in the record . . . m[ight] cut against [his Atkins] claim." Brumfield, 135 S. Ct. at 2280-81.

And, in any event, Dietz's testimony supported Wood's on the key issues, and thus actually reinforced Coonce's motion. Dietz testified that he had a mental-retardation specialist on his "team," psychologist Daniel Martell (whom the government initially noticed as an expert witness, A.277). After reviewing Wood's work, Martell found that Wood had done the proper testing, no evidence of malingering was present, and nothing indicated he should reevaluate Coonce's intellectual functioning. And Dietz accepted Martell's judgment.[31] Dietz also agreed with Wood that Coonce had suffered a "significant" traumatic brain injury in the car crash, which had caused permanent cognitive impairment. And he never questioned the IQ estimates in the 70s that earlier experts had reached based on Coonce's performance on other tests years before Castro's murder. Dietz only added that interviewing Coonce made him think Wood's 71 score was "somewhat

---

[31] Nothing prevented Dietz from pursuing the issue further had he questioned Wood's testing. Dietz otherwise spared no expense in Coonce's case, billing the government almost a quarter of a million dollars for his company's work. (Tr.4952-53).

lower" than his own estimate (since Coonce gave a "reasonable account of his side of the story" when Dietz confronted him with negative information in records); he speculated that Coonce might have been "more depressed" during Wood's testing, and that this might have affected his IQ score. Thus, although Dietz offered no precise estimate of Coonce's IQ, his testimony conveyed no disagreement that it had plummeted after Coonce's brain injury at age 20 and remained substantially below normal.[32] (Tr.5009-21, 5124-30, 5048; A.1471-74).

Now, after Hall, an IQ score of 71 places Coonce squarely within the range for a diagnosis of intellectual disability. Indeed, that is the very score the defendant in Hall had. 134 S. Ct. at 1992. As the Supreme Court recognized, there is no "strict cutoff" of 70 for such claims, since IQ testing is inherently "imprecise" and "IQ scores represent a range, not a fixed number." 134 S. Ct. at 1998-99, 2001. "Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean . . . . this involves a score of 65-75." Id. at 1995, quoting DSM-5, at 37. As Coonce's motion below pointed out, given the 71 score, his true IQ may fall anywhere between the mid-60s and the

---

[32] While Dietz testified Coonce claimed he liked to read Westerns and showed the psychiatrist a thick book he said he was reading (Tr.5019-20), Dietz acknowledged he never asked Coonce anything about that book (or any other) to see if Coonce had actually read it, let alone understood or remembered anything about it. (Tr.5130).

mid 70s.  (A.510 [ad.27], citing Hall, 134 S. Ct. at 1995, 1997-98).  See also

Brumfield, 135 S. Ct. at 2278 (error to deny hearing where prisoner's "reported IQ

test result of 75 was squarely in the range of potential intellectual disability").

Given the imprecision of such testing, even an IQ score several points higher

would have sufficed to require a hearing.  See Sasser, 553 F.3d at 1125 (error to

deny hearing where IQ score was 79).

Moreover, beyond Coonce's 71 IQ score, Wood's thorough evaluation

found that he suffers from significant cognitive impairments in memory, language,

attention, reasoning, organizing information, and executive functioning, including

his ability to control behavior and regulate emotion.  (Tr.2958-3009, 3959-61,

3965).  Both the psychologist who had evaluated Coonce two months after his car

crash and the BOP psychologist who tested him six years later likewise found

similar impairments.  (A.1576-77, 1579-83, 1818-21; Tr.2965-72).

This evidence also supported Coonce's showing of significantly subaverage

intellectual functioning.  See DSM-5, at 33, 37 (first criterion for intellectual

disability involves "deficits in intellectual functions, such as reasoning, problem

solving, planning, abstract thinking, judgment, academic learning, and learning

from experience, confirmed by both clinical assessment and individualized,

standardized intelligence testing"); Sasser  v. Hobbs, 735 F.3d 833, 844 (8th Cir.

73

2013) (a range of evidence about intellectual functioning, beyond IQ scores, is relevant to first criterion).

Finally, the fact that Coonce's poor intellectual functioning traced back to a traumatic brain injury, which also prompted a diagnosis of a cognitive disorder (Tr.2969-71), did not detract from his showing. The DSM-5 states: "When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned." DSM-5, at 38. See also id. at 31. The AAIDD Manual also says that intellectual disability may "originate later" in the developmental period, and be brought on suddenly by a "traumatic brain injury." Id. at 27, 66. Moreover, the Supreme Court recognized a generation ago that "[m]ental retardation is caused by a variety of factors, some genetic, some environmental, and some unknown." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 442 n.9 (1985).

Thus, in numerous capital cases, federal and state courts have found intellectual disability or evidence justifying a hearing where the condition owed at least in part to a head injury. See, e.g., United States v. Hardy, 762 F. Supp. 2d 849, 878, 904 & n.143 (E.D. La. 2010); United States v. Lewis, 2010 WL 5418901, at *31 (N.D. Ohio Dec. 23, 2010); Oats v. State, 181 So. 3d 457, 462-63

(Fla. 2015); <u>Comm. v. Williams</u>, 61 A.3d 979, 985 (Pa. 2013); <u>Smith v. State</u>, 357

S.W.3d 322, 352 (Tenn. 2011); <u>Ex parte Van Alstyne</u>, 239 S.W.3d 815, 819 (Tex.

Cr. App. 2007); <u>Tarver v. State</u>, 940 So. 2d 312, 319 & n.5 (Ala. Cr. App. 2004);

<u>State v. Carter</u>, 813 N.E. 2d 78, 83 (Ohio. App. 2004).

**C.    Extensive evidence of Coonce's adaptive deficits, which the court had heard and his motion flagged, also supported the need for an <u>Atkins</u> hearing.**

The second criterion of mental retardation involves "deficits in adaptive

functioning," in other words, limitations on daily life skills "across a variety of

dimensions." <u>Brumfield</u>, 135 S. Ct. at 2278-79.  Such deficits "result in failure to

meet developmental and sociocultural standards for personal independence and

social responsibility. Without ongoing support, the adaptive deficits limit

functioning in one or more activities of daily life such as communication, social

participation, and independent living, across multiple environments, such as home,

school, work, and community." <u>DSM-5</u>, at 33, <u>cited in</u> <u>Hall</u>, 134 S. Ct. at 1994.

<u>See also</u> <u>Sasser</u>, 735 F.3d at 845 (citing similar definition from previous version of

the DSM).

Coonce's mental-retardation motion reminded the court it had just heard

extensive evidence, from expert and lay witnesses and via records, that Coonce had

exhibited a range of significant deficits in adaptive functioning.  The evidence

revealed that, following his traumatic brain injury suffered in a car crash at age 20, Coonce spent a year and a half in the community before committing the kidnapping that landed him in prison. Consistent with a psychologist's findings, shortly after the crash, that Coonce had suffered significant cognitive impairments in attention, reasoning, and memory, his girlfriend noticed enormous behavioral changes: He became easily confused, could not remember things, and had an even harder time controlling his emotions and impulses. His stepmother also noticed memory problems. During that period, Coonce led an "extremely unstable and often chaotic" existence, as a defense psychiatrist summed it up, and showed himself completely unable to function independently in any way in society. Coonce could not hold employment, getting and losing several jobs. His girlfriend and stepmother sought psychiatric treatment for him from a series of clinics and hospitals, but Coonce was never able to follow up after the initial appointment. (Tr.3244-47, 3264-65, 3285-92, 3752-54, 3962-65, 4711-14; A.1322-43, 1345-1424, 1427-54, 1576-77, 1579-83, 1686-87, 1858-59, 1867-68). See also Facts, Section II, *ante*.

Since he was arrested for the kidnapping at age 21, Coonce has remained locked up; at the time of his capital trial, he had been incarcerated for more than a dozen years. Little can usually be discerned about adaptive functioning from

existence in prison, since highly regimented behavior in a cell under the constant supervision of guards "says nothing about the inmate's ability to take responsibility for his own health and safety while in the general community," the crux of the second criterion for intellectual disability. United States v. Davis, 611 F. Supp. 2d 472, 495 (D. Md. 2009). See also United States v. Hardy, 762 F. Supp. 2d 849, 899 (E.D. La. 2010); United States v. Salad, 959 F. Supp. 2d 865, 886 (E.D. Va. 2013).

Still, throughout Coonce's time in the BOP, he has experienced serious difficulty in daily functioning, despite the highly structured setting. In virtually every type of institution (his inability to adapt has prompted the BOP to cycle him through one prison after another), he has displayed limited interpersonal skills, been unable to effectively communicate or get along with staff, been victimized and fought with other inmates, engaged in self-mutilation and suicidal behavior, been flummoxed by basic tasks like typing on a computer, failed to take prescribed medication that would have reduced his psychiatric symptoms, repeatedly acted impulsively and heedlessly, and been written up many times mostly for pointless, self-defeating disciplinary infractions. In short, as defense psychiatrist Dudley concluded, in the BOP Coonce displayed a "broad-based instability in . . . important areas of functioning." (Tr.2110-2219, 2269-72, 2277-2366, 3965-68,

3971-72, 4028-29; A.1868-69).

This showing on the second criterion was not vitiated by evidence that Coonce's adaptive deficits may also, in part, have reflected other longstanding mental conditions tracing back to childhood — a major psychiatric illness such as bipolar or anxiety disorder, as the defense maintained (A.1858-62, 1869-70; Tr.1955, 2315, 2355, 3962-65), or anti-social personality disorder, as the prosecution asserted (Tr.5029-34). "[A] defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability." United States v. Wilson, ___ F. Supp. 3d ___, 2016 WL 1060245, at **18-19 (E.D.N.Y. Mar. 15, 2016) (discussing how both the DSM-5 and the AAIDD Manual omit any such requirement). Furthermore, "antisocial personality is not inconsistent with . . . adaptive impairment, or with intellectual disability more generally." Brumfield, 135 S. Ct. at 2280; Jackson, 615 F.3d at 965 (finding that defendant with other DSM-5 disorders, including anti-social personality, had nevertheless established right to Atkins hearing). Similarly, "depressive and bipolar disorders" and "anxiety disorders" often "co-occur" with intellectual disability. DSM-5, at 40.

When the court summarily rejected Coonce's motion, it had just finished listening to this extensive sentencing evidence describing his deficits, evidence that

the motion itself flagged. (A.510 [ad.27]). Thus, that evidence must be considered in determining whether a hearing is required, even though the motion did not recite the proof on the second criterion. See Brumfield, 135 S. Ct. at 2279 (in determining whether federal habeas court erred in denying evidentiary hearing on mental retardation, Supreme Court considers the full "record before the state court"); Jackson, 615 F.3d 959 (habeas petitioner sufficiently pled Atkins claim by incorporating evidence from trial record by reference).

This evidence certainly satisfied the minimal standard for obtaining a hearing. Again, as the Supreme Court has recognized, it suffices for the prisoner to show that he "may well have" suffered from adaptive impairments or that there is "reason to believe" he does. Even if "other evidence m[ight] cut against [his] claim," if he pleads colorable facts, a hearing is required. Brumfield, 135 S. Ct. at 2280-81.

**D.** **Coonce made the necessary showing that his mental retardation arose during the developmental period, the third criterion of the legal definition, notwithstanding that it traced back to the traumatic brain damage he suffered at age 20.**

The third criterion of mental retardation turns on when the disorder arose. Current professional standards and the most recent Supreme Court decisions require the onset or manifestation of deficits during the "developmental period," Hall, 134 S. Ct. at 1994, quoting DSM-5, at 33. See also Brumfield, 135 S. Ct. at

79

2282.

This can become a factual issue where a defendant is shown to be intellectually disabled as an adult yet there is a dearth of school records or other contemporaneous evidence from his youth.  See, e.g., Van Tran v. Colson, 764 F.3d 594, 601, 614-15 (6th Cir. 2014).  But courts rarely confront disputes over what age marks the end of the "developmental period," let alone a case that turns on that question.  Coonce's claim is the rare exception, since his intellectual disability appears to date back to his traumatic brain injury at age 20.

More than a decade ago, in holding that the Eighth Amendment forbids executing mentally-retarded offenders, the Court left it to legislatures and lower courts to define the scope of that constitutional protection.  Atkins, 536 U.S. at 317.  See also Bobby v. Bies, 556 U.S. 825, 831 (2009) (Atkins "did not provide definitive procedural or substantive guides" for deciding who qualifies as mentally retarded).  It did note in passing that under then-existing professional standards, the diagnosis usually applied when the condition manifested "before age 18."  Atkins, 536 U.S. at 308 n.3, quoting DSM-IV-TR, at 41 (4th ed. 2000); American Association on Mental Retardation, Mental Retardation: Definition, Classification,

and Systems of Supports, at 5, 318 (9th ed. 1992).[33]  For that reason, and because the scope of the third criterion has never been an issue in a federal death-penalty case, this Court and some others have tended to invoke the "age 18" definition in such cases.  See, e.g., Ortiz v. United States, 664 F.3d 1151, 1158 (8th Cir. 2011).

But those decisions have done so without needing to consider whether age 18 actually represents a rigid boundary under the Eighth Amendment, let alone whether it applies in federal capital prosecutions, which are governed in the first instance by the FDPA's *statutory* definition of mental retardation.  As follows, a close examination reveals that Congress meant to at least embrace cases, like Coonce's, involving onset by age 22, rather than requiring an earlier cutoff, if any.

The FDPA's prohibition that "[a] sentence of death shall not be carried out upon a person who is mentally retarded," 18 U.S.C. § 3596, enacted in 1994, was lifted wholesale and without discussion from the capital-sentencing provisions of the Anti-Drug Abuse Act (ADAA), passed six years earlier.  21 U.S.C. § 848(l).[34]

---

[33] The AAMR and the AAIDD are the same organization, which changed its name in the years after Atkins to reflect the professional medical community's shift to calling the condition "intellectual disability."  See Ortiz v. United States, 664 F.3d 1151, 1157 n.4 (8th Cir. 2011).

[34] Section 848(l) and other such procedural provisions of the ADAA were later repealed by Congress in a 2006 statute under which trials of substantive crimes made capital by the ADAA are now governed by the FDPA's procedures. See United States v. Stitt, 552 F.3d 345, 352 (4th Cir. 2008).

The exemption was added to the ADAA only shortly before it passed, at the end of a years-long process of drafting, revising, and shepherding the bill through Congress. The exemption's legislative history consists of a brief discussion on House floor two months before the bill was signed into law. Democratic Representative Levin offered amending language that would later become § 848(l), and read a "definition of 'mental retardation,'" containing no age cutoff, only a requirement that the condition have "manifested in the developmental period." Rep. Levin added: "That is in the early period of their lives." Republican Representative Gekas, the bill's leading House sponsor, said this definition of mental retardation, which reflected the "nationwide" standard, had been agreed to by conferees from both parties. Rep. Levin added that it had also been "accepted in the courts." Before the amendment passed, several other representatives spoke in support, one also describing the third criterion as onset during "the developmental period." No one mentioned any age cutoff.[35] 134 Cong. Rec.

───────────────────

[35] At the time of the amendment, the Supreme Court had granted certiorari on the question whether the Eighth Amendment permitted executing "an individual with the reasoning capacity of a seven year old," though it had not yet heard the case. See Penry v. Lynaugh, 1987 WL 955346, at *i (Dec. 30, 1987); Penry v. Lynaugh, 487 U.S. 1233 (1988). But the House discussion made no mention of that, and no one suggested that the mental-retardation exemption was being adopted to satisfy the Constitution, let alone that it was intended to mirror only whatever protection the Supreme Court might decide the Constitution afforded. Congress included in the ADAA a number of novel safeguards exceeding then-

H7259-02, 1988 WL 175612 (Sept. 8, 1988).

The representatives' references to the definition of mental retardation used "nationwide" and "accepted by the courts" were not to statutes or judicial decisions forbidding the execution of such persons. At that time, only one such statute existed, passed just a few months earlier in Georgia. That law likewise imposed no age cutoff, requiring only that the condition have manifested during "the developmental period." See Ga. Code Ann. 17-7-131; Penry v. Lynaugh, 492 U.S. 302, 334 (1989). And there had not yet been any court decision, state or federal, barring execution of the intellectually disabled.

Rather, the representatives more likely had in mind the age of onset in the "nationwide," federal definition of developmental disability — a category explicitly including "mental retardation" — that they had legislated a decade before, and which had been "accepted by the courts." In 1978, Congress amended the law providing governmental assistance to persons with such a disability, to define it as "manifest[ing] before the person attains age twenty-two." P.L. 95-602.

─────────────────────

recognized constitutional mandates, including, for example, a prohibition on executing juveniles, a right to jury sentencing, a requirement that the jury certify that it did not discriminate based on race, and special qualifications for counsel. See 21 U.S.C. § 848(i), (j), (l), (o), (q) (repealed 2006). Moreover, Congress carried over the mental-retardation exemption into the FDPA even after the Supreme Court had ruled in Penry that the Constitution did not require it. 492 U.S. 302, 340 (1989).

That change was purposeful, since the statute as originally adopted in 1975 had

included "mental retardation" within the definition of "developmental disability,"

but had specified the age of onset as 18. <u>See</u> P.L. 94-103. Years later, in 2000,

when Congress again revised that statute, it kept 22 as the age of onset, and that

remains the law today. 42 U.S.C. § 15002(8)(A). In fact, applying it to a case with

facts mirroring Coonce's, another circuit has held that an individual qualifies as

intellectually disabled under that law where his condition owed to a traumatic brain

injury suffered in a car crash at age 20. <u>Tennessee Protection & Advocacy, Inc. v.</u>

<u>Wells</u>, 371 F.3d 342, 346-50 (6th Cir. 2004).

Similarly, when Reps. Levin and Gekas took to the House floor in

September 1988 to announce the exemption, 'nationwide' federal law, 'accepted

by the courts,' also defined the "developmental period" as extending to age 22 for

Social Security claims based on mental retardation. <u>See, e.g.</u>, <u>Turner v. Bowen</u>,

856 F.2d 695, 698 (4th Cir. 1988), <u>citing</u> 20 C.F.R., Pt. 404, Subpt. P, app. 1, §

12.05 (1986); 50 Fed. Reg. 35038, 35068 (Aug. 28, 1985) (adopting that rule).

That standard too remains in force today. <u>See, e.g.</u>, <u>Lott v. Colvin</u>, 772 F.3d 546,

549 (8th Cir. 2014) (intellectual disability requires "onset . . . before age 22").

It would be unjustifiably strange for federal law to treat someone like

Coonce as intellectually disabled for one purpose, but not another. Indeed, <u>Hall</u>

teaches that the definition of intellectual disability in the death-penalty context should draw from the standards used for assessing this condition in the areas of "education" and "access to social programs." 134 S. Ct. at 1993. See also Tennessee Protection & Advocacy, 371 F.3d at 349 (accepting that developmental period extends to age 22 under Developmental Disabilities Act in order "to be consistent with our interpretation of the same age requirement" in Social Security cases). If anything, the government should be *more* leery about mistakenly discounting this condition when a life, rather than a financial stipend, is at stake. See Hall, 134 S. Ct. at 1990, 2001 (condemning use of strict IQ cutoff in part because it "creates an unacceptable risk that persons with intellectual disability will be executed").

In extending the "developmental period" beyond age 18, federal law is hardly an outlier. Some state mental-retardation statutes did incorporate the age-18 cutoff that Atkins, citing then-current professional standards, mentioned in passing.[36] See, e.g., Jackson, 615 F.3d at 961 (discussing Arkansas's statute). But other states followed the federal standard in making age 22 their benchmark. See,

---

[36] "Although the Court gave the age-of-onset requirement little attention, much of the state legislation that followed Atkins included it in an effort to mirror the Atkins-referenced definitions." Mulroy, Execution by Accident: Evidentiary and Constitutional Problems with the "Childhood Onset" Requirement in *Atkins* Claims, 37 Vt. L. Rev. 591, 602 (Spring 2013).

e.g., Ind. Code Ann. § 35-36-9-2; Md. Code Crim. L. Ann. § 2-202(b)(ii) (2009); Utah Code Ann. § 77-15a-102(2).  Still others — like Georgia, whose novel law had just been enacted when Congress exempted the mentally retarded from execution — eschewed any age cutoff in favor of requiring onset "during the developmental period."  See, e.g., Ga. Code Ann. § 17-7-131(a)(3); Colo. Rev. Stat. Ann. § 18-1.3-1101; Ky. Stat. Ann. § 532.130(2); Nev. Rev. Stat. Ann. § 174.098(7); S.C. Code Ann. § 16-3-20(C)(b)(10); Wyo. Stat. Ann. § 8-1-102(a)(xiii).  And some simply omitted any age-of-onset requirement.  See, e.g., Neb. Rev. Stat. § 28-105.01(3); N.M. Stat. Ann. § 31-20A-2.1(A) (2009).

Moreover, in the decade and a half since Atkins, professional standards on intellectual disability have moved toward rejecting the view that the developmental period ends abruptly at age 18.  And the Supreme Court appears to be following suit.

Since Atkins, the American Psychiatric Association has revised the DSM to abandon the age-18 cutoff mentioned by the Court, and now requires simply onset during the "developmental period."[37]  DSM-5, at 33.  In doing so, it moved closer

---

[37] The handful of state court decisions that have denied mental-retardation claims by treating age 18 as a fixed upper boundary have all involved statutes that, unlike the FDPA, explicitly mandated such a cutoff, and all but one of those cases were decided under the now-superseded version of the DSM that did likewise.  See, e.g., State ex rel. Clayton v. Griffith, 457 S.W. 3d 735, 753-54 (Mo. 2015);

to the American Psychological Association's standard for intellectual disability, which had previously extended that period to 22. Manual of Diagnosis and Professional Practice in Mental Retardation, 13, 36 (1996). Moreover, while the other leading professional standard for intellectual disability, the AAIDD's, identified 18 as the upper boundary for the age of onset in the 2010 edition of its manual, see AAIDD Manual, at 1, a more recent publication sponsored by the organization appears to step back from that view.[38] After noting that the states have taken different approaches, it acknowledges the DSM-5's repudation of efforts to erect a cutoff, and approvingly suggests this reflects emerging understanding that "brain development (and therefore, possibility for onset of ID) does not necessarily end at age 18." AAIDD, The Death Penalty and Intellectual Disability, Chapter 6, at 77-78 (Polloway ed. 2015).

Hall held that the Eighth Amendment protection against executing the intellectually disabled should be informed by the standards currently used by

State v. Strode, 232 S.W.3d 1, 14-15 (Tenn. 2007); Comm. v. Vandivner, 962 A.2d 1170, 1187-88 (Pa. 2009); State v. Anderson, 996 So. 2d 973, 986-87 (La. 2008).

[38] Noting age 18 had been chosen somewhat arbitrarily because it "generally corresponds to the end of high school in the United States," even the 2010 publication anticipated that drawing a hard line there might be scientifically questionable since "considerable change" in brain development "occurs . . . beyond" the "teenage years." AAIDD Manual, at 28, 93.

skilled medical professionals in the field.  134 S. Ct. at 1993-94.  See also Moore

v. Texas, 136 S. Ct. 2407 (2016) (granting certiorari to review use of outdated

medical standard to reject Atkins claim).  Indeed, Hall explicitly criticized judicial

insistence on a bright-line rule on an issue — there, IQ scores — where clinical

experts employ a more flexible, functional standard.[39]  And, in discussing the third

criterion, the Court specifically cited the DSM-5 definition, referring simply to

"the developmental period" without any age cutoff.  Id.

That view comports with the Supreme Court's own growing recognition of

the scientific consensus that the human brain does not mature until the early 20s.

In Miller v. Alabama, 132 S. Ct. 2455, 2464 n.5 (2012), the Court cited with

approval the amicus brief by the APA on this subject.  That brief explained that

impulsivity continues to decline through age 22 and "the skills required for future

planning continue to develop into the early 20s."  Amicus Brief, 2012 WL 174239,

at **9, 12-13 & n.11 (Jan. 17, 2012).  See also Tim Requarth, Neuroscience is

Changing the Debate Over What Role Age Should Play in the Courts, Newsweek

(Apr. 18, 2016), http://tinyurl.com/zz7l9xk (discussing how lower courts and legal

--------

[39] Coonce urged this view in his Atkins motion, arguing that "the age of 18
cannot be the cut off for the onset of the deficits in intellectual functioning,"
especially given  Hall's warning against "a formalistic cut off" for IQ and its
recognition that this categorical exclusion is "fluid."  (A.511 [ad.28]).

policymakers are coming to share this recognition).  Moreover, in <u>Roper v. Simmons</u>, 543 U.S. 551, 574 (2005), the Court recognized that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18."

Furthermore, the recognized reasons for barring execution of the intellectually disabled fully support interpreting the FDPA as extending the developmental period to at least age 22, and covering Coonce's claim.  Because of their diminished comprehension, impaired communication, and lowered impulse control, mentally-retarded individuals bear reduced culpability, are less able to plan and deliberate, and are often followers rather than leaders.  Subjecting them to capital punishment fails to serve the penological objectives of retribution and deterrence.  Such defendants also generally make poor witnesses and have trouble assisting their counsel and regulating their demeanor (thus, for example, giving an unwarranted impression of lack of remorse).  Those problems, together with the risk that jurors will view intellectual disability as making a defendant more dangerous in the future, combine to create a risk that he will receive a death sentence despite factors militating against it.  <u>See</u> <u>Atkins</u>, 536 U.S. at 320-21; <u>Hall</u>, 134 S. Ct. at 1992-93, 1999.  <u>See also</u> 134 Cong. Rec. H7259-02, 1988 WL 175612 (Sept. 8, 1988) (Congressional supporters cite several of these considerations as justifying statutory prohibition against executing the mentally

retarded).

These concerns apply equally to adult defendants, like Coonce, who suffered from significant intellectual and adaptive deficits at the time of the crime and still suffer from them at the time of trial. (And they were fully realized in Coonce's case. See Facts, Section IV, *ante*; Point VII.E, *post*.). Indeed, an individual, like Coonce, whose intellectual functioning drops into the retardation-range in late adolescence is arguably *more* impaired than ones born with such a depressed IQ, who, as Wood testified, at least have time before adulthood to try to learn to "compensate for their deficits." (Tr.3007).

Even under the dubious view that a rigid age-of-onset requirement helps ensure the condition is genuine and not feigned, see Com. v. Vandivner, 962 A.2d 1170, 1187-88 (Pa. 2009), recognizing that the developmental period extends to at least 22 would not frustrate those aims. Intellectual disability claims are litigated and resolved in adversary proceedings in hundreds of Social Security benefits cases every year, using a boundary of age 22. And, as discussed, here there was no real dispute that, as a result of brain damage he sustained a decade and a half ago, Coonce's impairment is genuine and he has not malingered in his various psychological assessments over the years that have all consistently shown or estimated substantial intellectual deficits. See also Mulroy, Execution by

Accident: Evidentiary and Constitutional Problems with the "Childhood Onset" Requirement in *Atkins* Claims, 37 Vt. L. Rev. 591, 647-48 (Spring 2013) (age-of-onset requirement not justified by need to prevent malingered retardation claims).

For all these reasons, reading a strict age-18 cutoff into the FDPA exemption to foreclose Coonce's claim *ab initio* would not only constitute an unsupported and unreasonable reading of the FDPA but would also raise serious doubts about its constitutionality, which the Court must strive to avoid. See Union Pac. R. v. U.S. Dep't of Homeland Sec., 738 F.3d 885, 892-93 (8th Cir. 2013) (citation omitted). Some judges and commentators have properly questioned the constitutional validity of the age-of-onset requirement. See, e.g., State ex rel. Clayton v. Griffith, 457 S.W. 3d 735, 758-59 (Mo. 2015) (Stith, Draper & Teitelman, JJ., dissenting) (state's statutory age-18 cutoff violated Eighth Amendment because Atkins' mandate "that it is unconstitutional to execute someone who is intellectually disabled does not depend on when an intellectual disability manifested"); State v. Anderson, 996 So. 2d 973, 987 (La. 2008) (while applying Louisiana's statutory age-18 cutoff, court acknowledges it "can appear arbitrary" rather than "principled" to "distinguish[] between the 19-year [old] . . . and the 17-year old" with comparable "IQ" and "adaptive skills" deficits); Mulroy, *supra*, at 594 ("'age of onset' requirement is . . . irrational, unwarranted, and arguably unconstitutional"

in the death-penalty context).

That criticism has force because a primary rationale for the third criterion in a clinical setting — the need to distinguish developmental from adult-onset disabilities so as to identify appropriate support systems or facilitate research — arguably does not apply in the Atkins context, where the main issue is how the defendant's mental condition affects his thinking and behavior at the time of the crime and the time of trial.  See Mulroy, *supra*, at 602-603; ABA, Recommendation and Report on the Death Penalty and Persons with Mental Disabilities, 30 Ment. & Phys. Disab. L. Rep. 668, 669-70 (2006) (age of onset should not matter in Atkins cases);  Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 422-23 (1985) (age-of-onset requirement has an "obscure" origin and "limited" relevance to criminal justice). See also Hall, 134 S. Ct. at 1993 (to determine if IQ cutoff is valid, Court considers psychiatric profession's view of the "purpose and meaning" of IQ scores).

Though the Court need not actually reach the constitutional question, in order to preserve any necessary claim on that point, Coonce asserts that applying any cutoff here, let alone a rigid age-18 boundary, would violate the Eighth Amendment as well as the Equal Protection component of the Fifth Amendment. Cf. Smith v. Ryan, 813 F.3d 1175, 1183 (9th Cir. 2016) (because Atkins'

"rationales . . . concentrate on the time the crime was committed and the ensuing trial," a defendant comes within its protection "if he can demonstrate that he was intellectually disabled during either of these periods.").

Accordingly, Coonce's showing below also satisfied the third criterion for mental retardation.[40]  The Court should remand for a hearing on his claim.

## II.

**The government improperly urged jurors to dismiss Coonce's retardation-level IQ even as mitigation based on his refusal to submit to pretrial competency testing and the unavailability of any "blood test" for intelligence.**

In truth, no evidence contested Coonce's proof that he functioned intellectually at or near the mental-retardation level.  <u>See</u> Point I.B, *ante*.  To convince sentencing jurors to dismiss it then, the prosecutors resorted to two impermissible tactics.

First, over objection, the government elicited evidence that, almost three years earlier, soon after it first sought the death penalty, Coonce had refused to submit to intelligence testing when sent to MCC Chicago to determine his competency to stand trial.  (A.457; Tr.4301-05).  The government called BOP

---

[40] Alternatively, even were the scope of the developmental period regarded as a question of fact, Coonce's case should still be remanded, with that question included among the ones the parties would address and the district court would decide at a hearing.

psychologist Ron Nieberding, who had begun but never completed an evaluation because of Coonce's non-cooperation. Nieberding's seat-of-the pants "estimate" of Coonce's intellectual ability (low-average to average) relied largely on the fact that he appeared coherent and could answer questions in their one conversation, and on some school records that *predated* his brain damage.[41] The psychologist was not really familiar with that history or any of the expert neurological and intelligence assessments performed on Coonce. (Tr.4663-66, 4671-73, 4684-88; A.1468-69).

Unsurprisingly, given the inherent weakness of an opinion resting on such sketchy data, the prosecutor focused the jury on *why* Nieberding was unable to assess Coonce's intellectual functioning. He elicited that Nieberding wanted to assess Coonce's "cognitive ability" and specifically his "IQ," using "a number of instruments," including "cognitive or intellectual measures," plus additional tests to see if Coonce was faking. But he could not, because after telling Coonce the nature of the tests and explaining the process, Coonce "declined to participate," refusing to meet with Nieberding again. The prosecutor highlighted that Coonce had balked at "[a]ny IQ testing" (Tr.4667-69; A.1468-69), and returned to this

---

[41] Nieberding explained that he had no choice but to speculate based on fragmentary information because he "ha[d] to file a report." (Tr.4669-70).

94

point on redirect, making sure it was the last thing jurors heard from Nieberding:

> Q: . . . Mr. Coonce had done what in response to your questions
> concerning taking a battery of tests?

> A: Wasn't willing to cooperate and actively participate in that part of
> the process.

(Tr.4702).

Using Coonce's exercise of his right not to speak further with the BOP psychologist to undermine the essentially uncontested evidence of his 71 IQ score violated due process.[42] Coonce had been advised that he could remain silent — both by the magistrate judge at his first appearance a year before the competency evaluation, and by Nieberding before their first conversation. (4/23/10 Tr.2; Tr.4659). He chose to do so. The government could not then use that silence against him, see Doyle v. Ohio, 426 U.S. 610, 618 (1976) (given implied assurance that silence would "carry no penalty," it was "fundamentally unfair" for government to use it to impeach defendant's testimony), including on a mental-health issue, see Wainwright v. Greenfield, 474 U.S. 284, 294 (1986); see also Commonwealth v. Duffey, 855 A.2d 764, 772 (Pa. 2004). Nor was this unfair to the prosecutors, whose expert Dietz could have but chose not to perform any IQ

---

[42] This issue is reviewed *de novo*. See United States v. Frazier, 408 F.3d 1102, 1109 (8th Cir. 2005).

95

testing when he later evaluated Coonce on the eve of trial.  See Point I.B, *ante*.

The government also employed another improper tactic during summation to divert jurors from the proof of Coonce's retardation-level IQ.  Professing no quarrel with defense expert Wood's methods or results, the prosecutor nonetheless urged jurors to dismiss the IQ evidence on a basis that would cast aside virtually all expert psychological testimony, and, indeed, any expert testimony involving interpretation or opinion.  The prosecutor argued that having the defendant's "answers to . . . questions," unlike "draw[ing] blood" or "test[ing] for diabetes or cancer," is "not necessarily a reliable basis" for determining his intelligence. (Tr.5256-57).  But the accepted tests for intelligence rely primarily on such answers, and there is no scientifically valid objection to those tests.  See, e.g., Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002) (relying on petitioner's performance on the WAIS, "the standard instrument in the United States for assessing intellectual functioning").  Ignoring factually supported, reliable expert testimony simply because psychological assessments do not mirror blood tests is irrational decisionmaking, forbidden in capital sentencing by the Eighth Amendment.  See Parker v. Dugger, 498 U.S. 308, 321 (1991); California v. Brown, 479 U.S. 538, 562 (1987).

The inadmissible evidence about Coonce's silence was not harmless beyond

a reasonable doubt, see Satterwhite v. Texas, 486 U.S. 249, 257 (1988); 18 U.S.C.

§ 3595(c)(2), and the prosecutor's "blood test" argument, though unobjected to,

constituted plain error, see Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S.

725, 732-33 (1993).[43]  Not a single juror found Coonce's 71 IQ score as a mitigator

(A.554, 567 [ad.48, 61]), though it should have figured significantly, see, e.g.,

Brownlee v. Haley, 306 F.3d 1043, 1073 (11th Cir. 2002), and might well have

altered the outcome.  See Point IV.C, *post*.  The Court should vacate Coonce's

death sentences and order resentencing.

## III.

### As a result of the prosecutor's improper presentation and the court's refusal to give a key instruction, the jury also dismissed Coonce's brain damage as mitigation though it was effectively undisputed.

A.     **Records showed and both sides' experts agreed that Coonce had suffered traumatic brain damage that caused permanent cognitive impairment.**

At sentencing, the defense showed that in 2000, at age 20, Coonce suffered a

severe traumatic brain injury in a high-speed car crash.  Paramedics found his

---

[43] For preservation purposes, Coonce also maintains that Satterwhite should be overruled for the reasons advanced by the dissent, see 486 U.S. at 26-66 (Marshall, Brennan & Blackmun, JJ., dissenting), and that all the constitutional errors affecting his death sentence asserted in this brief should be treated as *per se* reversible.

vehicle a crumpled wreck, where Coonce lay comatose with multiple facial fractures and other grave injuries.  Neurological screening at the scene and, later, the hospital scored him as severely brain-injured with permanent damage highly likely.  Even after regaining consciousness a couple of days later, Coonce remained confused and disoriented, and suffered amnesia for the next week or two.  Imaging showed extensive bleeding around his brain.  Two months later, psychological testing pointed to traumatic brain damage, with cognitive deficits in attention, reasoning, and memory.  As a result, Coonce was diagnosed with a "Cognitive Disorder," an Axis I major mental illness in the DSM.

A few years later while incarcerated at USP Florence, Coonce was attacked by a cellmate because of his sex-offender status, and suffered another head trauma that, while milder than the first, accentuated the neurological damage from the car crash and brought to the fore some of the same overt symptoms.  Evacuated to a civilian hospital where he remained in acute care for a week, Coonce again was found to be confused, disoriented, and suffering from amnesia, projectile vomiting, and headaches that would continue for some time.

Jurors received essentially undisputed evidence of these facts, consisting of both documentary evidence and expert testimony.  (Tr.2959-67, 2971, 3959-61; A.1576-77, 1579-83, 1818-21).  <u>See also</u> Facts, Sections II-III, *ante*; Point I.B,

*ante*.

Defense neuropsychologist Wood, a specialist in brain injuries, also performed a comprehensive battery of tests on Coonce the year before trial. Those showed neurological impairments in memory, language, and executive functioning (controlling behavior and regulating emotion). Wood's testing also revealed that brain damage had depressed Coonce's IQ dramatically, from average before the car wreck down to the mentally-retarded range, below 97% of the population. This comported with other testing two months after the accident and then again six years later, while Coonce was in the BOP, which roughly estimated him at or near the edge of intellectual disability. See Point I.B, *ante*.

Concerning Coonce's brain damage, prosecution psychiatrist Dietz did not really diverge from Wood. He concurred that Coonce has suffered a "significant" traumatic brain injury in the auto accident, and that his score on the neurological test administered right after was "as low as it gets." He agreed that Coonce had likely remained in a coma or unconscious for  days. Nor did he dispute that Coonce had suffered another "significant" traumatic brain injury in the assault at USP Florence. Dietz believed that Woods' testing showed impairment consistent with brain damage, and that such damage had caused Coonce memory problems and headaches. The psychiatrist conceded that he met the DSM standard for mild

neurocognitive disorder due to traumatic brain injury.  Furthermore, Dietz did not

disagree that Coonce's intellectual functioning had plummeted after the car crash

and remained substantially below normal.  See Point I.B, *ante*.

Dietz also testified that a neuropsychologist on his "team" had reviewed

Wood's results and raw data and found that Wood had done the proper testing,

agreed with Wood that there was no evidence of malingering, and saw no reason to

reevaluate Coonce as to brain damage.  See Point I.B, *ante*.

**B.     Prosecutors nevertheless urged jurors to dismiss this evidence because Coonce was at fault for the car crash where he sustained his brain injury and for being in prison to suffer the assault that accentuated some symptoms.  In conjunction with the court's refusal to give a key instruction, this led the jury to ignore Coonce's brain damage as mitigation.**

Given this compelling, essentially undisputed evidence that Coonce had

suffered traumatic brain injuries causing significant neurological damage, it is

stunning that this mitigation never even made it onto the sentencing scale for a

single juror.  On the verdict form, the jury recorded zeroes next to the following

mitigators:

• 	#16—"When Defendant Coonce was twenty (20) years old, he sustained traumatic brain injuries as a result of a car crash";

• 	#18—"In 2007, while in federal prison, Defendant Coonce was brutally assaulted by another inmate, resulting in an additional traumatic brain injury"; and

- #19—"As a result of his traumatic brain injuries, Defendant Coonce's full scale IQ dropped from 105 to a present 71."

(A.553-54, 566-67 [ad.47-48, 60-61]).  After a private meeting post-verdict, the court reported that jurors said they "put zero" for "some factors that they felt had been proved" but which they felt deserved "no weight."  (Tr.5379).

The government's cross-examination insinuations and summation arguments best explain the jurors' perverse rejection of Coonce's brain damage as mitigation.

Questioning social worker Janet Vogelsang, who had noted Coonce's head injury at age 20, the prosecutor suggested that jurors should not "consider that mitigation" because Coonce "brought [it] upon himself" by running a red light. Pressing this theme at some length, the prosecutor said to her, "*my point is . . .* you are disconnecting the injury from his conduct and presenting it as mitigation when in fact *it's very reasonable to say that's not mitigation at all* because he brought that upon himself, he caused that accident."  He asked Vogelsang: "[I]s that not a fair characterization?"  (Tr.3847-49).

The prosecutor returned to this theme in summation.  While acknowledging Coonce's brain damage, he insisted that the resulting impairment was simply not mitigation, and thus should be ignored.  Why?  Because having run a red light (and later put himself in prison where he could be assaulted), Coonce's brain damage was ultimately his own fault.  And since they were things he "brought . . . on

101

himself," the resulting neurological impairments should be dismissed as mitigation:

> [Of the brain injury sustained in the auto accident:] My gosh, is that mitigation? He's speeding down the road, he runs through a red light, someone else hits him. He causes that accident. He hurts his passenger by his conduct. He hurts the person in the other car who's not, I don't think, seriously hurt, but he causes that. He brought that on himself. *Is that mitigation*? We don't dispute the fact of the accident.

> [Of the brain injury sustained in the USP Florence assault:] . . again, he did the things to bring him there . . . . And based on that Defendant Coonce finds himself in that situation. We don't dispute the fact of that but *is that mitigation*?

(Tr.5255-56) (emphasis added).

His colleague pressed the same theme in rebuttal, after defense counsel had discussed Coonce's brain damage. (Tr.5286-89). While acknowledging that Coonce had "suffered brain injuries" that likely caused "neurological dysfunctioning," the prosecutor urged jurors to recall what his colleague had "pointed out," namely, that "[t]his man caused the accident in 2000 that led to his first serious brain injury. He ran a red light." Likewise, argued the prosecutor, the assault and head injury Coonce suffered at USP Florence was also his fault because he "committed a crime that put him in the BOP," as well as disciplinary infractions that led to his transfer to Florence. (Tr.5326-27).

Coonce's lawyers had unsuccessfully moved *in limine* to prohibit such arguments asking jurors "to ignore or disregard legitimate mitigating evidence."

102

(A.513-16; Tr.4983-84).  The defense had also unsuccessfully sought a counteracting instruction that "if any of you find the factual existence of a mitigating factor you may not ignore that factor or give it zero weight.  If it is has been found factually true . . .you must give it weight on the life side of the balance."  (A.432, 447).  Without that language, nothing in the charge suggested there was anything legally inaccurate about the government's fault assertion (see A.521-543.1), or its broader argument that jurors could decide a proven, instructed-on factor was not actually "mitigating," for any reason they wished.  (See Tr.5251).  Thus, despite the defense's efforts, the jurors received free rein to exclude this important mitigation from their ultimate sentencing decision — as their verdict form and post-trial comments to the court make clear they did.

## C.    The prosecution's fault arguments contravened precedent and violated the Eighth Amendment.

The Eighth Amendment forbids limiting mitigation to those mental impairments "with which the defendant was burdened through no fault of his own."  Tennard v. Dretke, 542 U.S. 274, 283 (2004) (internal quotation omitted).  Tennard's history is instructive.  A decade and a half earlier, the Court had struck down a Texas death sentence because the jury charge lacked a vehicle for giving mitigating effect to the defendant's intellectual disability.  Id. at 277, citing Penry v. Lynaugh, 492 U.S. 302 (1989).  After Penry, the Fifth Circuit had put a gloss on

that decision, upholding similar instructions in other cases unless the defendant's

mental-impairment mitigation was "constitutionally relevant," meaning (among

other things) that it involved a "handicap with which the defendant was burdened

through no fault of his own." Tennard, 542 U.S. at 283 (internal quotation

omitted). See, e.g., Robertson, v. Cockrell, 325 F.3d 243, 253 (5th Cir. 2003)

(defendant's "self-inflicted" drug addiction was not constitutionally relevant as

mitigation); Cordova v. Collins, 953 F.2d 167, 170 (5th Cir. 1992) (same, for

defendant's voluntary intoxication).

But, in Tennard, the Supreme Court repudiated that test as having "no

foundation in [its] decisions" and "inconsistent with [the Eighth Amendment]

principles" laid down in them. 542 U.S. at 284-85. Indeed, in a number of cases,

the Court has recognized that drug use and drug addiction, despite being the

defendant's "fault," are still constitutionally mitigating. See, e.g., Brewer v.

Quarterman, 550 U.S. 286, 290 (2007) (defendant "had abused drugs"); Hitchcock

v. Dugger, 481 U.S. 393, 397 (1987) (defendant had huffed gasoline as a youth);

Bell v. Ohio, 438 U.S. 637, 641 (1978) (defendant had "drug problem").

If a reviewing court cannot label a defendant's mental handicap as

constitutionally irrelevant on the basis of fault, then surely a prosecutor may not

encourage and a trial court may not license a jury to do just that, as occurred in

Coonce's case.  Nor may a jury reject such a handicap as mitigation for that or any

other irrational or unsupported reason.  <u>Cf.</u> <u>United States v. McCullah</u>, 76 F.3d

1087, 1112-13 (10th Cir. 1996) (no error where jury could reasonably have found

from the evidence that defendant had no brain damage).  Indeed, ignoring

Coonce's undisputed brain damage on the prosecution's fault theory was even less

tenable than with drug addiction or voluntary intoxication.  Even if someone who

abuses alcohol or narcotics is to blame for their ensuing intoxication or addiction,

it is absurd to say that someone who ran a red light or committed a crime that

landed him in prison deserved to suffer traumatic brain damage.

     The government cannot show that these interrelated errors were harmless

beyond a reasonable doubt.  <u>Satterwhite v. Texas</u>, 486 U.S. 249, 257 (1988); 18

U.S.C. § 3595(c)(2).  Brain damage is especially "powerful" as mitigation, and

bears "central significance" in a capital sentencing.  <u>Littlejohn v. Trammel</u>, 704

F.3d 817, 860 (10th Cir. 2013).  Had Coonce's traumatic, permanent brain damage

been weighed on the life side of the scale, it might properly have tipped the

balance.  <u>See also</u> Point IV.C, *post*.

     For these reasons, the Court should vacate his death sentences and remand

for resentencing.

## IV.

**The court violated Coonce's Fifth Amendment right against self-incrimination by authorizing prosecution psychiatrist Dietz to obtain and present a detailed confession to prove his conduct during the crime.**

The Fifth Amendment commands that "no person . . . shall be compelled in any criminal case to be a witness against himself." All would agree that the court would have violated that safeguard had it ordered Coonce, on the eve of sentencing, to submit to interrogation by an FBI agent about how he helped kill the victim, for the government to use in making its case for death.

That is essentially what occurred here except that the interrogator was a prosecution psychiatrist. And the Fifth Amendment forbids that no less. The court unconditionally compelled Coonce, over objection, to submit to questioning about the crime during an evaluation by prosecution psychiatrist Dietz. Armed with that ruling, Dietz interrogated Coonce in detail about his step-by-step conduct during Castro's homicide, and at sentencing the prosecutors showed the jury videotaped excerpts of that interrogation.

Dietz admitted that the video presentation was the prosecutors' idea, and that they had handpicked the clips jurors would be shown. He did not even use this evidence in assessing Coonce's mental condition, let alone rebutting any defense expert's opinion; indeed, none of them had been called to testify about Coonce's

(or Hall's) actions during the incident.  Rather, the prosecutors calculatingly employed Coonce's statements simply to help prop up their maximally aggravated version of what he did and what Castro suffered.

This violated the Fifth Amendment as well as Rule 12.2 of the Rules of Criminal Procedure, and seriously undermined Coonce's defense.  The error is even more disturbing because there was good reason to believe that Coonce exaggerated key portions of his confession to Dietz.  The Court should reverse his death sentences and order resentencing.

**A.      Over objection, the court authorized Dietz to interrogate Coonce about murdering Castro and then present his videotaped confession at sentencing, not to address his mental condition but simply to prove the aggravating details of his criminal conduct.**

Complying with a court-ordered deadline (A.81), defense counsel alerted the government, more than two months before trial, to the names of two mental-health experts who had examined Coonce and might be called at sentencing.  The notice summarized their potential testimony as best counsel could at that point, necessarily in somewhat general terms.  It said that Dr. Richard Dudley might "testify about Defendant Coonce's mental health and its role as a mitigating factor" and Dr. Stacey Wood might "testify regarding his general intelligence and disability resulting from traumatic brain injuries."  (A.317).

The government moved to require Coonce to submit to an unbounded

evaluation by its expert, not just to "rebut any mental health mitigation evidence" but also to "further the truth-seeking function of trial." (A.327-28). The defense did not oppose a rebuttal evaluation, but urged that, under the Fifth Amendment and Rule 12.2, any such "examination and presentation must be limited in scope based on the expert mental health evidence that the defense intends to introduce." (A.341-45). Among other authorities, Coonce cited another federal capital case in which the defense had successfully argued that the government's expert's evaluation and his "mental health presentation at sentencing" should steer clear of the charged crime. (Id.).

At the pretrial conference a few weeks later, Coonce's lawyers reminded the court of their written opposition and reiterated the need to set "parameters" on the scope of the government's rebuttal. (4/14/14 Tr. at 28). When the court issued no ruling, Coonce filed another pleading, urging the court to confine Dietz to addressing the issues or topics to be covered by the defense experts, which here meant he should be "prohibited from inquiring about any fact involved in the events, which led to the indictment of this case and in particular [Castro's] death." Counsel again cited both the Fifth Amendment and Rule 12.2. (A.394-95. See also A.609; reminding court of "significant issue" of whether Dietz "can question Wesley about the events and circumstances leading up to" the murder). In

opposition, the government again insisted it should enjoy a broad opportunity to rebut, through Dietz's evaluation and testimony. (A.408-10).

On the eve of jury selection, the court denied Coonce's request to cabin the prosecution's rebuttal's examination and presentation. Its order was unqualified and put no subject out of bounds. Coonce was directed to "respond to questions from Dr. Dietz during his examination relating [to] Coonce's mental state at the time of the offense." (A.412). The court said nothing about later revisiting the scope of Dietz's testimony or conditioning it on the scope of the defense experts' testimony. In other words, it refused to impose any limit on what Dietz might ask Coonce or how the government might use his answers.

A few weeks later, at sentencing, the defense presented expert testimony from neuropsychologist Wood, clinical social worker Vogelsang, and psychiatrist Dudley. Wood addressed Coonce's intellectual disabilities and low IQ, and the effects of his traumatic brain damage. She did not testify about Castro's killing, Coonce's role in it, or his mental state at the time. (Tr.2944-3057). See also Point I.B, *ante*. Vogelsang presented a social history of Coonce from birth until roughly age 20, when he went to prison after his kidnapping conviction in Texas. See Facts, Sections I-II, *ante*. Like Wood, she did not address the homicide or Coonce's conduct or mental state during it. (Tr.3618-3702, 3718-54).

Dudley's testimony focused on identifying mitigating factors in Coonce's development that engendered serious mental and emotional impairments as an adult. (Tr.3878-3893, 3901-76). He largely relied on the documentary history of Coonce's foster placements, juvenile commitments, and earlier BOP incarceration (though he also received other records, including ones describing the Castro homicide). (Tr.3881-85). Dudley also met with Coonce to find out more about his family history. (Tr.3903-04).

Dudley's testimony proceeded chronologically, from Coonce's birth to about 2007, three years before the homicide. (Tr.3878-3893, 3901-76). Toward the end of his direct examination, Dudley was asked about Coonce's overall mental health "in 2010," the year the homicide occurred, and answered that Coonce was "a person [with] trauma-related difficulties of anxiety and hypereactiveness," fearing "danger" from other inmates, and unstable and impulsive "in . . . important areas of functioning related to how he sees himself and his mood reaction to things." (Tr.3971). But Dudley never discussed Coonce's mental state in participating in Castro's killing, such as, for example, whether Coonce could or did act intentionally or with premeditation, or whether he understood or could control his behavior. And Dudley certainly never discussed Coonce's specific conduct during

110

the murder.[44]  (Tr.3878-3893, 3901-76).

The prosecution's "rebuttal" case at sentencing centered on Dietz, who had questioned Coonce for approximately six hours.  (Tr.5001-64).  Extended video clips from that interview were embedded in PowerPoint slides accompanying Dietz's testimony.  After having persuaded the court, over objection, to have the interview videotaped (see A.392-93, 410-11), the prosecutors then selected 11 excerpts for Dietz to play for the jury.  Before they did so, Dietz admitted, he "had no intention of finding clips to show the jury or of presenting any video whatsoever."  (Tr.5146-47).  The clips showed Coonce wearing inmate clothing, handcuffed, and shackled even though he was presumably under guard in a secure room in the Medical Center with bars on the windows.[45]  (*e.g.*, Gov. Ex. #464 at 87; A.1481).

_____

[44] On cross-examination, the government tried to inject evidence about Coonce's mental state in committing the crime.  Dudley acknowledged that the evidence showed Coonce had not acted impulsively or in self-defense.  (Tr.4003-05, 4011-12).  Pressed about what Coonce had said on this subject, Dudley answered only that Coonce "had been upset with [the victim] about something and had participated in this killing with his codefendant."  (Tr.4001-02).

[45] Dietz also testified and presented similar slides about his separate interview of Hall.  (Tr.5064-5105).  The court overruled an objection to showing the defendants in restraints (even though the prosecutor agreed to just "play the audio"), saying: "the jury can appreciate the fact that . . . for everyone's protection that the shackling is appropriate."  (Tr.3178-79).

Dietz told the jury about Coonce's childhood, including how "harmful life events" had affected him. The psychiatrist found Coonce's history of bad acts and emotional instability indicative of an anti-social and borderline personality as well as most likely a persistent depressive disorder. And Dietz largely agreed with defense expert Wood that Coonce suffered from a cognitive disorder, which traced back to traumatic brain damage he sustained in a car crash at age 20. (Tr.5001-39).

But another focus of Dietz's testimony was the psychiatrist's questioning of Coonce about his, Hall's, and Castro's respective actions at each step as the homicide unfolded. Eight of the 11 video excerpts the prosecutor played for the jury from Dietz's interview had Coonce responding to queries about the actual murder and the events immediately preceding it. (Tr.5036-37, 5057-63; Gov. Ex. #464 at 53-55, 81-89; A.1523-24, 1528-33. See A.1477-78, 1480-82).

The prosecutors also prepared and provided each juror with transcripts of the clips, so they could follow along as they watched. In a table of contents as well as on the top of each transcript, the prosecutors had assigned each video excerpt a catchy title. The ones in which Dietz questioned Coonce about the crime included titles like "Cloth on Castro Face," "Coonce Kick Castro Neck," and "Leader." (A.1523-24, 1528-33; Tr.5003).

When Dietz came to the PowerPoint slide titled "Murder of Victor Castro,"

he simply announced the accompanying video clip as a "part of Coonce's description of the crime." (Tr.5036). The prosecutor then showed the jury an almost three-minute excerpt in which Dietz had gotten Coonce to narrate his conduct:

> We went in the cell, uh, tied him up, and I stomped on h–, he laid on the floor, on his back, and I ju–, I had boot on, and I jumped, uh, on his neck. He sat up straight, and he passed out when he hit the floor. Uh, then I stood on his neck, me and Hall stood on his neck for a minute, uh, then, uh, I left his cell, uh, went downs stairs [and after a few minutes] went back upstairs, and uh, Hall was still standing on his neck, uh. But, oh, yeah, before I left the cell . . . I smelled feces. So I automatically assumed he was dead.

(Gov. Ex. #464 at 54; A.1523. See A.1477). When that video clip ended, the prosecutor prompted Dietz to go to the next one, which the psychiatrist said was "about one aspect of the crime." (Tr. 5036). The jury then watched another, minute-and-a half excerpt, in which the psychiatrist asked whether there was anything around Castro's neck, and Coonce answered:

> [W]e took . . . some kind of cloth and . . . put it over his eyes and tied it around his head and when he layed on the floor . . . we covered up his eyes and he wouldn't see me jumping on his — about to jump on his neck and that's why we covered his eyes. But after I – I stomped on his neck a couple of times -- and when I did – when they – like I said, when I stomped on him the first time, h– he was laying flat on his back and because I stomped on his so hard, his whole body he almost sat up completely and then he – well, during all that process it slipped off his head and ended up around his neck.

(Gov. Ex. #464 at 55; A.1524. See A.1478).

In each of these two video clips, as Coonce described what happened, he also physically acted out how Castro was lying on his back, his body abruptly jerked upwards into a sitting position when he was attacked but then fell back again, and the blindfold slid off his eyes onto his neck. (Gov. Ex. #464 at 54-55).

After detouring to other subjects, the prosecutor returned to Coonce's videotaped confession to the homicide. And Dietz culminated his direct examination with seven more transcript pages of testimony, five PowerPoint slides, and five video excerpts on that subject. (Gov. Ex. #464 at 80-89; A.1480-82, 1528-33; Tr.5057-63).

In one of those clips, which lasted almost a minute and a half, Dietz again asked Coonce about his actions when the victim was actually killed, and Coonce detailed what he had done:

Q: Did you kick him in the neck?

A: Yes, sir.

Q: That's before st–stomping on him?

A: I stomped on his neck, I probably – I jumped on him and I probably – because there was an abrasion on his chin that was from my boot. I – I kicked him a few times and that was it. And I stood on his neck for about a minute or so and then I left. I smelled the feces and I figured he was dead, so I left.

(Gov. Ex. #464 at 83; A.1529. <u>See</u> A.1480).

114

In yet another pair of clips totaling a minute and a half, Dietz asked Coonce whether, in Castro's murder, was "one of you a leader and one a follower?" Coonce answered:

> Honestly, no matter what he says or what anybody says, no. We were both – we're both just as guilty as together. He was not calling the shots, I wasn't calling the shots . . . . there was no leader or no follower. And that's – that's – the I – I don't care what he says. It don't matter what he says, there was no leader.

(Gov. Ex. #464 at 88; A.1533. See A.1481. See also Facts, Section C.4, *ante*).

In addition to relaying Coonce's account of his criminal conduct and his disavowal that Hall had been the leader, Dietz showed the jury excerpts in which Coonce said he and Hall had spoken in advance about killing Castro and that he meant for Castro to die. Dietz testified that Coonce could understand the wrongfulness of his conduct and control his behavior and that his involvement was "planned and deliberate." (Tr.5057-58; A.1480-81). Relying on Coonce's account of his motives, the psychiatrist also testified that Coonce participated in the murder primarily so that prison officials would segregate him, and secondarily because Castro had once gotten him in trouble and because he was angry at his counselor for disapproving a visitor. (Tr. 5060-63; A.1480-81).

In summation the next day, the prosecutors employed Coonce's account of the crime to Dietz to argue that his conduct was just as culpable as Hall's, he had

also stood on Castro's neck and thereby caused Castro's death, and his actions

were especially aggravated because Castro was conscious and struggled for some

time during the attack:

> You heard in some chilling detail, I would suggest to you, the
> statements of Defendant Coonce where he said, I stomped on him
> once, his head pops up, they blindfolded him . . . but then he falls back
> to the ground or they push him back to the ground, and he says, I
> stepped on his throat . . . . for about a minute or so, then he left the
> cell.

(Tr.5214).

> How do we know what facts support that, the heinous and cruel
> [aggravating factor]? . . . . As Mr. Coonce said to Dr. Dietz, he
> stomped on his neck, popped up, the fabric across his eyes, the
> blindfold fell down. The blindfold was put on so that he wouldn't see
> that they were about to kill him as opposed to a fake hostage situation.
> But then the blindfold comes down . . . .
>
> We know that Victor Castro-Rodriguez was conscious of his death as
> it was happening and it did not happen quickly. It did not happen
> quickly at all . . . . How do we know that? Because we know that
> Defendant Coonce stomps on his throat and then steps on his throat
> but we also know that he stepped off of his throat after a period of
> time.

(Tr.5221-23).

> He was bound. He knew he was dying. He was seeing up at them —
> because we know the blindfold came down — his killers as they were
> killing him. Victor Castro-Rodriguez was helpless. I ask you to find
> that for both defendants that the heinous and cruel statutory
> aggravating factor has been met.

(Tr.5227).

116

[Regarding the mitigating factor that] Defendant Coonce played a lesser role in the murder of Victor Castro-Rodriguez. You heard him yesterday say it was equal, it was equal, we both did this. [Regarding the mitigating factor that other] inmates equally culpable to the crime will not be punished by death. He says again, I did these things. We were equally responsible.

(Tr.5257).

[Regarding the especially-heinous aggravator: Castro] was conscious during that time. He was aware of what was happening. There is some evidence that he may have even struggled because one of the individuals . . . suggested, he had to knock him down when he's talking to Dr. Dietz to get him under control . . . . they kill him in a slow, depraved, and heinous way. This wasn't just simple strangulation.

(Tr.5330).

**B.     The court erred by refusing to confine Dietz to obtaining and using statements from Coonce for the "limited rebuttal purpose" allowed by the Fifth Amendment and Rule 12.2.**

A court generally lacks authority to require a capital defendant to provide statements to a psychiatrist for the prosecution to use in obtaining a death sentence. The defendant's Fifth Amendment right against self-incrimination, which extends to the sentencing hearing, protects him from any such involuntary examination. See Estelle v. Smith, 451 U.S. 454, 462-63 (1981). This reflects the "vital principle that criminal proceedings rely on accusations proved by the Government, not on inquisitions conducted to enhance its own prosecutorial power." Mitchell v. United States, 526 U.S. 314, 325 (1999).

117

The defendant may waive that protection if he presents his own evidence about his mental condition "through a psychological expert who has examined him." Kansas v. Cheever, 134 S. Ct. 596, 601 (2013). For, when that occurs, "'[o]rdinarily the only effective rebuttal'" will be "'contradictory opinion testimony'" by a prosecution expert based on his or her "'personal interview'" of the defendant. Id., quoting United States v. Byers, 740 F.2d 1104, 1113 (D.C. Cir. 1984) (en banc). See also Buchanan v. Kentucky, 483 U.S. 402, 422 (1987). Otherwise, the defendant could provide the jury with a "potentially inaccurate view of his mental state." Cheever, 134 S. Ct. at 601.

But it follows that any such waiver is far from open-ended. Rather, because a court-mandated psychiatric evaluation may be conducted and its fruits admitted "only for a 'limited rebuttal purpose,'" its scope is closely limited by the subject-matter and purpose of the testimony the defendant chooses to introduce through his own expert.[46] Cheever, 134 S. Ct. at 603, quoting Buchanan, 483 U.S. at 424. See also id., citing Powell v. Texas, 492 U.S. 680, 685-86 n.3 (1989) (per curiam).

Thus, because the defendant in Cheever called an examining expert to testify

---

[46] The limited nature of the waiver "harmonizes" with the principle that when a criminal defendant chooses to testify to "facts that tend in his favor," he waives the privilege only to the extent of "laying himself open to cross-examination upon those facts." Cheever, 134 S. Ct. at 601 (citation and internal quotation omitted).

that drug intoxication had negated his ability to form specific intent, the Court

upheld the prosecution's use of a compelled psychiatric exam for the logically

tailored rebuttal purpose of showing that Cheever "made a choice to shoot." 134

S. Ct. at 601-02 ("the State permissibly followed where the defense led"). At the

same time, however, it remanded to the lower court to address whether other

aspects of the prosecution psychiatrist's testimony "exceeded the scope of rebuttal

testimony permitted by the Fifth Amendment" or state evidence rules. Id. at 603.

In federal capital cases, the Fifth Amendment principle of "limited rebuttal"

recognized in Buchanan and Cheever has been implemented through Rule 12.2. It

forbids the government from introducing, at a capital sentencing, any "statement

by a defendant [made] in the course of" a compelled mental-health evaluation, or

any "testimony by the expert based on [such a] statement" or "other fruits" of it,

except (1) "on an issue regarding mental condition," (2) "on which the defendant

has introduced expert evidence." Fed. R. Crim. P. 12.2(4)(A) & (B).

Applying Rule 12.2 in light of these authorities, lower courts have also

recognized that a capital defendant's use of a mental-health expert does not

necessarily "open the door for any type of mental health testing" by the

government. United States v. Taylor, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004).

See United States v. Williams, 731 F. Supp. 2d 1012, 1020 (D. Haw. 2010)

("government may *rebut* Defendant's mental health defense, not prosecute based upon Defendant's mental health"). Rather, a defendant may only be required to undergo a prosecution examination "parallel" to the one performed by the evaluating defense expert.[47] Id. See also United States v. O'Reilly, 2010 WL 653188, at **5-6 n.21 (E.D. Mich. Feb. 19, 2010) (limiting government evaluation to "examination or testing that was performed by defense experts").

In restricting compelled psychiatric interviews to a "limited rebuttal purpose," courts have been especially wary of requiring the defendant to discuss the charged crime, as Coonce had to do. Thus, in remanding Cheever, the Supreme Court specifically flagged for further scrutiny that the government psychiatrist had not only addressed the defendant's mental state at the time of the murder, but had "narrated the crime," describing the defendant's, codefendant's, and victim's actions during the incident. Cheever, 134 S. Ct. at 603 n.3. That distinguished Buchanan, where the prosecution expert "had set forth his general observations

---

[47] The Eleventh Circuit essentially applied this principle in United States v. Troya, 733 F.3d 1125 (11th Cir. 2013). A defense expert obtained and considered the defendant's "self-reports" about his childhood in testifying about risk factors that had influenced his adult behavior. A prosecution expert then testified to a contradictory opinion, in part because the defendant had denied to him many of those childhood events. Since his testimony "directly rebut[ted]" the defense expert's, the government was found not to have "exceeded the scope" of Rule 12.2 or the Fifth Amendment. Id. at 1139-40.

about [petitioner's] mental state . . . but had not described *any* statements by petitioner dealing with the crimes for which he was charged."  483 U.S. at 423.

Federal courts of appeals, including this Circuit, have also understood the Fifth Amendment problems with compelling a defendant to incriminate himself in the charged crime during a psychiatric interview.[48]  See, e.g., Gibbs v. Frank, 387 F.3d 268, 275 (3d Cir. 2004) (state court unreasonably rejected Fifth Amendment claim where prosecution psychiatrist "repeat[ed] incriminating statements" defendant had made in pretrial interview, not "to prove a[ny] psychological point" . . . but "simply for the truth of the admissions of fact"); Reifsteck, 535 F.2d at 1034 (no Fifth Amendment violation where experts gave only their "clinical impressions of [defendant's] mental condition at the time of the offense," and included no "incriminating statements made by defendant").

_____

[48] So have a number of state courts.  See, e.g., Lewis v. State, 970 P.2d 1158, 1171 (Okl. Cr. App. 1998) ("when a defendant raises an insanity defense he waives his Fifth Amendment right to silence regarding mental health issues but he does not waive his right to remain silent regarding the details of the crime"); State v. Bush, 442 S.E.2d 437, 439 (W. Va. 1994) (no violation of the defendant's right against self-incrimination where neither of the government's experts "mentioned anything about the actual murders, what led up to the murders, or any of the defendant's statements regarding the murders," and instead testified only about the defendant's mental state and drug use); Shepard v. Bowe, 442 P.2d 238, 239-40 (Or. 1968) (*en banc*) (Fifth Amendment entitled defendant to refuse to answer prosecution psychiatrist's questions "concerning his conduct relating to the offense charged").

So have other federal death-penalty courts faced with the issue, including in this Circuit. Thus, for example, in United States v. Johnson, 383 F. Supp. 2d 1145 (D. Iowa 2005), because the defendant was asserting, as a mitigating factor, a longstanding "mental condition" but not one "specifically related to her involvement in the crimes," the court ruled that the prosecution psychiatrist did not need to ask or present the jury with her answers to "offense-specific questions" since that would "exceed the scope of the defendant's 'limited' waiver of her Fifth Amendment right against self-incrimination." Id. at 1162, 1164.

In Coonce's case, the court diverged from these precedents by refusing to place any limits on the scope of Dietz's rebuttal examination and testimony, despite counsel's specific request that the prosecution psychiatrist stay away from "the events which led to" Castro's death because those would not rebut the defense experts' testimony.[49] (A.395). As discussed, those experts focused on Coonce's overall mental condition, and none addressed his ability to understand, form intent, or premeditate; his motivation; or any other aspect of his mental state in helping kill Castro. Thus Dietz went too far even in eliciting and presenting the video in which Coonce purportedly laid out his thought process and motives in planning the

---

[49] This issue is reviewed *de novo*. See United States v. Frazier, 408 F.3d 1102, 1109 (8th Cir. 2005).

murder with Hall.

More important, the blow-by-blow details of Coonce's conduct that Dietz elicited and conveyed (such as that Coonce had also stood on Castro's neck, and that, when Coonce attacked him, Castro desperately struggled) shed no light on any issue a defense expert had injected (since none of them testified about Coonce's conduct in the homicide), let alone one involving Coonce's mental condition.  Cf. Pope. v. United States, 372 F.2d 710, 720-21 (8th Cir. 1967) (*en banc*) (where defense expert testified that defendant "answer[ed] all questions. . . including those relating to the crime," defendant could not invoke Fifth Amendment to avoid "a similar comprehensive examination by the State"), vacated on other grounds, 392 U.S. 651 (1968).  Indeed, Dietz never even analyzed or incorporated those details about Coonce's actions into his testimony, his PowerPoint text, or any opinion about Coonce's mental condition.  Rather, at the prosecutors' insistence, the psychiatrist simply replayed excerpts from Coonce's videotaped confession that the prosecutors had handpicked, as the jurors followed along with transcripts that the prosecutors had given colorfully prejudicial titles.  Cf. id. (no error because psychiatrist gave his opinion, rather than merely reciting defendant "self-incriminatory concession[s]").  In summation, the prosecutors invoked the video statements not to controvert a "potentially inaccurate view" of Coonce's brain

123

damage, retardation-level IQ, or any other aspect of his mental condition that the defense experts had offered, Cheever, 134 S. Ct. at 601, 603, but simply to support its maximally aggravated version of Coonce's actions and the victim's suffering.

For these reasons, Dietz's elicitation and presentation of Coonce's statements about the crime went well beyond the "limited rebuttal purpose" permitted by the Fifth Amendment and Rule 12.2. Cheever, 134 S. Ct. at 601, 603. The Supreme Court's apt summary in Estelle applies here too: "[T]he ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made the 'deluded instrument of his own conviction,' it protects him . . . from being made the 'deluded instrument' of his own execution." 451 U.S. at 462 (internal quotation and citation omitted).

## C.   Coonce's sentencing defense was manifestly prejudiced by the prosecution's use of his videotaped statements about the crime.

Coonce's compelled confession to Dietz proved quite damaging to his sentencing defense. As discussed, the prosecutors capitalized on the error in summation by repeatedly invoking this evidence as proof that Coonce had jointly caused Castro's death rather than only aiding and abetting the killing; that Castro had struggled against Coonce's attack and suffered a prolonged death; and that Coonce did not follow Hall's lead but was at least his equal in the incident. And

the jurors responded by unanimously finding the aggravating factors that the prosecutors argued the confession helped prove, including that the killing was especially cruel, and unanimously rejected the mitigating factor that Coonce played a lesser role than Hall in the homicide.  (A.549-50, 554, 561-63, 567 [ad.42-44, 48, 55-57, 61]).

It is true that, on the night of the killing, Coonce gave a written statement to an FBI agent that also implicated him in a role comparable to Hall's, including their both having stood on Castro's neck.  (A.624-25; Tr.1052-55.  See Facts, Section IV.C.4, E.3, *ante*.).  But Dietz's video excerpts were hardly cumulative of that statement, for several reasons.

First, as trial counsel argued, there was good reason to believe that, in the immediate wake of the homicide, Coonce exaggerated his role to the FBI agent, to avoid acknowledging he was just a weak follower of Hall.  See Facts, Section IV.C.4, *ante*.  While that motive carried forward, still, the interview with Dietz occurred four years later.  By then, jurors may have assumed, Coonce had ample opportunity to reflect on the incident and to consult with his counsel (including about their theory of defense, that he played a lesser part in the murder).  Thus, his self-incrimination at that point (at odds with his own attorneys' contentions) naturally would have carried more weight with the jury.

Second, the initial statement was typed by the FBI agent and merely signed by Coonce, whereas Dietz's videotaped interrogation allowed the jury to see and hear Coonce himself, in living color, describe what he did to Castro, at points even physically acting it out on camera.[50]

And third, Coonce's confession to Dietz included damaging details absent from his initial statement to the FBI agent. These included that Castro struggled and remained conscious for some time during the attack, as well as that originally there was actually a plan with a third inmate to stab a prison counselor that day (with knives at the ready) and that, when that became unfeasible, Hall asked Coonce what they should do and Coonce decided they should kill Castro. See Facts, Section IV.C.4, E.3, *ante*.

The sentencing summations bear out the singular importance of Coonce's crime statements to Dietz. The defense tried to argue, as it had at trial, that Coonce played a lesser role. And the other evidence made that a real possibility. See Facts, Section IV.E, *ante*. But, as discussed, the prosecutors singularly focused on Dietz's interrogation to argue otherwise and to magnify the weight of the

---

[50] As discussed, the presentation's dramatic impact was heightened because Coonce was made to submit to Dietz's questioning wearing prison garb, and handcuffed and shackled even though he was in a prison room with barred windows and presumably under the watchful eye of guards.

aggravating factors.  No doubt they did so in part because the video was so much

more vivid and dramatic than Coonce's typed statement (see, e.g., Tr.5214:

reminding jurors that they "heard" Coonce recount the crime to Dietz in "chilling

detail"), and so much more recent (see, e.g., Tr.5253: emphasizing what Coonce

said "to Dr. Dietz" just "three weeks ago").  But the government's arguments also

cast Coonce's videotaped interview as new evidence that transformed the

evidentiary picture from trial.  Thus, for example, in summarizing how key

portions of the interview supported the cruelty aggravator, one prosecutor observed

that the government's pathologist, who had testified at trial, had "more limited

knowledge" than the jurors, who now had "all of the information" about "exactly

how this happened."  (Tr.5221-22).  See also Facts, Section IV.F, *ante*.  The Dietz

video enabled the government to dismiss its own expert's less aggravated

assessment of the physical evidence (that Castro might have lost consciousness in

as little as 20 seconds), saying: "We know that's not what happened here."  How?

Because of what "Mr. Coonce said to Dr. Dietz."  (Tr.5223).

The additional importance of Coonce's confession to Dietz beyond his initial

statement makes this case similar to Arizona v. Fulminante, 499 U.S. 279 (1991),

where the erroneous admission of an incriminating statement required reversal,

even though the jury also heard another admissible confession.  Id. at 296.  The

Fulminante Court relied on considerations that echo here, including that the inadmissible confession may have seemed more credible to jurors and that it contained additional incriminating details, including ones the prosecution relied on at a capital sentencing to support a cruelty aggravator.  Id. at 299-303.

In fact, any cumulativeness claim by the prosecution would be even *less* tenable than in Fulminante because here the videotaped confession also came with the influential imprimatur of a psychiatric expert.  (Tr.4951-52).  See Clark v. Arizona, 548 U.S. 735, 778 (2006) (noting "apparent authority" that typically accompanies testimony from "psychologists and psychiatrists"); Satterwhite v. Texas, 486 U.S. 249, 259 (1988) (improperly admitted testimony of prosecution psychiatrist was not cumulative, since his "qualifications as a medical doctor specializing in psychiatry," as much as the "content of his message," may have influenced capital-sentencing jury); United States v. Barnette, 211 F.3d 803, 824 (4th Cir. 2000) (testimony by a mental-health "specialist" may have a particular "impact" on a capital-sentencing jury).

Dietz told jurors he had been "qualified" by courts across the country as a psychiatric expert more than 1,000 times.[51]  He explained that his job as a forensic

---

[51] The prosecution was able to elicit that testimony even though, earlier at sentencing, the court had *sua sponte* dressed down Coonce's counsel for posing the same inquiry to one of his experts.  (Tr.2766-68).

interviewer was to employ his expertise and knowledge "to determine whether [the defendant's] telling the truth or not." (Tr.4951-52, 4957-58). Dietz's PowerPoint presentation then highlighted how a few of Coonce's other statements, about a different past incident, might not be truthful. (E.g., A.1475). But when it came to Coonce's answers about how the homicide unfolded, Dietz conveyed no such uncertainty. (Tr.5036; A.1477-78, 1480-81). And he repeated, as if they were true, a number of other claims that came solely from Coonce and were uncorroborated, such as that there was originally a plan with a third inmate (who had knives) to kill Coonce's counselor, that Castro had previously clashed with Coonce and informed on him, and that Coonce was an equal leader in the crime. (Tr.5061-63).

Thus, any juror harboring reservations about whether Coonce's initial signed statement had exaggerated his conduct and role in Castro's murder likely abandoned those after not only watching the video confession but hearing an expert psychiatrist validate it.

In the circumstances of this capital case, so prejudicial an error cannot be discounted. See Turner v. Murray, 476 U.S. 28, 34-35 (1986) (capital jury's sentencing decision is a "difficult, individualized judgment" involving a "range of discretion," that can easily be tainted by improper considerations). A death verdict

was not a foregone conclusion just because Coonce was convicted of a murder in federal prison; indeed, more than half of such cases that reach a capital sentencing result in life verdict.  See Point XVI.C, *post*.  And, here, though Coonce's jury found significant aggravating factors, they were arrayed against compelling mitigating ones, found by most or all jurors, involving his brutal upbringing.  See Facts, Section I, *ante*.  The government cannot show beyond a reasonable doubt that his damaging confession to Dietz did not influence the outcome, see Satterwhite, 486 U.S. at 257; 18 U.S.C. § 3595(c)(2); even if just for one juror, that would have been enough to spare his life, see 18 U.S.C. § 3593(e); Wiggins v. Smith, 539 U.S. 510, 537 (2003).

Accordingly, this Court should reverse Coonce's death sentence and order resentencing.

## V.

**The court admitted unreliable and misleading forensic evidence about Coonce's role in the offense, an important contested issue at the sentencing hearing.**

At trial, the government presented testimony from the FBI case agent that an abrasion on the victim's chest appeared to "match" and "track" the sole of Coonce's boot, rather than that of codefendant Hall's shoe.  The testimony should not have come in.  Footwear experts in the FBI lab had performed a careful

analysis and could not even draw a comparison between the abrasion on the victim's chest and Coonce's boot, let alone find a match. The government made no showing that the case agent had any expertise or training in footwear comparison. And his testimony was simply inaccurate; for, viewing these trial exhibits now, the size and edges of Coonce's boot and Hall's shoe appear to be remarkably similar, such that no layperson would have a clue whether the abrasion came from one or the other.

Similarly, the government presented inadmissible, misleading testimony that a substance containing DNA from the victim, found on the instep of Coonce's boot, was blood. In reality, a preliminary screening test indicated that the substance *might* be blood, but a required confirmatory test produced no positive result. That screening test is unreliable on its own, as other courts have recognized, because it often yields false positives. And here the government compounded the error by encouraging jurors to rely on the screening test and to dismiss the absence of confirmation.

Like the prosecution psychiatrist's inadmissible and misused interview with Coonce about the crime, see Point IV, *ante*, this improper forensic testimony bore on his role in the killing, an important and disputed issue at sentencing. Admitting the footwear evidence over defense objection was not harmless, and admitting the

blood evidence was plain error.  The Court should grant Coonce sentencing relief.

**A.**     **The court erred in refusing to strike FBI Agent McClain's incompetent testimony that an abrasion on the victim's chest matched the sole of Coonce's boot.**

It was undisputed that the victim died after someone stood on his throat for several minutes, compressing his larynx and trachea, and asphyxiating him. (Tr.1340, 1343-45, 1614-18).  Autopsy photographs demonstrated some bruising on the center of his neck.  They also showed that, directly above, his lower chin had been rubbed raw and bloody.  (Tr.744, 1327, 1333, 1337-38; A.616-19, 651-54).

The autopsy also revealed two abrasions on the victim's right upper chest near his collarbone, one narrow, curved, and looking almost like a laceration. (Tr.1327, 1337-38, 1621-22; A.616-19, 651-54).  There was some internal bleeding underneath and adjacent bruising on the right lower neck, suggesting that such injuries may have resulted from someone's stomping on him.  But none of those injuries lay over, or even right near, his airway at the center of his neck.  And the expert pathologists for both sides agreed that the blows to the right collarbone area were distinct and separate from the sustained pressure on the center of his throat that cut off his breathing and killed him.  (Tr.1348-50, 1614-15, 1621, 1623, 1626).

Although the chest abrasions thus were not directly related to the victim's death, the prosecutors sought to establish at trial that Coonce rather than Hall must have inflicted them, in order to counter Coonce's overall, sentencing-focused defense that he had played a lesser role in the attack. See Facts, Section IV.C.3, E.4, *ante*; Point IV.C, *ante*. This should have been difficult for the prosecutors to do since, aside from Coonce's statements — whose credibility was highly questionable since he clearly sought to exaggerate his role in the crime, see id. —no other evidence, and specifically no forensic evidence, tended to show that Coonce rather than Hall inflicted those abrasions. Indeed, as discussed, the prosecutors sent autopsy photographs along with Coonce's boots and Hall's shoes to the FBI crime lab, where they were analyzed by footwear experts, who determined that the "impressions" on the victim's chest "lack[ed] sufficient detail for a meaningful comparison." (Tr.1549-50. See also A.669).

But the prosecutors did not let this unhelpful conclusion stop them. Instead, when FBI case agent Rick McLain testified about collecting evidence, including Coonce's boots and Hall's shoes, they led him on a detour into the subject of footwear impressions. They did so with no foundation for any opinion testimony, including no evidence that McLain had any expertise or experience in this subject. After showing him photographs depicting the victim's chest, the government

asked, "how do [the abrasions] compare with [Coonce's] boot you're holding in your hand?"  McLain responded, "I think they line up pretty close."  The government pressed further: "The curvature of the abrasions and lacerations *match* the boot that you're holding in your hand that belongs to Mr. Coonce?" McLain agreed they did: "That's correct."  (Tr.1518-19) (emphasis added).

McLain acknowledged on cross-examination that the FBI lab had found the abrasions insufficient for any comparison, and thus that no "scientific" opinion was available.  (Tr.1549-50).  But on redirect examination, he repeated that one of the chest abrasions matched Coonce's boot: Asked by the prosecutor for a "layperson's observation" of what a photograph of the longer, curved abrasion showed, McLain provided one: "It looks like the outside edge of Mr. Coonce's right boot on the right side."  (Tr.1569-70).  Confronted again on recross-examination with the FBI lab's results, McLain dismissed them and doubled down on his own opinion: "Their standard is scientific comparison . . . I'm just stating from my personal observations that curve on that outside edge, to me, *matches* that wound."  While conceding he was not an expert, he defended his conclusion, saying he could tell the mark had been left by Coonce's boot and not Hall's shoe because "Coonce's boot *tracks* that curve, whereas Mr. Hall's tennis shoes don't. There's a *big difference* when you line the two up against that wound."  (Tr.1574-

75) (emphasis added).

When McLain left the stand, Coonce's counsel moved to "strike" his "opinion as to the matching boot and abrasion marks on Mr. Castro's body" because, as the agent had admitted, "he's not an expert." Counsel added that, because of McLain's status as an FBI agent, the jury would be inclined to credit his opinion. The court denied the motion without explanation. (Tr.1604-05).

That was error under well-established Circuit precedent because the government never established a foundation for McLain's comparison; indeed, the FBI lab's finding was that no reliable comparison was possible.[52] "It is competent to present to the jury the character of footprints and shoes only where it has been established that the footprints and shoes are distinctive enough to afford reliable comparison . . . . Such comparison is essential to show a connection between the defendant and the prints, thereby providing the relevancy required for admission into evidence." United States v. Stabler, 490 F.2d 345, 348 (8th Cir. 1974), quoting McDonnell v. United States, 455 F.2d 91, 95 (8th Cir. 1972). In both Stabler and McDonnell, this Court found error because such testimony was absent.

---

[52] This issue is reviewed *de novo*, because the court's ruling implicates Coonce's constitutional rights, see United States v. Campbell, 764 F.3d 880, 887 (8th Cir. 2014) and because it appears to have been based on a misinterpretation or misapplication of decisional law on the Rules of Evidence, see United States v. Montgomery, 635 F.3d 1074, 1089 (8th Cir. 2011).

"We have on prior occasions recognized the speculative nature of footprint evidence, especially where, as in the present case, no expert testimony clearly establishes a link between the footprint and the shoes worn by the defendant." Collins v. Auger, 577 F.2d 1107, 1111 n.3 (8th Cir. 1978).

Nor may the government circumvent this rule by defending McLain's testimony as lay opinion admissible under Federal Rule of Evidence 701. Such testimony is admissible "only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." United States v. Peoples, 250 F.3d 630, 641 (8th Cir. 2001). Indeed, McLain was in no better position than the juror or any other layperson to observe the photographs of the chest abrasions and the defendants' footwear. Moreover, such observation now makes clear that no layperson could have a clue about what inflicted the abrasion McLain testified about — let alone find, as the agent purported to, that one piece of footwear but not the other "matched" or "tracked" it. Contrary to McLain's testimony, the outside edge of Coonce's boot and Hall's shoe appear almost identical in their length and curvature, with neither one any

more or less consistent with the abrasion than the other.[53]

Therefore too, perhaps most critically, McLain's testimony that he determined there was a "match" between the chest abrasion and Coonce's boot was simply inaccurate and misleading.  See Johnson v. Mississippi, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"); United States v. Fields, 483 F.3d 313, 337 (5th Cir. 2007) (federal capital defendant "may not be sentenced on the basis of misinformation of constitutional magnitude") (citation omitted).

While jurors might have been able to assess that testimony on their own, it would have required them to ask that the photographs of the abrasions and the defendants' footwear be sent back to the deliberations room, and to conduct their own visual comparison.  Nothing indicates they did so.[54]  That is not surprising, since, as defense counsel had warned, the jurors naturally would have deferred to testimony by McLain that he had already performed the necessary comparison and

_____

[53] For the Court's convenience, so that it need not call for and examine Coonce's boot and Hall's shoe (which were admitted as government exhibits 31 and 37), photographs of the soles of both are included in Coonce's appendix. (A.1925-28).  Those photographs were part of the FBI footwear-comparison report provided by the government in discovery, though they were not introduced into evidence.

[54] The exhibits were not sent back to the deliberations room *en masse* when the jury retired.  Rather, specific exhibits were provided only if and when the jury requested them.  (See Tr.5360-61).

137

matched the abrasion with the sole of Coonce's boot.  The government had brought

out that he was a veteran criminal investigator (see, e.g., Tr.1471-72) and so, as far

as jurors knew, he presumably dealt with these kinds of forensic issues all the time.

The defense effort to impeach McClain could not have remedied the error, even

had it been effective, for it simply raised the kind of "credibility" issue "that is the

bread and butter of a trial — it [did] not address the problem that the jury should

never have heard that testimony in the first place."  Long v. Butler, 809 F.3d 299,

311 (7th Cir. 2015).

**B.      The Court plainly erred in admitting evidence and argument that DNA
from the victim found on Coonce's boot had been tested and
"presumptively" determined to be blood.**

Much as the government cast the FBI lab's footwear results as an

excessively cautious "scientific" non-finding that did not really detract from the

significance of McLain's "match," so too it misled jurors to believe that the

inability to confirm the presence of the victim's blood on Coonce's boot did not

really detract from the significance of a "positive" result on a preliminary

screening test.

An initial visual examination by the FBI lab noted a number of red-brown

and brown stains on the outside of Coonce's right boot and Hall's right shoe,

which they were wearing when the victim was killed.  (A.674-79.  See Tr.1310-

12).  DNA testing by FBI expert Kehl found some of the victim's DNA in two such stains, one on the instep of Hall's right shoe and the other on that of Coonce's right boot.  (A.670-72, 680-89; Tr.1595-97; <u>see</u> A.674-79).

But the DNA results by themselves did not establish what biological material from the victim (*e.g.*, blood, skin cells, saliva, *etc.*) was present on Coonce's boot, or when or how it had been deposited there (*e.g.*, stomping on the victim, walking through his cell, *etc.*).  Thus, nothing in the testimony or report of the government's DNA expert answered the question that Coonce's counsel had posed to FBI case agent McLain, just before Kehl took the stand:

> . . . just because DNA is on someone's shoe does not mean that shoe was on that person's body, does it?  I mean, I'm sure you know enough about DNA to know that it's shed all over the place.  Dry skin cells carry DNA in a place where Mr. Castro inhabited either the cell block or his individual cell, his DNA is likely to be all over the place?

(Tr.1578).

The government sought to fill this evidentiary gap with testimony that the substance on Coonce's boot had been tested and found to be blood.  FBI biologist Weddle testified that she drew blood from Castro and performed "serology exams for blood" on footwear from the defendants.  (Tr.1299, 1309).  She "did a presumptive test as well as a confirmatory test for blood" on Coonce's right boot and Hall's right shoe, and she "photographed the areas that were positive."

(Tr.1310-11).  The prosecutor asked: "And did you find blood on actually both shoes or a presumptive test for blood on both shoes?"  Weddle answered: "I did find presumptive positive areas on both shoes."  When she repeated that there were "positive areas of staining" on the instep of Coonce's boot, the prosecutor clarified: "The blood test that you did?  "Yes," Weddle confirmed.[55]  (Tr.1312-15).  Three times in her direct testimony Weddle or the prosecutor used the phrase "presumptive positive" to describe her blood-test results.  (Tr.1314-15).

Agent McLain, in turn, testified that the victim's chin had been bloodied, and that he thought Coonce might have "scraped the side of his boot where the DNA shows up off of Mr. Castro's chin."  (Tr.1518).  When Coonce's attorney tried to get McLain to acknowledge uncertainty about what kind of DNA was on Coonce's boot and how it might have gotten there, the agent said he doubted any other scenario, since, among other things, there "was a presumptive positive for blood."  (Tr.1579).  On cross-examination by Hall's counsel, McLain reiterated that the results had been "presumptive for blood" and that "there's a reason" for the absence of a positive result on the confirmatory test.  (Tr.1579-80).

Government DNA expert Kehl testified, much like Weddle and McLain, that

---

[55] The government also elicited that Weddle had examined footwear or clothing for blood more than a thousand times.  (Tr.1317).

serology testing on Coonce's boot was "presumptively positive" and "the presumptive test of that first test was positive for the presence of blood," though "the confirmatory test . . . did not receive a positive result."[56]  (Tr.1593-94).

Worse, summing up Kehl's testimony on direct examination, the prosecutor wove the "presumptive positive" blood result in with the DNA match, asking if her ultimate conclusion was "within a reasonable degree of scientific certainty . . . that Mr. Castro's *blood* is the source that is matched to the inside seam of Mr. Coonce's boot and Mr. Hall's shoe."  Kehl concurred: "*Yes, sir.  That's correct*."  (Tr.1595) (emphasis added).

Cross-examined about the blood testing by Hall's counsel, Kehl entrenched her position further, insisting that the results on the second test simply indicated there was not enough blood to register ("that test requires a lot more material") and all it meant was that the initial "presumptive positive" result was not "100 percent" certain.  "It's presumptively positive for blood; however, it's not definitively blood."  (Tr.1598-99).  On redirect, the prosecutor got Kehl to further defend the "presumptive positive test" because, while theoretically a false positive could have been triggered by chemicals from "vegetable[s]," here such a possibility could be

---

[56] Kehl also indicated that the same results emerged in testing the substance on the instep of Hall's right shoe where the victim's DNA was found.  (Tr.1594).

141

ruled out: "Those aren't generally a concern to us because most of our evidence wouldn't have had vegetables on them."  (Tr.1600).

Taken together, the testimony from Weddle, McLain, and Kehl essentially conveyed to the jurors that (1) the "presumptive positive" result for blood was valid and should carry weight with them, even if it did not amount to proof to a "100 percent" certainty, and (2) the absence of scientific confirmation could be explained away.  And that is just what the prosecutor argued in summation, telling jurors that they could be sure the DNA on Coonce's boot had come from the victim's blood (due to Coonce's boot rubbing against the victim's chin) because while "this was a presumptive test for blood . . . . There wasn't enough blood to make a confirmatory test . . . . So the presumptive test makes sense."  (Tr.1673-74).

The problem with the prosecution's presentation is that, as several other courts have held, a "presumptive positive" result on a screening test for the chemical Phenolphthalein, which is what the government used here (see A.683), is unreliable and should never be admitted absent a positive confirmatory result, which was lacking.  At minimum, the government should not have misled the jury to think that the screening test was reliable enough to support the inference that blood from the victim was the source of the DNA on Coonce's boot.

The Supreme Court of Connecticut found an abuse of discretion in the

admission of similar testimony that the presence of Phenolphthalein equated to a positive "presumptive test for blood" where there was no confirmation. State v. Moody, 573 A.2d 716, 722 (Conn. 1990).  The court noted that it was merely a preliminary screening result that could signify something other than blood.  Thus, absent confirmation, the Phenolphthalein result "had no probative value whatsoever" and "was entirely irrelevant." Id.  Several other courts have agreed. See, e.g., State v. Fukusaku, 946 P.2d 32, 66 (Haw. 1997) (screening tests such as Phenolphthalein test are inadmissible absent positive confirmatory test); State v. Pittman, 18 A.3d 203, 208-09 (N.J. Super. 2011) (same).  See also United States v. McCluskey, ECF #827, at 8-9, No. 10-2734 (D.N.M. Feb. 26, 2013) (in federal capital case, court excludes Phenolphthalein testing as lacking reliability and relevance given absence of positive confirmatory test); United States v. Williams, 2013 WL 4518215 (D. Haw. Aug. 26, 2013) (same; when challenged, government agrees not to present such evidence).

Moreover, as one state court has noted, while some jurisdictions have tolerated testimony about Phenolphthalein test results, they have conditioned it on the prosecution's accurately informing the jury about the limits of that testing and its potential for false positives. Pittman, 18 A.3d at 209.  But, as discussed, that did not happen here.  On the contrary, the government and its witnesses misled the

jury on this point by defending the "presumptive positive" result as simply not "100 percent" certain, dismissing concern about a false positive (suggesting that only happens when the tested substance contains a "vegetable"), and explaining away the absence of a positive confirmatory result (ascribing it to an insufficient quantity for testing).  See Goode v. Branker, 2009 WL 8545584, at *11 (E.D.N.C. Oct. 21, 2009) (finding error when, based on unconfirmed Phenolpthalein test, prosecution "falsely portrayed to the jury that . . . a test for blood . . . indicated blood, not some substance which might be blood, was on petitioner's boot").

**C.** **The errors in admitting unreliable and misleading testimony and argument about footwear comparison and blood testing require reversal of Coonce's death sentences.**

The government improperly and inaccurately conveyed to jurors that an abrasion on the victim's chest matched Coonce's boot, and that DNA from the victim found on the boot was blood.  Both these points bore on Coonce's role in the killing, an important and disputed issue at sentencing.  See Facts, Section IV.E.3, *ante*; Point IV.C, *ante*.  Admitting the footwear evidence over defense challenge was not harmless beyond a reasonable doubt, see Satterwhite v. Texas, 486 U.S. 249, 257 (1988); 18 U.S.C. § 3595(c)(2), and admitting the unobjected-to blood evidence, which was so clearly inadmissible and misleading, was plain error, see Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732-33 (1993).

144

See also Point IV.C, *ante*.  Individually and especially cumulatively, these errors call for reversal of Coonce's death sentences and resentencing.

## VI.

### The court unfairly skewed the jury instructions on future violence in favor of the government.

The court refused to present the sentencing issue of Coonce's future BOP conduct to the jury evenhandedly in its instructions, instead placing a thumb on the government's side of the scale.  It insisted on telling jurors not just the aggravating factor alleged by the government, that Coonce would commit additional violence in the BOP if not executed, but also the *evidence* the government was claiming proved this, namely, his past violent conduct and threats, his lack of remorse, and his low rehabilitative potential.  The court did so over defense objection that such one-sided marshaling was inappropriate.  Compounding this error, the court refused to instruct the jury on the defense's mitigating factor that Coonce could be controlled by the BOP in the ADX-type solitary confinement setting he would face.[57]

---

[57] This issue is subject to *de novo* review.  See United States v. Young, 613 F.3d 735, 744 (8th Cir. 2010) ("when the refusal of a proffered instruction simultaneously denies a legal defense, the correct standard of review is *de novo*").  See also United States v. Valentine, 70 Fed. Appx. 314, 324 (6th Cir. 2003) (reviewing *de novo* whether court made imbalanced comments on the evidence).

As a result, the jury charge (and the verdict form, which tracked it) spelled out the government's allegation about Coonce's likely future violence *and* the evidence prosecutors claimed to support it— but never even mentioned the defense's contrary theory, let alone any of the defense evidence. In summation, the government exploited this instructional imbalance by arguing that the conclusion it urged (that Coonce would be violent in the future) was determined by the evidence that the court had listed in the instruction.

**A.    In both the instructions and verdict form, the court articulated the government's theory and summarized its evidence on the issue of Coonce's future BOP conduct, but made no mention of the contrary defense theory, let alone the evidence supporting it.**

In its notice it was seeking the death penalty, see 18 U.S.C. § 3593(a), the government alleged, as an aggravating factor, "[f]uture dangerousness based upon the probability" that Coonce "would commit criminal acts of violence that would constitute a continuing threat to the lives and safety of others." (A.50-51 [ad.9-10]). The notice also laid out the evidence the government claimed would support this factor, including Coonce's "continuing pattern of violent conduct" and threats of violence, and his supposed "lack of remorse" and "low rehabilitative potential." (Id.).

Coonce moved to strike this evidentiary discussion from the notice as improper to include in the jury instructions. He argued that the jury should be

instructed only on the aggravating factors as the FDPA provides, see 18 U.S.C. § 3593(d)-(e) — not their evidentiary "sub-parts."  (A.88-90, 129; see also A.129). But the government disagreed (A.180-81), and the court denied Coonce's motion. (A.325, 332 [ad.22, 24]).

Later, the government proposed jury instructions that piggybacked on the court's ruling.  These included not only a charge on the alleged aggravating factor of future violence, but also one summarizing the evidence that, according to prosecutors, supported this factor.  (A.386).

At sentencing, the defense disputed the severity, extent, and causes of the violent and threatening conduct in Coonce's background, and also sought to show that he was remorseful and could be rehabilitated.  But it primarily challenged the future-violence factor by presenting evidence, from a former BOP warden and a BOP official at ADX, that Coonce could be safely managed and would positively adjust under the solitary-confinement conditions he would continue to face if spared.  See Facts, Section V, ante; Point VII, post.

Accordingly, so that the jury could consider his defense, Coonce asked to have the jury instructed on the mitigating factor that the BOP "is capable of imposing conditions of confinement that will control [his] future behavior." (A.518.  See also A.446, 450).

But, after the government objected to Coonce's request, the court denied it without explanation, and refused to present the jury with "any mitigating factors regarding the [BOP's] ability to . . . control" him. (A.520 [ad.35]). At the same time, it also turned aside Coonce's renewed objection to having the charge itemize the government's evidence supporting its allegation of future violence. (Tr.4996-97).

At the charge conference, Coonce's counsel objected to both rulings, and drew the Court's attention to how they imbalanced the jury charge. (Id.). The objection to marshaling the government's evidence on future violence was particularly "relevant," counsel explained, because the court had "refused . . . our proposed mitigating circumstance[] that dealt with the issue," one that "involved . . . the Bureau of Prisons being able to safely manage [Coonce] . . . . we very much need at least one mitigating circumstance addressing, rebutting the issue of future danger." (Id.; see also id.: defense counsel reiterates that their objection to having the charge summarize the government's future-violence evidence for the jury "goes hand-in-hand, really, with our request for that mitigating circumstance language"; A.462-63: defense resists government's objections to these mitigators).

The court defended its choice to instruct the jury solely on the evidence favoring the government's position, saying that summary was "supported by the

148

evidence." (Id.; see also id.: prosecutor resists striking the summary, and cites testimony supporting it).

Adopting the government's proposal, the court instructed the sentencing jury, both orally and in writing, that:

> The first non-statutory aggravating factor alleged by the government for each count is that Defendant Coonce presents a future danger to others based upon the probability that Defendant Coonce would commit criminal acts of violence that would constitute a continuing threat to the lives and safety of others. *Defendant Coonce has engaged in a continuing pattern of violent conduct, has threatened others with violence, has demonstrated lack of remorse and/or has demonstrated a low rehabilitative potential*.

(A.526 [ad.37]) (emphasis added).

Tracking this instruction, the verdict form asked:

> Do you, the jury, unanimously find that the Government has established beyond a reasonable doubt that Defendant Coonce presents a future danger to others based upon the probability that Defendant Coonce will commit criminal acts of violence that would constitute a continuing threat to the lives and safety of others, *in that Defendant Coonce has engaged in a continuing pattern of violent conduct, has threatened others with violence, has demonstrated lack of remorse, and/or has demonstrated a low rehabilitative potential*, as set out in Instruction No. 8?

(A.549-50, 562-63 [ad.43-44, 56-57]) (emphasis added).

Thus, in both the instructions and verdict form, the court not only presented the government's *theory* on the issue of future violence, but also marshaled the government's *proof* on it, itemizing the categories of evidence that the prosecutors

149

claimed supported their theory.  By contrast, the jury heard (and read) *nothing*

from the court that even mentioned the defense theory on this issue, namely, that

the BOP could continue to safely manage Coonce in a solitary-confinement setting,

let alone any of the kinds of evidence the defense had presented to back it up.

In sentencing Coonce to die, the jury unanimously found the future-violence

factor.  Id.

**B.     The court doubly erred in delivering such skewed instructions.**

**1.     One-sided summarizing of the future-violence evidence**

Although it was common a century or more ago, federal trial judges today

"rarely" marshal or summarize the evidence.  United States v. Mundy, 539 F.3d

154, 159 (2d Cir. 2008).  See Weinstein, The Power and Duty of Federal Judges to

Marshall and Comment on the Evidence in Jury Trials and Some Suggestions on

Charging Juries, 118 F.R.D. 161, 169 (1988); Wright *et al.*, 21A Fed. Prac. & Proc.

Evid. § 5081 (2d ed. 2012).

It is "for good reason" that the practice "has fallen into widespread

disfavor," for "[j]udges cannot marshal the evidence without exercising their own

judgment on how evidence should be described, which aspects should be stressed,

which aspects ignored.  In doing so, courts inescapably influence the jury on

decisions which should be the jury's sole province."  Mundy, 539 F.3d at 158;

Weinstein, *supra*, at 168 ("the very process of choosing which testimony to review and which to leave out is in itself a comment on the evidence").  See United States. v. Harris-Thompson, 751 F.3d 590, 602 (8th Cir. 2014) (suggesting trial court should instruct on party's theory, but not include "a judicial narrative of [that party's] version of the facts"); United States v. Carter, 528 F.2d 844, 851 (8th Cir. 1975).  Moreover, "the influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference and may prove controlling."  Quercia v. United States, 289 U.S. 466, 470 (1933) (citation and internal quotation omitted).  See United States v. Neumann, 887 F.2d 880, 882 (8th Cir. 1989).

Thus, even when marshaling the evidence was more common, the Supreme Court cautioned about the judge's duty "to use great care" that any summary or comment "especially . . . not be one-sided."  Quercia, 289 U.S. at 470 (citation omitted).  To be evenhanded, summarizing has to cover the evidence favorable to the defendant as well as that favorable to the government.  Starr v. United States, 153 U.S. 614, 626 (1894) ("The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him.").

This Court has taken such warnings quite seriously. For example, in United States v. Dunmore, 446 F.2d 1214, 1217, 1218 (8th Cir. 1971), "[t]he trial court called to the jury's attention most of the evidence offered by the government. Yet . . . the court made only brief mention of the evidence adduced by the defense." This Court reversed the conviction because such a "one-sided recapitulation of the evidence does not meet the standards of impartiality required of a federal judge." It did likewise in United States v. Brandom, 479 F.2d 830, 836 (8th Cir. 1973), because, "while the trial judge summarized the evidence favorable to the government, it failed to do the same with respect to the evidence submitted by the defendant."[58] See Boatright v. United States, 105 F.2d 737, 740 (8th Cir. 1939) (same; "trial judge should state the facts not only with accuracy, but with fairness, referring both to that which is favorable to the defendant, and that which is unfavorable to him").

This Circuit's pattern instructions for criminal cases do not provide for a trial judge to summarize the evidence, and they note that, while not forbidden, this should only be attempted with caution. Model Jury Instructions, Eighth Circuit, No. 3.12, at 94 n.1 (2014). It is true that the pattern instructions for death-penalty

---

[58] The prejudice was not cured by the court's instruction that jurors were the sole judge of the facts. Id. at 836.

cases offer an example of a charge on future violence listing the "pertinent facts" such as the defendant's lack of remorse, <u>Model Death Penalty Jury Instructions, Eighth Circuit</u>, No. 12.08 (2013). But nowhere does this pattern charge suggest — nor could it under this Circuit's decisional law — that a district court may one-sidedly flag only the "facts" favoring this factor, and ignore even the defendant's theory on the issue.

And that is just what the court did here. Its instruction summarized only the government evidence supporting future violence, and never mentioned any of the defense testimony on the issue, from BOP experts showing that, if spared, Coonce could continue to be safely managed in an ADX-like isolation setting and thus would *not* probably engage in violence. The instruction also omitted anything that tended to discredit or otherwise detract from the listed government evidence supporting dangerousness.

Furthermore, by instructing that certain conduct (such as Coonce's "lack of remorse") should be considered in support of this aggravating factor, the court's charge suggested that, if true, such matters were probative of his likelihood of future violence in prison. But whether that "inference[] should be drawn" was solely for "the jury" to decide. <u>Mundy</u>, 539 F.3d at 157. <u>See also</u> <u>United States v. Martin</u>, 740 F.2d 1352, 1357 (6th Cir. 1984) (warning against judicial "comments"

153

that "usurp the jury's role as factfinder").  The court's intrusion into that function

was particularly disturbing here because the inference — that, based on the listed

evidence, Coonce would probably be violent even in an ADX-like isolation setting

— was not only questionable, but at the heart of the dispute between the parties at

sentencing.[59]  <u>See</u> Facts, Section V, *ante*; Point VII, *post*.

Worse, the language of the charge —"in that Defendant Coonce has engaged

in . . . has threatened . . . has demonstrated" — may have suggested to jurors that

these contested claims had been deemed by the court factually proven, rather than

being just allegations.  The verdict form likely conveyed the same thing, by also

asking jurors whether they found dangerousness "in that" Coonce "has"

demonstrated he lacks remorse, *etc.*

### 2.    Refusal to instruct on the defense theory on future violence

Itemizing just the government's *evidence* in support of future violence

would have been bad enough.  But the court compounded the unfairness, and

committed another serious error by refusing even to instruct the jury on the defense

*theory* on this key issue, namely, that the BOP could control Coonce.

---

[59] Indeed, as early as his unsuccessful pretrial motion to strike the summary, Coonce had pointed out the empirically demonstrated lack of any nexus between the listed categories of evidence, such as "lack of remorse," and future violence in prison.  (A.84-87).

The FDPA and this Court's pattern instructions provide for a capital jury to be instructed on mitigators that are supported by the evidence, as this one was. <u>See Model Death Penalty Instructions</u>, *supra*, No. 12.10[8] & n.1; 18 U.S.C. § 3592(a), 3593(c). So does the Eighth Amendment, at least where, as here, the jury is charged on each of the government's aggravators including non-statutory ones crafted by the prosecutors. <u>See Delo v. Lashley</u>, 507 U.S. 272, 275 (1993).

Just as aggravating factors are analogous to elements, <u>see Ring v. Arizona</u>, 536 U.S. 584, 609 (2002), mitigating factors function as affirmative defenses at a capital-sentencing hearing, <u>Walton v. Arizona</u>, 497 U.S. 639, 650 (1990). Thus, the court was obligated to give Coonce's mitigating charge on future violence because it constituted his "theory of the case," <u>see United States v. Slagg</u>, 651 F.3d 832, 848 (8th Cir. 2011) and his "affirmative defense," <u>see Mathews v. United States</u>, 485 U.S. 58, 64 (1988), on the issue. The court did not have discretion to completely omit this, while at the same time instructing the jury on not only the government's theory but also a one-sided summary of its evidence.

The government's objection to the defense instruction, that it was not "specific to the defendant" but rather an argument against the death penalty generally (A.459-60), lacked merit, and its supporting citation to <u>United States v. Johnson</u>, 223 F.3d 665, 671, 675 (7th Cir. 2000), was inapposite. In <u>Johnson</u>, the

155

Seventh Circuit recognized that since (as here) the prosecution had injected the issue of future violence, the defendant *was* entitled to have the jury consider, on that issue, how BOP "security arrangements" could effectively control his conduct. Johnson also approved of non-dangerousness as a mitigating factor as long it is an "argu[ment] against sentencing this defendant to death . . . not an argument against the death penalty in general." Id. at 671. Indeed, "that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating" and thus, the Supreme Court has recognized, "may not be excluded from the sentencer's consideration." Skipper v. South Carolina, 476 U.S. 1, 5 (1986); Ayers v. Belmontes, 549 U.S. 7, 15 (2006).

Here, Coonce's proposed instruction would have focused the jurors on whether he, as an individual, could be controlled, based on all they had heard — from both sides — about him and the BOP's ability to manage prisoners with his particular characteristics (*e.g.*, retardation-level IQ, mental illness, a previous sex offense, *etc.*). The defense obviously was not asking for a life sentence because *other* BOP inmates might be safely housed in high-security settings.[60]

---

[60] The government also argued that the defense evidence supporting its proposed instruction had been admitted only to rebut the aggravating factor, and not as mitigation. But that was incorrect, since no such limitation had been requested by the government or imposed by the court when the evidence came in. In any event, the government objected to having the charge present Coonce's

**C.    The court's biased summary of the government's future-violence evidence and its refusal to even instruct on Coonce's theory on this key issue require reversal of his death sentence.**

The court's slanted charge ran afoul of well-established precedent on judicial summarizing of the evidence and jury instructions.  And it deprived Coonce of his rights to a reliable sentencing determination, due process, and full and fair jury consideration of his defense against the future-violence aggravator and of his mitigation, as protected by the Fifth and Eighth Amendments and the FDPA, 18 U.S.C. §§ 3592(a), 3593(c), (d).

This defective charge proved especially prejudicial because it bolstered the government's position on a critical, vigorously contested issue at sentencing.  See Facts, Section V, *ante*; Point VII, *post*.  Not only do interviews with capital jurors in other cases and mock-juror studies consistently show that future dangerousness or violence is the most compelling of all aggravating factors in the eyes of jurors.[61] But verdict sheets in federal capital trials also confirm this.[62]

_____

theory on future violence in any way, even in connection with the aggravating factor.  (A.459-60).

[61] See, e.g., Blume, Garvey & Johnson, Future Dangerousness in Capital Cases: Always "At Issue," 86 Cornell L. Rev. 397, 398 (2001); Constanzo & Constanzo, Jury Decision Making in the Capital Penalty Phase, 16 Law & Hum. Behav. 185, 188-89 (1992).

[62] See Cunningham, Sorensen & Reidy, Capital Jury Decision-Making: The Limitations of Predictions of Future Violence, 15 Psychol., Pub. Policy & L. 223,

Thus, it is not surprising that the prosecutors here devoted considerable attention to the future-violence factor, including starkly warning jurors that a death sentence was needed to protect correctional officers from Coonce. And, in doing so, they effectively exploited the imbalanced instructions by arguing that an affirmative finding was dictated by the kinds of evidence the court had listed in its instruction, namely, Coonce's prior violence and threats as well as his purported lack of remorse. (Tr.5238-44, 5247-48, 5325-26). Since the court's instruction omitted any mention of the defense theory on this issue (that the BOP could continue to safely manage Coonce in an ADX-like setting), the prosecutors could relegate their response to a few paragraphs of the rebuttal. (Tr.5327-28). See also Point VII, *post* (challenging that response as improper).

The prejudicial effect of the slanted instructions is further highlighted by the results in other federal death-penalty cases where juries have been given balanced charges directing them to consider both an aggravating factor of the defendant's risk or threat of violence and a mitigator factor of whether he could be safely controlled and managed in a high-security federal prison. In a number of those

234-35, 244-45 & Table 1 (2009) (study of jury findings and verdicts in 72 federal death-penalty cases over 13 years showing 82.4% of defendants who were found likely to engage in future violence in the BOP were sentenced to death, while 81.6% of those who were not so found were not sentenced to death).

cases, including one involving a BOP homicide, some jurors have found the mitigator and the jury has returned a life verdict.[63]

In another recent federal death-penalty case in which a general imbalance in aggravation-mitigation instructions was found to be "questionable," relief was denied because the record showed the jury was not "actually prejudiced" because it had parsed the aggravating factors, finding some but not others, thus indicating it had given "balanced" consideration to each.  United States v. Taylor, 814 F.3d 340, 364 (6th Cir. 2016).  Here, though, there is simply no indication from the verdict sheet or otherwise that Coonce's jury gave "balanced" consideration to the future-violence aggravator, but rather much indication to the contrary.

Given all this, together with the compelling mitigating evidence about Coonce's nightmarish upbringing that the jury found established several mitigators, see Facts, Section I, ante, and the fact that fewer than half of all BOP

---

[63] See, e.g., United States v. McCluskey, No. 10-cr-2734, ECF #1481, #1481-1, Verdict Sheet at 2, 18 (D.N.M. 2013); United States v. Northington, No. 07-cr-550, ECF #1466, Verdict Sheet, at 7, 12 (E.D. Pa. 2013); United States v. Richardson, No. 1:08-cr-139, Verdict Sheet, at 6, 12 (N.D. Ga. 2012), available at FDPRC Website, Verdict Forms, http://tinyurl.com/h6zpua9.  The numerous courts that gave both charges, see Cunningham, Limitations, supra, at 235, apparently did not perceive, as the government claimed here, that it would invite an "internally inconsistent" verdict.  (A.460).  It is not necessarily inconsistent for a juror to find that a defendant generally presents a likelihood of violence, but one that in his individual case can be safely managed by the BOP in a high-security prison setting.

murder cases that reach a capital sentencing end in a death verdict, see Point

XVI.B, *post*, the government cannot carry its burden to show beyond a reasonable

doubt that these instructional errors did not affect the outcome. Satterwhite v.

Texas, 486 U.S. 249, 257 (1988); 18 U.S.C. § 3595(c)(2). The Court should

reverse Coonce's death sentences and order resentencing.

## VII.

**The government loaded its presentation on the future-violence aggravating factor with misleading, improper evidence and argument.**

### A.     Introduction

To counter the government's aggravating allegation that Coonce would

seriously assault and possibly kill others in prison if not executed, the defense

relied on testimony from two corrections experts, former BOP warden Mark Bezy

and ADX Florence legal counsel Chris Synsvoll, that the BOP could safely manage

him, including his mental-health issues, in a super-maximum, solitary-confinement

setting, as it had done in the two years before trial (during which he had been free

of any disciplinary infraction) — either at ADX Florence, where most federal

inmates who commit institutional homicides are sent, or another comparable

isolation setting. See Facts, Section V, *ante*; Point VI.A, *ante*.

But prosecutors worked unfairly and unlawfully to undermine this evidence. First, the government repeatedly encouraged jurors to focus on the cost and administrative inconvenience of housing him in a setting like ADX — mainly by warning that the BOP lacked sufficient "beds" for all the prisoners meriting placement there, and that it might take years to finish getting other such units fully up and running. Imposing a death sentence based on financial or bureaucratic considerations would be arbitrary under any circumstances. But such appeals were particularly indefensible here, since the BOP, the entity that decides where to house federal inmates and what prison capacity to create, operates, like the prosecutors, under the direction of the Attorney General. And all belong to the U.S. Department of Justice. Thus the prosecutors essentially were telling jurors that Coonce must be executed because *their own agency*, notwithstanding its robust $27 billion budget, might choose to deny him a "bed" in any of its solitary-confinement settings.

Second, through misleading, unreliable testimony and arguments, the government ceaselessly encouraged jurors to fear that, if they spared Coonce, he would soon end up in an open-population setting — indeed, quite possibly the institution where the murder occurred, the Medical Center at Springfield. It sat in the jurors' own community and their family members, friends, and acquaintances

161

may have worked there.[64]  In reality, the record shows not only that the BOP would have been free to keep Coonce indefinitely in a solitary-confinement setting like ADX, but that this was almost certainly what it would have done had he been spared.  It was also virtually certain that he would not have returned to the Medical Center in the foreseeable future, let alone to freely roam the grounds.

Third, in hypothesizing that Coonce would be unwisely transferred to an open-population setting where he would commit violence, the government encouraged jurors to speculate that the BOP (again, part of their own agency) would act negligently or incompetently rather than based on sound, reliable correctional judgment.  This too was improper and injected arbitrariness into the sentencing decision.

Fourth, the government's witness examinations and arguments repeatedly cited Coonce's mental illness as *itself* proof of his dangerousness and a reason to condemn him, thus directly inverting a constitutionally acknowledged mitigating factor into an aggravating one.

Finally, the prosecutors maintained that ordering Coonce's execution was the only way to ensure he would be kept in isolation, on death row.  This was not

---

[64] The court's refusal to ask potential jurors about this in voir dire is the subject of Point XII, *post*.

only untrue, but it impermissibly invited jurors to impose a death sentence even if they did not think Coonce deserved execution.

**B.**    **The government improperly encouraged jurors to impose death because it would be too costly or administratively inconvenient to keep Coonce in solitary confinement.**

The government introduced its theme of "not enough beds" while cross-examining former BOP warden Bezy.  "It's a number and resource problem, correct?  You obviously can't put all the violent people at ADX?" the prosecutor began by asking.  Bezy agreed.  Then, after eliciting that over 4,000 inmates are serving life sentences in the BOP and that, due to ongoing renovations, ADX now had only 426 beds (down from its 490-bed capacity) for the 417 inmates currently housed there, the prosecutor asked: "Nine empty beds . . . there's a lot of pressure to put people at the ADX, correct?  They can't house all the violent people?"  And moments later: "There's only so many places you can put them, is that right?"  When Bezy noted that the BOP had other solitary-confinement housing, the prosecutor chimed in: "Not at the ADX, you don't?"  Bezy agreed.  (Tr. 2839-2840).

The government also brought out that, following a lawsuit over psychiatric care at ADX, the BOP had created a new, ADX-type unit at USP Atlanta for high-security prisoners with serious mental illness, and had revised its policies to

163

discourage placing them at ADX unless security considerations required it.  In other words, as Bezy and Synsvoll, the BOP legal counsel at ADX, testified, and as the BOP's own policy states, officials still enjoy wide latitude to incarcerate prisoners with serious mental illness in solitary confinement where appropriate.  See Facts, Section V, *ante*.

Nonetheless, the government pivoted back to its theme that solitary confinement might be too costly or administratively inconvenient, especially if Coonce were deemed seriously mentally ill (though the prosecutors themselves denied that he actually was).  Thus, one prosecutor got Synsvoll to agree that (in the prosecutor's words) "because of the logistics of it," there were presently only "26 beds in [the ADX-type unit in] Atlanta," with "[n]ineteen filled right now," and that some seriously mentally-ill prisoners who had been at ADX were still "pending placement" in Atlanta.  (Tr.4566-69).  And that another similar program was "not online yet" and, even when it was, would initially house only six inmates.  (Tr.4570-71).

Of course, when to set up such units and how large to make them would continue to be decisions for the Department of Justice.[65]  Yet in cross-examining

_____

[65] Indeed, so were the decisions over many years to deny adequate mental-health care to prisoners at ADX, which necessitated the creation of those additional units in the first place.  See Mark Binelli, Inside America's Toughest Federal

Synsvoll, the prosecutor encouraged jurors to assume that the absence of enough beds in those units to house all the prisoners who belonged in them was instead a fixed feature of the "financial universe." Thus, he got Synsvoll to agree that the BOP did not have "limitless" or "infinite" financial "resources" for housing "unlimited people," but instead operated within "financial constraints." (Tr.4570-71).

The prosecutor also revisited the "not enough beds" theme with Synsvoll. The BOP legal counsel agreed that "[s]tate inmates are competing for those limited . . . beds," and that every prisoner moved out of ADX would be replaced. (Tr.4577). And the prosecutor had Synsvoll confirm the "financial stressors" associated with operating ADX, including the staffing costs. (Tr.4574).

The government highlighted the same points with its own expert, former BOP administrator Scott Dodrill. Testimony had indicated that emergency circumstances might require again holding Coonce briefly at the Medical Center — if, for example, he had to appear in court nearby again. In that event, the evidence showed, Coonce could be isolated in a solitary-confinement cell, as he had been for the trial. (Tr.2865-66, 2877, 2882-83). But the prosecutor elicited from Dodrill that "in today's economic times to have a cell with one inmate in it, that's going to

Prison, New York Times (Mar. 26, 2015).

cost you 4.2 staff around the clock for one person to stand in front of the cell."

The prosecutor pressed on, asking Dodrill about the "unique financial costs" of solitary confinement. The defense objected at sidebar that the government's repeated talk of "funding" and "staffing" was improperly "interject[ing] cost as a basis for jurors selecting death." The objection overruled, the prosecutor then elicited from Dodrill a detailed description of all the different "shifts" and "time slots" required to staff an inmate in solitary confinement. (Tr.4895-97).

Similarly, the government brought out from Dodrill that, contrary to Bezy's testimony, the BOP's plan to open another ADX-type institution in Thomson, Illinois (Tr.2816-17), faced looming funding delays. (Tr.4914). Dodrill also told jurors that the BOP still had not decided either how to "designate[]" the Thomson facility or who would be housed there, and that repairs would further delay getting it "up and running." (Id.) The misleading, if not false, character of this testimony is reflected by a BOP press release, issued just three months later, naming Thomson's first warden and trumpeting that the facility would house 1,900 high-security inmates.[66]

_____

[66] Federal Bureau of Prisons, BOP Director Names Warden for AUSP Thomson (Aug. 28, 2014), http://tinyurl.com/jt3m5zj. See also U.S. Government Accountability Office, Bureau of Prisons: Management of New Prison Activations Can Be Improved, at 34 (Aug. 2014), http://tinyurl.com/jbsua6b.

The government employed all this testimony to great advantage in summation. When the defense argued that housing Coonce at ADX or a similar setting like the USP-Atlanta unit would largely eliminate any threat (Tr.5291), the prosecutor shot back in rebuttal that "there is constant pressure at the ADX to step down inmates because there's only 470 beds approximately at that institution, and there are more people that need that space than spaces they have available," raising a "serious question . . . whether or not this man will even ever go to the ADX." The prosecutor also noted that the BOP's contemplated high-security units for mentally ill prisoners "aren't done yet." (Tr.5327).

Fighting for a death sentence based on the cost and administrative inconvenience of safely housing Coonce was improper and violated his Eighth Amendment rights under this Court's precedents.[67] "There is simply no legal or ethical justification for imposing the death penalty" based on the "cost" of imprisoning a capital defendant for life, "and it is not a proper factor to be considered by the jury."[68] Blair v. Armontrout, 916 F.2d 1310, 1323 (8th Cir.

_____

[67] This and the other evidentiary issues in this point are reviewed *de novo*, because the court's rulings implicated Coonce's constitutional rights. See United States v. Campbell, 764 F.3d 880, 887 (8th Cir. 2014).

[68] Even in non-capital sentencing, cost of imprisonment is an improper consideration. United States v. Pepper, 570 F.3d 958, 965-66 (8th Cir. 2009), vacated in part on other grounds, 562 U.S. 476 (2011).

1990); <u>Miller v. Lockhart</u>, 65 F.3d 676, 682, 685 (8th Cir. 1995) (same); <u>Antwine</u>

<u>v. Delo</u>, 54 F.3d 1357, 1364 (8th Cir. 1995) (same).  <u>See also</u> <u>Brooks v. Kemp</u>, 762

F.2d 1383, 1412 (11th Cir. 1985) (*en banc*) (prosecutor's jury argument about cost

was "clearly improper" because "cost is not accepted as a legitimate justification

for the death penalty"), <u>vac'd on other grounds</u>, 478 U.S. 1016 (1986); <u>Edwards v.</u>

<u>Scroggy</u>, 849 F.2d 204, 210 (5th Cir. 1988) (same).

**C.**   **The government misled jurors to think that, if not sentenced to death, Coonce would be returned, possibly very soon, to an open-population setting, perhaps even at the nearby Medical Center.**

In suggesting there would not be enough "beds" to incarcerate Coonce in a

solitary-confinement setting, <u>see</u> Section A, *ante*, the prosecutors wanted jurors to

think that Coonce would be returned to an open-population setting.  Thus, they also

cross-examined Bezy and Synsvoll about other prisoners, either mentally ill or

convicted of BOP homicides, who once were at ADX but later were transferred to

USPs or to the Medical Center.  They implied that the same thing would happen to

Coonce, despite saying nothing about the records of those inmates whom the

prosecutor had cherry-picked, let alone laying any foundation that they were

comparable to him.  (Tr.2845-2854, 4566-69).

Worse, the government parlayed that testimony into an extended dog-and-

pony show about the privileges available to open-population inmates at the

Medical Center.  The prosecutor elicited from his expert Dodrill that Springfield featured "all kinds of recreation programs," including "Ping-Pong tables, pool tables, softball fields, volleyball," even  "bocce ball."  (Tr.4898).  He showed the jury an extended series of nearly 30 photographs from "the grounds" at Springfield, having Dodrill discuss each one.  These included a "baseball or softball area," "Ping-Pong, card tables, and foosball," "pool tables," "a hobby craft area" with a "ceramic area" and "kilns," "a stick art program," an "exercise area where [inmates] have the machines, bikes, and treadmills," a "library" with "reading materials," an area where inmates could watch movies together on large screens, an area for "intramural activities like indoor soccer," "handball courts," a "softball field," "the bocce ball court," a "track" around the facility for walking, a "volleyball" area, a "pavilion" for "chess or cards," an "area to play horseshoes," a "cafeteria" where inmates could dine together, and an area they could learn and practice "small engine repair."  (Tr.4898-4909; A.1491.1-1491.54).

This presentation, particularly the Springfield slideshow, was a baseless scare tactic.  Former warden Bezy had testified that if Coonce ever returned to Springfield, he would be kept isolated in a special cell, as he was during trial.  (Tr.2855, 2865-66, 2877, 2880-83).  Bezy also explicitly said that Coonce "could

not safely function" in an open-population setting, mainly because he had such a long history of being victimized by other inmates. (Tr.2809).

Indeed, prosecution expert Dodrill himself ultimately confirmed that Coonce would not be going to an open-population setting in Springfield or a USP. A former BOP administrator who had overseen classification for the entire agency, Dodrill acknowledged on cross-examination (though only after the prosecutor's extended slideshow about Springfield on direct) that if jurors spared Coonce, the BOP would send him to ADX or, if his mental illness precluded that, the ADX-type unit in Atlanta. "[H]e would never go back to Springfield except on a temporary emergency basis." (Tr.4936-37). Dodrill also made clear it was beside the point that some other BOP homicide offenders had been transferred out of solitary confinement because, unlike those inmates, Coonce had "a terrible track record in other institutions" as well as other "issues." (Tr.4936).

Nonetheless, the government's other evidence, particularly the startling slideshow about prisoners strolling the grounds and enjoying varied recreational activities at the Medical Center, had sufficiently muddied the waters and stoked the jurors' fears and anger that the prosecutors could argue in summation that Coonce would likely not remain long in a place like ADX and might not even be sent there at all. (Tr.5327-28). See Section B, *ante*.

Defense counsel objected to the government's presentation, protesting that Coonce would "go to ADX or some other very secure facility" and that Springfield's conditions and facilities for open-population inmates were "not relevant." (Tr.2370-72, 4899). But the court overruled them, saying that Bezy had testified Coonce would "likely go to Springfield." (Tr.4899). In doing so, the court ignored that Bezy ultimately made clear that would occur only if Coonce were kept in solitary confinement there.

By licensing the government to inscribe in the jurors' minds a frightening and indelible misimpression that, if spared, Coonce would enjoy complete freedom of movement and access to other inmates and staff, in a facility in their own community, the court violated his rights to due process and to a reliable sentencing under the Fifth and Eighth Amendments and 18 U.S.C. § 3593(c). See Johnson v. Mississippi, 486 U.S. 578, 590 (1988) (reversing death sentence where jurors were "allowed to consider evidence . . . revealed to be materially inaccurate"); United States v. Fields, 483 F.3d 313, 337 (5th Cir. 2007) (capital defendant "may not be sentenced on the basis of misinformation of constitutional magnitude") (citation omitted). Cf. Simmons v. South Carolina, 512 U.S. 154, 165-66 (1994) (due process violated where capital jury was misled about defendant's possible future custody status).

Furthermore, the photographic presentation about movie night, bocce ball courts, and other prisoner privileges at Springfield would have had no bearing on Coonce's likelihood of future violence even had it accurately represented where and how he would be incarcerated. It simply served to stoke resentment against inmates by conveying the supposed comforts of daily life in prison. Appealing for a death sentence on that basis was also improper. See Bland v. Sirmons, 459 F.3d 999, 1027 (10th Cir. 2006); Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002).

Finally, the misimpression that Coonce would return to an open-population unit also prejudiced his defense by playing into the government's argument that a life sentence would amount to no punishment, since he was already serving life. (See, e.g., Tr.5262). It is wrong to argue that "there is no other available punishment [than the death penalty] for one already serving a sentence of life imprisonment without possibility of parole," for "there are other sanctions less severe than execution that can be imposed even on a life-term inmate . . . . such as through a transfer to a more restrictive custody or correctional facility or deprivation of privileges of work or socialization." Sumner v. Shuman, 483 U.S. 66, 83-84 (1987). And the testimony here showed that the BOP, if it wished, could keep Coonce in solitary confinement as long as it considered that appropriate, as it has done with numerous prisoners. See Facts, Section V, *ante*. See also 28 C.F.R.,

Pt. 541, Subpt. D, § 541.40-50 (when inmate commits serious infraction, he may

be sent to an isolation unit for a period to be specified in advance; regulation

mentions no limit on maximum term of isolation).  But this was effectively negated

by leading the jurors to doubt that Coonce would in fact be isolated very long or

perhaps at all.  And the court exacerbated the harm by refusing his request for an

instruction that the BOP "is capable of imposing conditions of confinement for

Wesley that will punish him for the murder of Mr. Castro."  (A.518, 520; Tr.4997-

98 [ad.35]).  Cf. United States v. Rodriguez, 581 F.3d 775, 799-800 (8th Cir. 2009)

(prosecutor improperly argued that life sentence for murder would result in no

additional punishment).

**D.**     **The prosecutors effectively invited jurors to speculate that the BOP**
        **would act negligently or incompetently by returning Coonce to a setting**
        **like the Medical Center in which he would commit violence.**

The problems with a future-violence prediction that hinged on Coonce being

returned to an open-population unit in a USP, discussed above, were compounded

because it required jurors to assume that the BOP likely would *not* exercise sound,

reliable correctional judgment.  The testimony showed that the BOP keeps an

inmate like Coonce in solitary confinement as long as he is considered dangerous

in a less restrictive setting, and moves him only if experienced, expert correctional

officials are assured that he *can* be safely managed there and would *not* engage in

173

violence. Otherwise, he stays in isolation. And these officials do an excellent job, for it appears that no BOP homicide offender who has been transferred out of solitary confinement has ever killed again. (Tr.2808-13, 2820-22, 2867-72, 4547-51, 4556, 4584-86, 4939). See also Facts, Section V, *ante*.

Of course, such competent and reasonable management does not mean it is *impossible* that a transferred prisoner could act violently. But the aggravating factor here required the government to prove beyond a reasonable doubt not some risk greater than zero, but rather a "*probability*" that Coonce "would commit criminal acts of violence." (A.526 [ad.37]) (emphasis added). See Jurek v. Texas, 428 U.S. 262, 269 (1976) (validating constitutionality of aggravating factor of "probability that the defendant would commit criminal acts of violence").

Thus, transferring Coonce to an open-population setting if *it is probable* that he will engage in violence there would constitute negligence or incompetence by the BOP. (Indeed, as discussed, prosecution expert Dodrill testified it would not be a sound correctional decision). And it was improper for the government to encourage jurors to speculate about such a prospect.[69] See Darden v. Wainwright,

---

[69] Prior to trial, Coonce complained that the dangerousness factor was "speculative," because, among other reasons, "[m]odern prison facilities and procedures such as employed by BOP" at institutions like ADX "allow the preemptive immobilization of any offender, virtually negating any presumed 'risk,'" and BOP officials can keep an inmate at ADX as long as they believe

477 U.S. 168, 180 & n.10 (1986) (misconduct for prosecutor to argue that executing defendant for murder while on prison furlough was "only way" to prevent future murders since corrections officials might negligently release him again); Tucker v. Kemp, 762 F.2d 1496, 1508 (11th Cir. 1985) (*en banc*) ("possibility of future incompetence of corrections . . . personnel" should not be "invoked to alter [a capital sentencing] jury's perception of its role" ).  Thus, in a recent federal death-penalty case, United States v. Caro, 597 F.3d 608, 625-26 (4th Cir. 2010), the Fourth Circuit found "troubling" the prosecutor's summation argument: "What about this classification system that the BOP has?  The question is can we rely on the BOP to send Caro to a place where he won't kill? . . . [W]e know that the system for classification is not failsafe."  Noting that a capital defendant is entitled to an "individualized determination," the Court explained that "[t]he suggestion that the BOP would not secure Caro adequately to prevent future violence implicates policy and resource considerations that are quite different." Id., citing Tucker, 762 F.2d at 1508.

It was particularly unacceptable for prosecutors to imply that the BOP might recklessly transfer Coonce, since they were part of the same agency, the Department of Justice, and worked for the same supervising official, the Attorney

security considerations call for it.  (A.183, 205, 217, 231).

General.[70]  See United States v. McCluskey,  No. 10-cr-2734, ECF #1017, at 18-20

(D. N.M. June 11, 2013) (in capital prosecution, court bars government from

suggesting it might hand over defendant to State of Arizona, which could not

incarcerate him as securely as BOP).

**E.    The government impermissibly turned Coonce's mental illness, a mitigating factor, into an aggravating one, by telling jurors that it meant he would be incurably violent and thus deserved execution.**

The United States Supreme Court has long recognized that it would violate

the Eighth Amendment to "attach[] the 'aggravating' label . . . to conduct that

actually should militate in favor of a lesser penalty, such as perhaps the defendant's

mental illness."  Zant v. Stephens, 462 U.S. 862, 885 (1983).  As an example, it

cited a case in which a capital-sentencing judge had treated the defendant's mental

illness as aggravating on a theory that it would make him more violent in the

future.  See id., citing Miller v. State, 373 So. 2d 882, 885-86 (Fla. 1979).  More

recently, the Court identified, as one reason for exempting intellectually disabled

offenders from the death penalty, the risk that their indisputably mitigating

_____

[70] Indeed, in other contexts, courts do not permit a party to gain a litigation advantage by having the fact-finder speculate that party might not act reasonably. Thus, for example, in compensating a wrongfully terminated employee for future lost earnings in a civil case, the factfinder must assume that the employee will act appropriately to mitigate damages by reasonably pursuing other jobs.  See United Paperworkers Int'l Union v. Champion Int'l Corp., 81 F.3d 798, 805 (8th Cir. 1996).

condition could be invoked to support "the aggravating factor of future dangerousness," thus resulting in a "wrongful execution." Atkins v. Virginia, 536 U.S. 304, 321 (2002). See also Roper v. Simmons, 543 U.S. 551, 573 (2005) (it would be "overreaching" for a prosecutor to encourage jurors to count mitigator of defendant's youth "against him" on a theory that it made him more dangerous). The same appears to be true in non-capital federal sentencing. See United States v. Portman, 599 F.3d 633, 638 (7th Cir. 2010) ("It is a misunderstanding of diminished capacity to suggest that because reduced mental capacity would make recidivism more likely, an increased sentence would be necessary.").

Nonetheless, throughout Coonce's sentencing, the prosecutors encouraged jurors to treat his mental illness as *itself* a reason to execute him because it supposedly made him incurably violent even in a high-security prison.

The prosecutors climaxed their cross-examination of defense neuropsychologist Wood by discussing for several pages how brain injuries can increase aggression and thus heighten dangerousness. (Tr.3051-53). And they got Vogelsang, the defense social worker, to essentially agree that Coonce was "so badly broken" that he would "be a danger for the rest of his entire life." (Tr.3825-27).

This strategy continued with the corrections experts. Thus, the prosecutor got Bezy to agree that "the more you isolate someone [with] mental health issues, the more violent they may become" (Tr.2851, 2867), and that, if Coonce suffered from serious mental illness, there would be additional hurdles to incarcerating him at ADX because the lack of adequate care there had resulted in a lawsuit and revised policies. (Tr.2841-52). See also Section A, *ante*. The prosecutor also questioned Bezy about how Coonce's mental illness could endanger prison guards because he had a history of self-mutilation and suicide attempts and, if this recurred, a guard might need to enter his cell. (Tr.2856-57). The prosecutor addressed these same subjects with Synsvoll and Dodrill. (Tr.4566-75, 4912-3).

Using this testimony, the prosecutors argued that Coonce posed a danger because he is mentally ill: "[A]s their own experts have acknowledged, Ms. Vogelsang said that he's irretrievably broken. That's what was suggested by her testimony. There's nothing more that can be done for Mr. Coonce . . . . if she's right, what do you do with the man? By her own statement, he'll always be a future danger. He'll always present problems. He'll always be a potential to kill because he is irretrievably broken." (Tr.5325-26. See also Tr.5327-28).

To be clear, Coonce does not claim that the government was precluded from arguing a likelihood of future violence based on evidence such as his past conduct

and statements, even if those were somehow related to his mental illness. (Though, in fact, his model behavior in prison during the two years before trial, when he finally received proper psychiatric medication, indicated that his mental illness was actually treatable). Rather, prosecutors crossed the line laid down by <u>Zant</u> and other decisional law when they explicitly urged that Coonce's mental illness *itself* made him dangerous and thus justified a death sentence.

**F.     The government bookended its tainted presentation on Coonce's dangerousness by inaccurately and improperly characterizing a death sentence as the only way to keep him isolated.**

Having suggested that cost considerations or BOP incompetence might land Coonce back in an open-population setting if he were spared, the prosecutors also presented evidence that death-sentenced prisoners are housed indefinitely in solitary confinement at USP Terre Haute, which is reserved as a "long term" setting for such a "purified" group. (Tr.2632, 4894). In summation, they used the contrast to cast a death verdict as the only sure way to isolate him:

> So this kind of argument that suggests that somehow he'll go to the ADX, it doesn't wash because there's no guarantee that even if he goes to the ADX he will stay there. The only place where he will never be stepped down, the only place where he will be in a place where he'll be isolated and segregated is death row in Terre Haute, Indiana.

(Tr.5328).

Not only did this mislead jurors since, as discussed, the BOP could have kept Coonce in solitary confinement indefinitely whatever the verdict. Even more disturbing, this tactic invited jurors to impose death even if some of them believed Coonce did not deserve to die and could be safely managed in solitary confinement. See Mills v. Maryland, 486 U.S. 367, 374 (1988) (invalidating instruction allowing death verdict even though some jurors thought death was inappropriate); Caldwell v. Mississippi, 472 U.S. 320, 331-32 (1985) (condemning argument that tempted jurors to vote for death despite being "unconvinced that death is the appropriate punishment").[71]

Indeed, jurors may have thought that solitary confinement, and not Coonce's actual execution, would be the only real-world result of a death verdict, especially as the government also highlighted remarks by Coonce that the federal government does not execute people and that condemned prisoners remain on death row for a

---

[71] The prosecutor compounded the problem by also appealing for a death verdict to send a message to citizens that they could "rely on legal processes rather than self-help." Only their faith in that, he continued, could prevent society from descending into "anarchy . . . vigilante justice, and lynch law." The prosecutor prefaced this by saying he was quoting the words of former Justice Lewis Powell. (Tr.5209). As Caldwell recognized, it is improper to appeal for a death verdict to "'send a message' of extreme disapproval for the defendant's acts." 472 U.S. at 331. See also United States v. Sinisterra, 600 F.3d 900, 910-11 (8th Cir. 2010) (prosecutor's "send a message"-type arguments "impinge[d] upon the jury's duty to make an individualized determination that death is the appropriate punishment").

decade or longer and their death sentences are eventually set aside. (Tr.1755-56, 2670-72; Gov. Ex. #104). See Caldwell, 472 U.S. at 332-33.

## G. Conclusion

These features of the government's dangerousness presentation violated Coonce's rights to due process and a reliable, non-arbitrary sentencing determination, as protected by the Fifth and Eighth Amendments to the Constitution and 18 U.S.C. § 3595. Given the importance of his future behavior in prison and the damaging nature of these tactics, they were quite prejudicial, especially collectively. For the same reasons that apply to the court's intrusive and imbalanced instruction on future violence, see Point VI.C, *ante* the government cannot show that a death sentence for Coonce was a foregone conclusion or that the Court's errors in allowing the tainted evidence and arguments on this key issue were harmless beyond a reasonable doubt.[72] See Satterwhite v. Texas, 486 U.S. 249, 257 (1988); 18 U.S.C. § 3595(c)(2). Accordingly, the Court should vacate Coonce's death sentences and order resentencing.

---

[72] The defense objected to most of the improprieties, and further objections on the same points would have been futile. Moreover, any unpreserved errors were plain since the misleading and illegitimate nature of the government's appeals to the jury was so obvious, and their cumulative effect so damaging. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732-33 (1993).

# VIII.

**By removing Coonce from the courtroom before delivering a mid-sentencing-hearing instruction suggesting that protesters outside the courthouse might pose a risk to jurors, the court violated his right to presence and potentially prejudiced the jurors' perception of his dangerousness.**

About two weeks into sentencing and a week before the case went to the jury, the court brought counsel into chambers to tell them he had learned there was "something on the news this morning" about a "planned protest here at noon today, anti-death penalty, and I'm told that there's been somebody walking the sidewalk." The court announced that "in light of that," it was "sealing the names of all the jurors in the case," and it instructed counsel that "the defendants are not to have access to the names of the jurors." The court also informed counsel that "if the protest seems to amount to something that, you know, might be disruptive," it would "talk to the jurors about it before they go" to lunch, and do so "outside the presence of the defendants." The court said it would tell jurors "what's going on and . . . give them the option of staying here." (Tr.4308-09).

Defense counsel objected to the court's excluding Coonce when it spoke to the jurors, but the court overruled the objection. When counsel added that similar protests had taken place outside courthouses in other federal capital cases he had

tried without any attempt by the protesters to "interfere in the judicial process or with the jurors," the court cut off the discussion. (Tr.4310-11).

Later that day, just before the lunch break, the court conspicuously had the defendants removed from the courtroom before instructing the jurors about the protesters. After the last witness of the morning concluded his testimony, the court told the jurors to wait in the jury room and that they would be brought "right back" in. Immediately after they exited the courtroom, the court had the marshals remove the defendants.[73] Then, three minutes after the jurors had left the courtroom, the court brought them back in, and delivered the following instruction:

> Ladies and gentlemen, just out of an abundance of caution, there were
> a handful of protesters outside the courtroom today — outside the
> courthouse protesting the fact that the federal government recognizes
> the death penalty. I wanted to give you all a heads up on that. I don't
> know that there are very many people there at this point in time. We
> do have some extra security personnel out there. I just suggest don't
> wear your jury badges when you go out and, you know, don't let
> anybody engage you. And, like I said, there are security people out
> there. And I don't anticipate any difficulty whatsoever but I did want
> to let you know what I know about that situation. And I do also want
> to let you know that I've taken steps to make sure that your names and
> your addresses are not part of the public record of this proceeding.
> And, again, like I say, I do that out of an abundance of precaution, not
> because I really anticipate that anyone will experience any difficulty
> but better to be safe than sorry in that regard. And, again, if there is

---

[73] Presumably the jury was excused while the defendants were removed so that the jurors would not see their restraints. (See 4/28/14, pp.4-6).

anything that occurs that makes you feel uncomfortable, I know that
you'll report that to Terri so that I can see to it that we address that.

(Tr.4451-52).

This instruction was quite different from the one the court had told counsel it

would deliver to inform jurors of the protests and offer them the option of eating

lunch in the courthouse.  By twice telling jurors that there were "security personnel

out there" (once adding that there was "extra security"), that the protesters had

prompted the court to "make sure that your names and addresses are not part of the

public record" (so as to be "safe" rather than "sorry"), and that their juror badges

might make them a target, the court raised the baseless specter that the protesters

might harass or even threaten or try to harm the jurors.[74]

Moreover, since they had heard mitigation testimony from numerous family

members and others close to Coonce's over the preceding week, some of the jurors

may have worried that the protesters were not just ideologically aligned with the

defense in opposing capital punishment, but personally associated with Coonce or

his mitigation witnesses.  For why else would the court have taken pains to keep

him and his codefendant away when it warned them about the protesters?  The

---

[74] The record says nothing about the actual protest, and a media search by
Coonce's appellate counsel uncovered no local stories mentioning the prospect of a
courthouse protest or that one ever occurred.  This suggests that if any protest was
actually planned or held, it was insignificant.

court's own thinking seems to have gone in that direction: As noted, when it learned of the anticipated protest it ordered counsel not to allow their clients to access or memorialize the jurors' names or addresses.

The Supreme Court and this Court have recognized that, under Federal Rule of Criminal Procedure 43, a defendant is entitled to be personally present when the court instructs a sitting jury.  Rogers v. United States, 422 U.S. 35, 39 (1975); United States v. Nelson, 570 F.2d 258, 261 (8th Cir. 1978).  See also United States v. Koskela, 86 F.3d 122, 125 (8th Cir. 1996); United States v. Mesteth, 528 F.2d 333, 335 (8th Cir. 1976); United States v. Treatman, 524 F.2d 320, 322 (8th Cir. 1975).  Indeed, that right is so important it is non-waivable in a capital case.  See Crosby v. United States, 506 U.S. 255, 260 (1993); Diaz v. United States, 223 U.S. 442, 455 (1912).

Because the court violated Rule 43, its exclusion of Coonce from its instruction about the protest was "presumptively prejudicial.  This presumption may be overcome," and the error shown to be harmless, only "by a clear indication of an absence of prejudice."[75]  Koskela, 86 F.3d at 125; United States v. Martin, 777 F.3d 984, 991 (8th Cir. 2015); Nelson, 570 F.2d at 261 (error may be harmless

---

[75] A federal capital sentencing error, whether constitutional or not, requires reversal unless the government proves "beyond a reasonable doubt" that it was harmless.  18 U.S.C. § 3595(c)(2).

"if there does not exist 'any reasonable possibility of prejudice'"), <u>quoting</u>

<u>Mesteth</u>, 528 F.2d at 335.  <u>See also</u> <u>Rogers</u>, 422 U.S. at 40.

Here there was far more than a reasonable possibility of prejudice.  As discussed, the court's instruction intimated that jurors faced some risk of harassment or perhaps worse from the protesters.  And the tenor of the instruction, Coonce's conspicuous exclusion from the courtroom, and the proximity of his relatives and friends who had just testified all may have combined to raise a concern among jurors that Coonce himself or his witnesses might somehow be connected with the protesters and thus part of the threat.

At a proceeding in which the issue of the defendant's dangerousness was central and disputed, such a jury instruction was hardly innocuous.  <u>Compare</u> <u>Rogers</u>, 422 U.S. at 40 ("nature of the information conveyed to the jury, in addition to the manner in which it was conveyed, does not permit . . . conclusion" that Rule 43 violation was harmless) <u>with</u>, <u>e.g.</u>, <u>Nelson</u>, 570 F.2d at 261 (error harmless where court merely reiterated correct instruction on question of law); <u>Martin</u>, 777 F.3d at 991 (same, where court's comments were "ministerial in nature and repeated instructions which jurors generally receive before and during trial").

Coonce's exclusion also violated his constitutional right to presence under the Due Process Clause of the Fifth Amendment and the Confrontation Clause of

the Sixth Amendment.[76]  Such a right exists at any stage where the defendant's

"presence would [not] be useless, or the benefit but a shadow," but rather would

"contribute to the fairness of the procedure."  Kentucky v. Stincer, 482 U.S. 730,

745 (1987) (citation and internal quotation omitted).  The instructing of jurors

about the protests was a proceeding where Coonce could "have gained [some]thing

by attending," in contrast to the one in United States v. Gagnon, 470 U.S. 522, 527

(1985).  There, a juror had expressed concern after noticing the defendant

sketching portraits of the jurors.  With the acquiescence of defense counsel and the

defendant (unlike here, where counsel objected), the trial judge said he would

speak to the juror alone in chambers (not, as here, in the courtroom after the

defendant's conspicuous removal).[77]  Moreover (in contrast to the gratuitously

fear-inducing instruction given here), there the judge helpfully explained that the

defendant "was an artist, meant no harm, and [that] the sketchings had been

confiscated," and also elicited assurances from the juror that he would remain

impartial.  Id. at 524.

_____

    [76] Because this issue turns on the extent of those constitutional protections, it
is reviewed de novo.  See United States v. Bordeaux, 400 F.3d 548, 552 (8th Cir.
2005).

    [77] Though the Supreme Court rejected Gagnon's constitutional claim, it did
not address whether his rights under Rule 43 were violated because it concluded
that Gagnon and his counsel had (unlike here) waived his presence by acquiescing
to the ex parte questioning in chambers.  Id. at 527-28.

Thus, in contrast to <u>Gagnon</u>, where the juror would have drawn no adverse inference from the defendant's absence from a (properly handled) in-chambers discussion, Coonce's removal from the courtroom may well have prompted his jurors to assume that the court had some reason for not wanting him to hear its (unnecessary and improper) warning about potential harassment from the protesters — and perhaps to speculate that the reason was that Coonce or those close to him were somehow connected with the protest.  <u>See</u> <u>Larson v. Tansy</u>, 911 F.2d 392, 396 (10th Cir. 1990) ("there is the reasonable possibility that the jury speculated adversely to the defendant about his absence from the courtroom" during instruction), <u>quoting</u> <u>Wade v. United States</u>, 441 F.2d 1046, 1050 (D.C. Cir. 1971);  <u>See also</u> <u>United States v. Fontanez</u>, 878 F.2d 33, 37-38 (2d Cir. 1989) (same, relying on "psychological" influence on jury of defendant's exclusion when court delivered instruction).

Accordingly, the Court should set aside Coonce's death sentences and order resentencing.

## IX.

**The court violated Coonce's confrontation rights by admitting extensive testimonial hearsay from his BOP records accusing him of various prison misconduct.**

This Court has recognized that it remains an open, unresolved question whether the Sixth Amendment's Confrontation Clause applies at a capital-sentencing hearing. United States v. Johnson, 495 F.3d 951, 976 (8th Cir. 2007) (concluding it need not address the issue because statements challenged there were not testimonial).

Other courts and judges around the country have divided over this important question. See, e.g., United States v. Umana, 762 F.3d 413 (4th Cir. 2013) (by 8-5 vote, denying en banc rehearing of split panel's ruling); United States v. Fields, 483 F.3d 313, 363 (5th Cir. 2007) (Benavides, J., dissenting in part) ("[t]he persuasive authorities, and our Sister circuits in particular, are divided on the issue"); United States v. Mills, 446 F. Supp. 2d 1115, 1128 (C.D. Cal. 2006) ("[T]here is a great deal of disagreement over" this issue); Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L. Rev. 1967, 1970 (2005) ("Lower courts . . . disagree[] about question[] . . . . 'Does the right of confrontation apply at capital sentencing?'").

Coonce's appeal squarely presents it.[78]  The challenged government hearsay at his sentencing was clearly testimonial, consisting of  BOP incident reports and disciplinary records recounting allegations by prison staff that Coonce had engaged in multiple instances of misconduct.  Coonce expressly preserved the issue below. For the reasons recognized elsewhere, as follows, this Circuit should hold that the Confrontation Clause applies to capital sentencing, find prejudicial error in the admission of the testimonial hearsay in Coonce's case, and reverse his death sentences.

*       *       *

Prior to trial, Coonce moved to exclude testimonial hearsay generally from his capital sentencing on Sixth Amendment confrontation grounds.  (A.353-60). The government responded that the protection would not apply at such a hearing (A.377-84), and the court agreed, denying the motion.  (Tr. 4/14/14, p.13.  See also A.763-64; Tr.2037-38, 2040, 2650).

At sentencing, the government called Benjamin Ramos, a BOP officer at the Medical Center, to testify in support of the future-violence aggravating factor. Ramos' job at Springfield was to investigate "disciplinary" and "criminal" matters.

---

[78] This issue is reviewed *de novo*.  See United States v. Dale, 614 F.3d 942, 955 (8th Cir. 2010).

The prosecutor had asked him to review and bring to court Coonce's "disciplinary files" from the BOP. (Tr.2110-11). After the prosecutor began to go through each incident in the files, defense counsel again interposed a confrontation objection; the court overruled it, granting the defense a continuing objection. (Tr.2136-37). Later during Ramos' testimony, Coonce's attorney twice again raised this objection unsuccessfully. (Tr.2204-06, 2260-63).

Ramos' direct testimony about Coonce's prison disciplinary files stretched across more than 100 transcript pages. (Tr.2110-2162, 2173-2219, 2269-72). He summarized and read excerpts from correction-officer reports and disciplinary records covering more than 60 different incidents over a decade from a variety of BOP institutions, beginning when Coonce was incarcerated for the Texas kidnapping, and ending two years before the start of his capital trial. Those reports and records themselves covered over 1000 pages, all of which the government introduced into evidence. (A.885-900, 944-1169, 1493-98. See A.582-86). Moreover, most of the incidents were described again by the prosecution psychiatrist Dietz when he testified. (Tr.5033-38; A.1475-79). See also Facts, Section III, *ante*.

Although the incidents alleged in the records were for the most part relatively minor, see id., some might have alarmed jurors. Those included, for

example, an occasion on which Coonce purportedly sexually assaulted another inmate; several in which it was claimed that he attacked or fought with other prisoners; several accusing him of threatening, throwing things at, or improperly touching BOP staff members, including females; and one in which two sharpened pieces of plastic were found in his cell.[79]  (Tr.2110-2162, 2173-2219, 2269-72; A.994-1013, 1021-23, 1074-81, 1088-94, 1126-28, 1137-42, 1151-53, 1166-69, 1493-98).

While most of the incidents resulted in disciplinary charges and sanctions, a number did not, including the one for the shanks.  (A.1002-04, 1008-13, 1137-42, 1166-69, 1497-98).  And the court refused to even limit the government to allegations that had been substantiated by some finding following a disciplinary hearing.  (Tr.2204).   Moreover, even where a BOP disciplinary officer concluded that Coonce had committed an infraction, the allegations in the records sometimes went well beyond the ultimate finding.  Thus, for example, the records and Ramos' testimony detailed an allegation by another inmate that Coonce had forcibly sodomized him.  But it appears the disciplinary officer found only that Coonce had

---

[79] The plastic pieces themselves as well as a photograph of them were identified by Ramos and admitted into evidence as government exhibits 194 and 195.  (Tr.2218-19).  BOP records, however, indicate that the plastic was discovered by another officer, and neither the records nor Ramos' testimony mention any involvement by him in the search or seizure.  (Tr. 2217-19; A.1166-69).

punched the inmate, based on a report from an officer who witnessed that and saw the inmate's mouth bleeding, and on Coonce's denial to investigators that he committed any sexual assault.  (Tr.2190-92, 2305-06; A.1088-94, 1872).

Virtually all of the allegations against Coonce contained in the BOP records came from BOP corrections and disciplinary officers whom the government never suggested were unavailable but did not call.[80]  Thus, the jury knew nothing about these declarants other than their names and job titles.  The allegations all took the form of reports and forms in which those unseen officers claimed to recount things they had seen or heard, or what other BOP employees, Coonce, or other inmates had told them.  Some of the statements were double or triple hearsay.  (See Tr.2110-2162, 2173-2219, 2269-72; A.994-1013, 1021-23, 1074-81, 1088-94, 1126-28, 1137-42, 1151-53, 1166-69, 1493-98).

The hearsay statements made or relayed in these records, by and to BOP officers investigating or adjudicating disciplinary incidents, plainly qualified as testimonial.  See Mills, 446 F. Supp. 2d at 1137 (finding such BOP records testimonial in federal capital case).  They were not made as part of any ongoing emergency; instead, their "'primary purpose' was 'to establish or prove past events

---

[80] The only significant exception was one threatening incident to which Ramos himself testified he was a eyewitness. (Tr. 2145-47; A.1021-23).

potentially relevant to later criminal prosecution.'" Ohio v. Clark, 135 S. Ct. 2173, 2180 (2015), quoting Davis v. Washington, 547 U.S. 813, 822 (2006).  However minor, many of the disciplinary infractions arguably violated some criminal statute; in several instances, the officers who authored the reports actually forwarded them to the FBI for "possible prosecution."  (A.1078, 1092, 1167).  And the investigations and disciplinary proceedings generally occurred with an eye to that possibility — in other words, "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"[81]  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 (2009), quoting Crawford v. Washington, 541 U.S. 36, 51-52 (2004).

These testimonial statements in Coonce's BOP records were inadmissible at his capital sentencing because the right of confrontation, safeguarded by the Sixth Amendment, applied there.  Some federal courts and judges have recognized this. See United States v. Umana, 750 F.3d 320, 364-69 (Gregory, J., dissenting), rehearing en banc denied, 762 F.3d 413 (8-5 vote); Fields, 483 F.3d at 376 (Benavides, J., dissenting in part); Mills, 446 F. Supp. 2d at 1119; United States v.

---

[81] The testimonial nature of the statements in Coonce's BOP records is also evidenced by the fact that they were made to or for persons considered law enforcement officers (e.g., prison investigators and disciplinary officers), and were formal statements, made in signed, official reports.  See Melendez-Diaz, 557 U.S. at 310-11; Davis, 547 U.S. at 823-27.  Cf. Clark, 135 S. Ct. at 2180-81.

Concepcion Sablan, 555 F. Supp. 2d 1205, 1221 (D. Colo. 2007); United States v.

Stitt, 760 F. Supp. 2d 570, 581 (E.D. Va. 2010).[82]  So have six state appellate

courts.  See Rodgers v. State, 948 So. 2d 655, 663 (Fla. 2006); State v. Carr, 331

P.3d 544 (Kan. 2014), rev'd on other grounds, 136 S. Ct. 633, 646 (2016);

Grandison v. State, 670 A.2d 398, 413 (Md. 1995); Pitchford v. State, 45 So. 3d

216, 251-52 (Miss. 2010); State v. Bell, 603 S.E.2d 93, 115-16 (N.C. 2004);

Russeau v. State, 171 S.W.3d 871, 880-81 (Tex. Cr. App. 2005).

To be sure, a number of courts, including panels from several other circuits,

have said that the Confrontation Clause does not apply in a capital sentencing, at

least at the selection phase.  See Smith v. Ryan, ___ F.3d ___, 2016 WL 3034147,

*7 (9th Cir. May 26, 2016); Fields, 483 F.3d at 338; Umana, 750 F.3d at 347-48;

Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002).[83]  Those courts regarded

---

[82] Some other federal courts have found or assumed that the Confrontation
Clause applies at the eligibility but not the selection phase of a capital sentencing.
See United States v. Johnson, 378 F. Supp. 2d 1051, 1060-62 & n.5 (N.D. Iowa
2005); United States v. Jordan, 357 F. Supp. 2d 889, 903 (E.D. Va. 2005); United
States v. Bodkins, 2005 WL 1118158, at **4-5 (W.D. Va. 2005).

[83] The Eleventh Circuit applied the Confrontation Clause to a psychiatric
report introduced at a capital-sentencing hearing.  Proffitt v. Wainwright, 685 F.2d
1227, 1251-55 (11th Cir. 1982), modified, 706 F.2d 311, 311-12 (11th Cir. 1983).
But it later rejected on collateral review a confrontation challenge where the
defendant had an opportunity to rebut the hearsay.  See Muhammad v. Secretary,
Fla. Dept. of Corr., 733 F.3d 1065, 1075 (11th Cir. 2013).  That decision
occasioned a lengthy dissent.  See id. at 1083, 1084 & n.4 (Wilson, J., concurring
in part and dissenting in part).

themselves as bound by <u>Williams v. New York</u>, 337 U.S. 241, 245, 251-52 (1949),

which allowed a state judge to consider hearsay without violating due process.

But, as the contrary opinions cited above have explained, such reliance on

<u>Williams</u> is misguided.  For the constitutional landscape has shifted dramatically in

the almost 70 years since it was decided, rendering a broad reading of it

irreconcilable with the law as it stands today.  The Supreme Court has since

realigned its Confrontation Clause jurisprudence, which formerly employed a

"reliability" standard, with the original understanding of the Clause as a

prohibition on all testimonial out-of-court statements, regardless of their reliability,

unless the speaker is unavailable and the defendant had a prior opportunity to

cross-examine him or her.  <u>See, e.g.</u>, <u>Crawford</u>, 541 U.S. at 51-52.  Moreover, the

Court also has since recognized that Sixth Amendment protections, particularly the

right to jury trial, attach not just to trial findings but to ones made at a capital-

sentencing hearing.  <u>See</u> <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016); <u>Ring v. Arizona</u>,

536 U.S. 584 (2002).  And finally, "[i]n the intervening years [since <u>Williams</u>],"

the Court has also acknowledged that "death is . . .  different."  <u>Gardner v. Florida</u>,

430 U.S. 349, 357 (1977) (plurality).  Thus, the Court's decisions have eliminated

the unfettered sentencing discretion in capital cases that <u>Williams</u> took for granted,

requiring a finding of aggravating factors and a conclusion that they outweigh

mitigating ones before death may be imposed.  See, e.g., Woodson v. North Carolina, 428 U.S. 280 (1976); Furman v. Georgia, 408 U.S. 238 (1972).

Those three quantum changes in the Supreme Court's jurisprudence can logically lead to only one conclusion: The Constitution does not permit basing a death sentence on an aggravating factor proven by testimonial hearsay.  Because the district court violated that principle in Coonce's case, it committed constitutional error.  Moreover, for the reasons discussed above, the allegations were so unreliable that their admission also violated the Due Process Clause of the Fifth Amendment and the Eighth Amendment's reliability requirements.  See Fields, 483 F.3d at 337-38 (a capital defendant may not be "sentenced to death on the basis of unreliable hearsay evidence").

As discussed, Coonce's counsel amply preserved the error pretrial and again several times during the government's questioning of Ramos.[84]  Moreover, the

---

[84] This conscientious preservation of error is not vitiated by the fact that, in the wake of the court's ruling and the admission of the damaging, unconfronted allegations about Coonce's prison history, the defense tried to elicit counterbalancing information from his BOP records (Tr.2277-2365), or that it brought out hearsay from other witnesses.  The record does not reflect to what extent the defense was simply trying to make the best of a bad ruling.  See Harrison v. United States, 392 U.S. 219, 223-25 (1968).  Moreover, the Confrontation Clause does not give rights to the government and does not require parity between the defense and prosecution in the introduction of hearsay at a capital sentencing.  Cf. Green v. Georgia, 442 U.S. 95 (1979).

government cannot possibly show that admitting Ramos' testimony about Coonce's prison records and the records themselves (with many of the incidents repeated in prosecution psychiatrist Dietz's testimony) was harmless beyond a reasonable doubt.  See Satterwhite v. Texas, 486 U.S. 249, 257 (1988); 18 U.S.C. § 3595(c)(2).  The issue of whether Coonce would be violent in prison proved central to the government's case at sentencing.  See Facts, Section V, *ante*; Point VI.C, *ante*.  While the misconduct alleged by the BOP records actually boiled down to, for the most part, relatively minor scuffles, harassment, and empty threats by Coonce, and certainly nothing comparable to homicide, still, the prosecutor's summation cited, as "powerful evidence" of likely future violence, what he called Coonce's "extraordinary . . . disciplinary record," including the "violations [and] the fights," one particular "attack" on an inmate at USP Beaumont the year he first entered the BOP, and his possession of two shanks at the Medical Center several months after Castro's killing.  (Tr.5241-43).

Accordingly, the Court should set aside Coonce's death sentences and order resentencing.

**X.**

**The government improperly put a thumb on the death side of the scale by presenting the jury over and over and over again with a young woman's graphic, inflammatory account of being kidnapped and raped by Coonce 14 years earlier, and by urging the jury to use that one crime to establish multiple, redundant aggravating factors.**

After having been institutionalized almost continuously since he was 4, Coonce was released by the Texas Department of Corrections at age 20 with no supervision or support to help him adjust to life in the community. Less than two years later, after a serious automobile crash left him with traumatic brain damage, Coonce committed the crime that landed him in the BOP for life in 2002: He kidnapped a young woman named Laurel Simmons at knife-point from outside a grocery store in Texas and forced her to drive him all the way to Missouri, sexually assaulting her several times over the course of the 13-hour trip before she managed to escape. See Facts, Section II, *ante*.

The defense never disputed that the government could present this terrible crime to the sentencing jury and convey how the young woman had been victimized. But that prerogative was circumscribed by the FDPA's prohibition on evidence whose probative value is outweighed by the danger of undue prejudice, 18 U.S.C. § 3593(c), which is more restrictive than the trial standard, Fed. R. Evid. 403. The Eighth Amendment and due process also prohibited presenting this

199

evidence so as to court a sentencing verdict based on "emotion" rather than "reason," <u>Godfrey v. Georgia</u>, 446 U.S. 420, 433 (1980), or "arouse and inflame the emotions of the jury," <u>United States v. Sampson</u>, 335 F. Supp 2d. 166, 183-86 (D. Mass. 2004) (excluding government evidence on that basis from capital sentencing). <u>See also</u> 18 U.S.C. § 3595(c)(2) (court of appeals must review whether a death verdict was "influence[d]" by "passion").

Here, the government exceeded those boundaries by presenting multiple, repetitive versions of the victim's emotional account of her ordeal, replete with the inflammatory details of her terror, suffering, and humiliation as she was raped three times, vaginally and anally, sodomized, and made to insert her finger in her vagina and anus.[85]

After spending four transcript pages of his opening statement taking the jury step by step through the incident (Tr.1740-43), the government called Michael Elsey, the FBI agent who investigated it. The prosecutor elicited an "overview" of what transpired, which took up a page and half of transcript and again covered each step. Then he had the agent read the victim's detailed statement to police about this nightmarish experience; it covered ten pages. (Tr.1875-89). Following

---

[85] This issue is reviewed *de novo*, because the court's ruling implicates Coonce's constitutional rights. <u>See</u> <u>United States v. Campbell</u>, 764 F.3d 880, 887 (8th Cir. 2014).

that recitation, the prosecutor replowed the same ground by directing the agent to read the factual basis of Coonce's plea agreement, drawn from the victim's statement, which took up more than two additional pages. (Tr.1890-94). But that was not all, as the prosecutor then asked the agent to "slowly and methodically" read to the jury Simmons' graphic, charged testimony, from Coonce's sentencing, describing not only what she suffered physically but also what she was thinking, feeling, and fearing at each point during the ordeal. That covered another 13 transcript pages. (Tr.1896-98, 1906-1920).

Having moved *in limine* to exclude excessive evidence about that incident (A.350-60; Tr. 1871-75), Coonce's counsel unsuccessfully "renew[ed] [his] objections" to the agent's going through "the details" of the victim's account "excruciatingly three times." (Tr.1929).

In addition to having the agent repeat the victim's account over and over, in great detail and at length, the government introduced exhibits that did the same, namely, Simmons' handwritten statement to police (A.769-80), a police report repeating her statement (A.765-68), the factual resume from Coonce's guilty plea, drawn from her account (A.782-84), a transcript of her testimony at his sentencing (A.792-806), and multiple versions of the presentence report setting out her statements (A.820-26, 1503-09). The prosecutors also repeatedly brought up her

account in cross-examining various mitigation witnesses.  (Tr.3282, 3292, 3353, 3547, 3607, 3611, 3839, 3857, 4013-14).  And the prosecution psychiatrist too went through what happened to Simmons in his testimony and PowerPoint presentation.  (Tr.5032-33; A.1475).

"The potential for double exposure to selected testimony to improperly influence a jury has long been recognized."  United States v. Walker, 1 F.3d 423, 430 (6th Cir. 1993) (jury was prejudiced by improper exposure to both video testimony and highlighted transcripts).  The danger of "overemphasiz[ing] the testimony of [certain] witnesses" is why courts must exercise careful discretion in considering readback requests.  United States v. Varsalona, 710 F.2d 418, 421 (8th Cir. 1983).  While some unnecessary repetition may be harmless, there are "circumstances . . . where that 'extra helping' of evidence can be so prejudicial as to warrant a new trial."  United States v. Ramos-Caraballo, 375 F.3d 797, 803-04 (8th Cir. 2004) (quotation omitted).  Thus, in United States v. Cunningham, 694 F.3d 372 (3d Cir. 2012), the Third Circuit reversed a conviction because the district court admitted multiple video clips of child pornography.  "[A]fter one excerpt . . . was displayed, the probative value of the remaining excerpts became diminished" until it became a "needless presentation of unfairly prejudicial and cumulative evidence."  Id. at 391.

Here too, the probative value of Simmons' account diminished to the vanishing point with not just "an extra helping," but multiple, detailed retellings. The court justified turning aside Coonce's objection by saying that there was some "variance" in "details" between each repetition. (Tr.1929). But it never identified any such details or, more important, explained how they were relevant to showing the nature and gravity of Coonce's criminal conduct. That relevance is elusive, especially since here the defense — unsurprisingly, given Coonce's guilty plea and confession — never disputed his actions. Moreover, if any successive version contained some additional details that the government considered important, it could have brought those out without reprising Simmons' entire step-by-step narration of the incident, again and again and again.

The prejudicial effect of that repetition was compounded by the court's additional error in licensing the government to submit not just one but four separate, yet overlapping aggravating factors premised on Simmons' kidnapping.[86] That tactic prompted the jurors to give the incident quadruple weight in their sentencing decision. The jury was instructed on, and found as aggravating factors, that Coonce (1) was serving a life sentence, received for the kidnapping; (2) had previously been convicted of two offenses involving the attempted infliction of

---

[86] This issue is reviewed *de novo*. See, e.g., United States v. Purkey, 428 U.S. 738, 761 (8th Cir. 2005).

203

serious bodily injury, one of which was the kidnapping; and (3) had "committed conduct suggesting a grave indifference to human life," by selecting Simmons at random to kidnap. In addition, the government relied on a fourth aggravating factor, that if spared Coonce was likely to be violent in prison, based in part of his having "engaged in a continuing pattern of violent conduct," including, quite, prominently, the crime against Simmons. (Tr.5237-50; A.522-26).

Spinning out multiple aggravating factors from the same fact or conduct violates the Eighth Amendment, most clearly when one is subsumed within another.[87]  See United States v. McCullah, 76 F.3d 1087, 1111-12 (10th Cir. 1996); United States v. Tipton, 90 F.3d 861, 899 (4th Cir. 1996).  See also United States v. Hammer, 25 F. Supp. 2d 518, 539-40 (M.D. Pa. 1998); United States v. Watson, 2007 WL 4591860, at **1-2 (E.D. Mich. Dec. 28, 2007).

The Supreme Court addressed this issue in Jones v. United States, 527 U.S. 373 (1999), but split 4-4 without resolving it.  Justice Thomas' opinion for four justices said that, even accepting a prohibition on double counting, the lower court had erred in finding that the phrase "personal characteristics [of the victim]," as used in victim-impact and vulnerable-victim aggravators, was duplicative.  The

---

[87] As with the government's presenting Simmons' version of the incident over and over, the defendants protested the double counting of aggravating factors. (A.84-85, 596.  See also A.65-68, 74-78, 348-49, 596).

former referred to those aspects of the victim's character and personality her family would miss the most, while the latter went to something different, namely, the victim's vulnerability.  Jones, 527 U.S. at 398-401.

Nonetheless, this Court, relying on Jones, has held that improper double counting of the same criminal history to establish two aggravating factors does not violate the defendant's constitutional rights because in FDPA cases the jury is instructed not to mechanically tally the aggravators and mitigators.  United States v. Purkey, 428 F.3d 738, 761-62 (8th Cir. 2005).  But Coonce's case is distinguishable since the prior crime was used to establish not just two but four aggravating factors, and was coupled with improper, multiple repetition of the underlying testimony.[88]

Here, moreover, the court was not evenhanded in its approach to cumulativeness, for it *sua sponte* upbraided Coonce's counsel for seeking to "repeat" too many "redundant" mitigating factors, and required them to dramatically "pare down" the list.  (Tr.2263-64, 4043; A.534-35).  See Criminal Pattern Jury Instructions, Tenth Circuit, No. 3.10, Comment (discussing importance of treating aggravators and mitigators equitably).  Coonce originally

---

[88] For preservation purposes, Coonce also respectfully maintains that Purkey, which conflicts with the Fourth and Tenth Circuit decisions cited above, was wrongly decided and should be overruled.

proposed more than 90 mitigating factors, which was well in line with the number that courts have presented in other cases in recent years. <u>See, e.g.</u>, <u>United States v. Williams</u>, No. 1:06-cr-79, ECF #2860 at 3-33 (D. Haw. Jun. 27, 2014) (149 mitigating factors); <u>United States v. Sanders</u>, No. 1:10-cr-351, ECF #328 at 4-6 (W.D. La. Sept. 26, 2014) (106 mitigating factors); <u>United States v. McCluskey</u>, No. 10-cr-2734, ECF #1431, #1431-1 at 4-22 (D.N.M. 2013) (160 mitigating factors). And the court never identified which of his proposed mitigators were "redundant," let alone why such overlapping could not be permitted, especially in light of the court's much more generous approach to the government's aggravating factors and testimony. After Coonce's lawyers duly "pared down" their list, the court submitted to the jury only 26 mitigators. (A.529-31). As a result, the instructions devoted almost twice as much discussion to the aggravating factors (and the evidence supporting them, <u>see</u> Point VI, *ante*) as it did to the mitigating ones. (A.522-31).

Accordingly, for these reasons, the Court should vacate Coonce's death sentence and order resentencing.

**XI.**

**The court erred by refusing to strike the aggravating factor of Coonce's probable future violence in federal prison because such predictions are unreliable, unsupported, incoherent, and uncorrectable.**

In addition to all the serious errors that tainted the jury's consideration of whether Coonce would commit future violence in the BOP if sentenced to life, <u>see</u> Points VI-X, *ante*, that aggravating factor lacked a sufficiently reliable basis to satisfy the Constitution and should never have been presented to the jury.[89]

Prior to trial, Coonce repeatedly moved to strike the *ad hoc* aggravator of "[f]uture dangerousness based on the probability that Coonce would commit criminal acts of violence that would constitute a continuing threat to the lives and safety of others" if not sentenced to death. (A.50 [ad.9]) (quoting death notice). By its terms, this factor required proof, beyond a reasonable doubt, of a "probability" of "criminal acts of violence" — that, if Coonce were spared, there existed a greater than 50% likelihood that he would seriously assault or murder a guard or another inmate.[90] (<u>See</u> Tr.5243: prosecutor argues to jury it is "not a question of whether but of when" Coonce would "kill" again).

_____

[89] This issue is reviewed *de novo*. <u>See</u> <u>Barefoot v. Estelle</u>, 463 U.S. 880, 896-906 (1983); <u>United States v. Purkey</u>, 428 F.3d 738, 761 (8th Cir. 2005).

[90] <u>See</u> Blacks Law Dictionary (10th Ed. 2014) (defining "probability" as "[t]he quality, state, or condition of being more likely to happen . . . than not.").

But before and during trial, Coonce's counsel presented empirical studies, testimony from a national expert on prison violence and from the Warden at ADX, and other information showing that no such probability exists for a high-security inmate in the BOP — and that, even if some defendants might pose a threat, juries cannot reliably identify them.  Given those facts, allowing the jury to consider this aggravator would violate Coonce's rights under the Fifth and Eighth Amendments, the FDPA, and the Federal Rules of Evidence.  (A.82-83, 182-265; see also A.64, 74, 346, 595.1).  But the court denied his motions.  (A.319-25, 332-33 [ad.15-24]).  And, at sentencing, the jury purported to find a "probability" of future violence by Coonce, and relied on that prediction in voting to execute him.

Where, as here, the only non-death sentencing option is life imprisonment without possibility of release (A.539-40), assessing dangerousness is limited to predicting the defendant's behavior in federal prison.  See, e.g., United States v. Fields, 516 F.3d 923, 942-944 (10th Cir. 2008).  This distinguishes it from the broad assessment of dangerousness to "society" that the Supreme Court long ago approved in Texas cases, where "life" allowed parole after 20 years.  See Barefoot v. Estelle, 463 U.S. 880, 884, 896-97 (1983); Jurek v. Texas, 428 U.S. 262, 274-76 (1976).  While acknowledging that such predictions were hard to make, the Court

observed that they were unavoidable in decisions implicating public safety, such as

bail and parole. Barefoot, 463 U.S. at 897, quoting Jurek, 428 U.S. at 274-76.

But the Supreme Court has not considered the reliability, under the

Constitution or the FDPA, of a purported finding that a capital defendant will be

dangerous in a maximum-security federal penitentiary, a setting specifically

designed, organized, and staffed to control inmates who have been convicted of

violent crimes.[91]  And even experienced prosecutors cannot predict who will be

violent in prison.  One study, examining death-noticed federal defendants who

were sentenced to life between 1991 and 2000, found no statistically significant

difference in the rates of serious disciplinary infractions by those whom the

government had labeled "dangerous" as compared to those whom it had not.[92]

(A.221-22, 232-34).

---

[91] In a case dealing with the right to rebut allegations of dangerousness *outside* prison, the Supreme Court, in *dicta*, noted the relevance of prison dangerousness.  Simmons v. South Carolina, 512 U.S. 154, 165-66 n.5 (1994).

[92] See Cunningham, Reidy & Sorensen, Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence, 32 Law and Hum. Behav. 46, 55-57, 59, 61 (2008).

Federal jurors fare no better.[93]  A study of federal inmates who had been

capitally tried and sentenced to either life imprisonment or death over two decades

compared the rates of serious prison violence by both groups against jury findings.

More than 90% of those whom jurors had predicted would be dangerous had

engaged in no serious violence in prison.[94]  (A.218-22, 232-34, 235-42).

Long-term studies likewise show the rate of significant prison violence by

capital offenders to be exceedingly low.[95]  (A.218-21, 229, 234, 249-56).  And no

data exist from which jurors, or anyone else, can reliably predict *which* few

offenders in the BOP will be assaultive.  (A.224-29, 243-48, 257, 259-65).  See

Cunningham, Limitations, *supra*, at 227-28, 246.  Even intuitive considerations fail

to predict prison violence.  See id. at 227.  That includes inferences the government

urged here (A.526, 548-49, 562-63 [ad.37, 43-44, 56-57]; see also Tr.5238-43),

---

[93] The district court acknowledged this point, albeit unwittingly.  Agreeing to
the prosecutors' request to preclude any of Coonce's mitigation witnesses from
opining about his possible future adjustment to prison (see A.334-334.2), the court
remarked that no one, "particularly lay people," could predict "what a person will
or will not do in the future."  (4/14/14 Tr., at 10).

[94] See Cunningham, Sorensen & Reidy, Capital Jury Decision-Making: The
Limitations of Predictions of Future Violence, 15 Psychol., Pub. Policy & L. 223,
239-41 & Table 4 (2009).

[95] See, e.g., Cunningham, Assertions, *supra*, Table 3 and text at 55-57, 60
(14-year study saw just 1.1 assaults with moderate injuries per 1000 life-sentenced
inmates each year — and no fatalities or assaults with major injuries).

210

such as lack of remorse, prior criminal conduct in the community, and a life sentence.  (A.247, 257-58, 262-63).  Even in jurisdictions whose statutes mandate consideration of "future dangerousness," courts have become skeptical about relying on such "intuitive" factors, which have never been validated as "actually accurate predictors of future behavior."  Coble v. State, 330 S.W.3d 253, 279 (Tex. Cr. App. 2010).

Nor did Coonce's conviction for a prison killing make future violence more likely, or a prediction of such violence more reliable.  Inmates who have committed serious violence in the BOP are generally sent to solitary confinement at ADX Florence; in that almost 500-bed facility, there have been no killings and virtually no serious assaults for the past decade.[96]  (A.210-13, 252, 254, 264).  See also Facts, Section V, *ante*.  No evidence suggests that the same security regime will be any less effective at the new ADX-type facilities where the BOP has begun housing seriously mentally-ill offenders.  See id.; Point VII.B, *ante*.

Moreover, BOP inmates who have committed prison homicides since 2005 (a total of about 8 a year across the entire federal prison system, see Point XVI.B, *post*) can be, and often are, kept at ADX for years or decades, as long as the

---

[96] There have been two killings (both of inmates) in ADX's 20-year history; both occurred in 2005 in a group recreation cage.  Since then, ADX inmates take recreation alone, and spend the remaining 23 hours or so a day in their individual cells.  (A.215-16).

Bureau's correctional experts think it necessary. Among those prisoners, apparently none of the ones eventually transferred out of ADX have committed another prison homicide. See Facts, Section V, *ante*; Point VII, *ante*. While the risk of future violence from prisoners under such close supervision cannot be completely eradicated, it remains vanishingly small. More important, no tools exist to aid federal juries in reliably identifying the rare defendant in a BOP homicide case who, despite heightened security, will act out violently again in the future.

The jury's assessment of a "probability" of future violence in a case like Coonce's is also inherently incoherent, and cannot satisfy FDPA's demands that aggravating factors be proven beyond a reasonable doubt. 18 U.S.C.A. § 3592(c). The Supreme Court has questioned whether it makes sense to require a fact to be proven "probably true beyond a reasonable doubt," and how a jury could possibly apply such an instruction. Concrete Pipe and Products v. Construc. Laborers Pension Trust, 508 U.S. 602, 625 (1993). Moreover, this formulation dilutes the statutory proof requirement no less than if it were applied to backward-looking aggravating factors (*e.g.*, by instructing jurors they need only be convinced beyond a reasonable doubt that Coonce "probably" engaged in substantial planning and premeditation).

Finally, such an unreliable prediction is also unacceptable because a death sentence cannot be corrected if the prisoner's subsequent conduct reveals that the prediction was flawed. See Evans v. Muncy, 498 U.S. 927 (1990) (Marshall, J., dissenting from denial of certiorari). The Supreme Court has called into question the constitutionality of mandatory life sentences for juveniles because such sentences impose unalterable consequences based on unreliable predictions of future behavior. See Montgomery v. Louisiana, 136 S. Ct. 718, 736 (2016); Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012).[97]

For these reasons, the aggravation finding of probable future violence by Coonce and his resulting death sentence violated the reliability and non-arbitrariness requirements of the Eighth Amendment and the due process protection of the Fifth Amendment.[98] Because the government cannot show that injecting this aggravator into Coonce's sentencing was harmless beyond a reasonable doubt, see Point IV.C, *ante*, the Court should vacate his death

---

[97] Similar concerns have prompted proposals to allow federal judges to revisit harsh non-capital sentences. See, e.g., D. Weis, Federal judge who regrets murder sentence backs legislation to allow 'second-look review', ABA Journal (Jan. 25, 2016).

[98] Though United States v. Allen, 247 F.3d 741, 788-89 (8th Cir. 2001), vac'd on other grounds, 536 U.S. 953 (2002), generally approved a similar aggravator, the Court does not appear to have had before it the legal arguments or record evidence presented here.

sentences.  Alternatively, it should remand for an evidentiary hearing and factfindings on the reliability of predictions about probable future violence in prison.

## XII.

### The court erred by refusing to voir dire about areas of bias critical to Coonce's case.

**A.  The court inexplicably declined to ask potential jurors about personal connections and attitudes highly likely to bias them, though even the government agreed that most of the questions were appropriate.**

Before and during jury selection, Coonce proposed areas of inquiry to ferret out biases directly relevant to this case and common in the community.  (A.278-83, 397-98, 401-05).  The court agreed to some of these requests, but later reneged on that promise without explanation, ultimately rejecting them all.  Thus, it never posed those or any equivalent inquiries to potential jurors, including the 12 ultimately seated.

**1.  Whether any juror's close relative or friend had worked at the prison where the murder occurred or at any other correctional institution, including as a guard.**

One obvious area of potential bias involved jurors' relationships with prison employees, particularly at the nearby facility where the murder occurred.  The

Medical Center is one of Springfield's largest employers.[99]  Personal connections

to this institution or to current or former employees could easily have impaired a

juror's ability to impartially evaluate key issues such as whether Coonce posed a

future danger to BOP staff.  That was especially true since the government's case

highlighted the threat Coonce supposedly posed to prison employees and suggested

that, if sentenced to life, he might end up back at the Medical Center.  See Facts,

Section V, ante; Point VII.C, ante.  Cf. United States v. Sablan, 2014 WL 7335210

(E.D. Cal. Dec. 19, 2014) (changing venue in capital case involving murder of

BOP guard because significant proportion of pool might have personal connections

to local prison employees).

        Thus, before trial, Coonce proposed that the questionnaire ask if any

veniremember or his or her "spouse, significant other, any member of [his] family,

or a friend, ever worked in a prison" or a "jail," and, if so, the position and dates.[100]

(A.280).  Agreeing the subject was important, the government proposed its own

pointed question: whether any potential juror had "ties to, or at, the . . . Medical

_____

        [99] Springfield-Greene County Library District, Historical Postcards of
Springfield, Missouri, http://tinyurl.com/zwk4uay.

        [100] As is customary in federal death-penalty trials, each potential juror
completed a questionnaire and counsel received copies before voir dire.  (See
2/12/14 Tr.2-18, 2/13/14 Tr.2-12; A.1887-1923).

Center . . . such as having been employed there, or having relatives or friends . . . employed there . . ."  (A.273-74).

But at a pretrial conference, the court announced it would stick with the format of the questionnaire it had used years earlier in another (non-BOP) capital case.[101]  (1/21/14 Tr., at 3-5.  See A.266).  There, jurors had been asked only whether they or their "spouse or significant other" had ever been involved in "law enforcement," followed by a long list of examples of that status, with "correctional officer" buried in the middle.  (A.270, 303-04).  The court limited the jury questionnaire here to the same two questions.  (A.1905-06 [Q61, Q62]).  In response, none of the seated jurors indicated any personal or spousal history as a correctional officer.[102]

These questions also left a gaping hole by completely failing to inquire whether the veniremember or his or her "spouse or significant other" had ever worked at the Medical Center or another jail or prison *other than* as a guard.  The Medical Center specialized in acute health care for special-needs prisoners and thus

---

[101] Codefendant Hall's counsel urged the court to use the earlier questionnaire as a model, but did not oppose any of Coonce's proposed questions whose denial is the subject of this claim.  (See A.266-68, 291-301, 307-09; 1/21/14 Tr. 13).

[102] Two seated jurors, #4 and #43, indicated a spouse had worked in "law enforcement," in a non-corrections position, and a third, #131, checked "yes," but indicated nothing more.  (A.1947, 2020, 2344).

presumably had employees filling those roles (*e.g.*, doctors, nurses, dentists, psychologists, *etc.*), not to mention other non-guard jobs (*e.g.*, clerical staff, maintenance workers, *etc.*).

The court's questions were also unjustifiably narrower than Coonce's because they completely ignored jurors' potential relationships with close friends or close relatives besides spouses, thus missing many potentially biasing connections.  Cf., United States v. O'Neill, 767 F.2d 780, 784-85 (11th Cir. 1985) (no new trial required when juror failed to disclose that two close friends were narcotics agents, because voir dire had asked only about relatives).  The court's truncated inquiry on this subject was especially unfair since other questions, particularly ones aimed at identifying anti-prosecution bias, were much broader. (See, e.g., A.1913 [Q83]: "Do you know personally or have you ever known personally anyone who has been convicted or pleaded guilty to a crime?").

To that end, before general voir dire, the defense again requested that the court ask jurors about any "close friends or family members" working in any capacity in any detention facility, or "anyone who ha[d] ever worked in any capacity" at the Medical Center.  (A.404).  But the court, having declared it would both pick the general voir dire questions and ask them without any attorney

involvement (4/14/14 Tr. at 14-17, 20; A.610), again declined.[103]  (See also Tr.137-38: Coonce's counsel unsuccessfully presses for such questions before voir dire begins).  Accordingly, the court made no general courtroom inquiry whatsoever into jurors' relationships with present or former employees of the Medical Center or other detention facilities, let alone whether such relationships might bias them.

> **2.      Whether any juror, his or her spouse, another close relative, or a close friend had ever been sexually abused.**

Decisional law teaches the important lesson that laypersons do not necessarily understand vague, general questions as lawyers and judges think they will, especially when the questions address sensitive subjects.  Thus, in one recent federal capital case, a juror who was asked if she had ever been "the victim of a crime," answered "no," even though (it was later discovered) she had been sexually abused by her father for years.  At a post-trial hearing, she explained: "I would attribute crime as having somebody hold a gun to my head or . . . stealing my purse or something of that nature . . . . My father was not convicted of any crime, and . . . I have not considered myself a victim." United States v. Fell, 2014 WL 3697810, at **6-7 (D. Vt. July 24, 2014).  The court found that the juror's questionnaire

---

[103] On each of the first three days of jury selection, the court conducted its general voir dire of large panels of approximately 75 jurors, and then broke each into two smaller groups of 30-40 for additional, death-penalty questioning.  (See Tr.1-686.  See also 4/14/14 Tr.14-17, 20; A.610; Point XIII, *post*).

response was not dishonest, since it was reasonable for her to respond to a generalized inquiry about "crime" without disclosing her experience with sexual abuse. The fault was counsel's for not conducting a more pointed voir dire. Id., at **12-13.

Here, everyone involved knew, long before jury selection, that sexual abuse would be a central, highly emotional issue at sentencing. From the indictment and death notice, it was obvious that the government's aggravation case would highlight Coonce's conviction for kidnapping and raping a young woman in Texas a decade before, with extensive evidence about the crime, the victim, and the prosecution. The government had also announced it would present proof that, shortly before that incident, Coonce had tried to abduct and molest a 13 year-old girl. (See A.45, 47.3, 49-50, 335-39, 350-53, 361-62 [ad.2, 6, 8-9]). See also Facts, Section II, ante.

Thus, the defense — heeding the lesson of Fell and other cases about the need for clear, specific questions on such sensitive subjects — requested that the questionnaire ask: "Have you, or . . . anyone that you know, been a victim of a sexual crime (sexual assault, rape, child molestation, etc.)? If 'Yes,' please briefly explain."[104] (A.281 [Q73]). Obviously, a veniremember who had endured such an

_____

[104] Such an inquiry obviously could have been handled discreetly. The questionnaire advised that any information provided would be used only by the

experience, or was close to someone who had, might not be able to be impartial toward Coonce. Equally important, such an experience might have created an implied bias, even if the juror professed impartiality. See Sampson v. United States, 724 F.3d 150, 167 (1st Cir. 2013) (if juror's "life experiences . . . correspond with evidence presented during the trial . . . obvious concerns about . . . possible bias" arise); Skaggs v. Otis Elevator Co., 164 F.3d 511, 517 (10th Cir. 1998) ("when there are similarities between the personal experiences of the juror and the issues being litigated," disqualification may be required).

But prior to trial, the court denied that and Coonce's other requests, announcing it would use the questionnaire from an earlier case, which asked only a vague, generic question, as in Fell: "Have you, your spouse, your significant other, a relative or a close friend ever been the victim of a crime." (1/2/14 Tr. 3-5; A.271).

Defense counsel objected that a "targeted" question was needed "to learn" if any juror had experienced sexual abuse or knew someone who had, reminding the court of the anticipated evidence about Coonce's prior rape case. The prosecutor

_____

court and counsel. (A.1887). Both when filling out the questionnaires and during voir dire, jurors who wanted to could speak privately with the court. (*E.g.*, 2/12/14 Tr. 4-5, 13; Tr.101-02).

agreed that evidence about that incident would "come into play" at sentencing. (1/21/14 Tr.9-10).

Two days later, the court declared a change of heart, and ordered the questionnaire revised to include Coonce's question about sexual abuse (as well as about a dozen other defense questions it had initially refused). (A.305). Per that order, the parties provided the court a revised questionnaire with that question included. (A.315).

But when potential jurors appeared a few weeks later to complete the questionnaire (with counsel absent), the question had disappeared. (So had numerous others proposed by Coonce that the court had agreed to add). Instead, reverting to its original ruling, the court's questionnaire asked only if jurors or anyone they knew had been a "victim of a crime." (A.1913 [Q85]). The court never alerted counsel it was reneging, let alone explained why.

After receiving the completed questionnaires and noticing the omission, Coonce moved for a supplemental questionnaire asking whether potential jurors had experienced or knew someone who had been the victim of a "sexual crime," such as "sexual assault, rape, child molestation, *etc.*," and whether they knew anyone who had been the victim of "any type of sexual assault." (A.397, 403).

When voir dire began, Coonce reiterated the need for a "specific" inquiry into this

subject. (Tr. 136). But, again, the court refused. (A.610; Tr.136).[105]

### 3. Whether any juror knew someone with brain damage, or had an opinion about expert mental-health testimony for a criminal defendant.

Based on other anticipated evidence and issues in his case, Coonce requested

that the court, either on the questionnaire or in voir dire, pose targeted questions

about brain damage and expert psychological testimony. As the court was aware,

Coonce intended to present expert testimony at sentencing that a head injury had

left him with traumatic brain damage, severely diminishing his cognitive

functioning and depressing his IQ by 30 points, into the mental-retardation range.

(See A.317. See also Point I.B, *ante*.). Thus, the defense needed to learn whether

veniremembers knew "anyone who has experienced brain damage or an

impairment in functioning," or had an "opinion of psychiatrists, psychologists or

other mental health professionals who testify in court." (A.282-83 [Q82, Q83,

Q90]).

---

[105] Every seated juror answered "no" to the question about being a "victim of a crime," except for one whose parents' home had been burglarized, and another who had suffered telephone threats and her sister an internet predator. (A.1954, 1991, 2027, 2063, 2099, 2135, 2171, 2207, 2243, 2279, 2315, 2351. See also Tr.84, 467-68).

But at a pretrial conference, the court denied the request.  (1/21/14 Tr.3-5).

Defense counsel objected that such questions were necessary to "identify potential

bias and prejudice," because these subjects represented "hot-button issue[s]."  (Id.

at 8).  The prosecutor agreed that Coonce's queries would be appropriate to

"target" these issues.  (Id. at 10).  Indeed, the government itself had proposed a

very similar question.  (A.274).

Following the pretrial conference, the court twice reversed course, initially

agreeing to add these questions but ultimately jettisoning them without notice or

explanation.  (A.305, 311-13, 316, 1887).  Coonce persisted, requesting voir dire

on whether any veniremember harbored "distrust or [a] negative opinion" about

testifying mental-health experts (A.405), but again the court refused.

The questions the court did include in the questionnaire and general voir dire

skirted these subjects.  The questionnaire inquired about distrust for expert

testimony generally (A.1918), and the court's voir dire asked about negative

opinions of "mental health professionals" generally (e.g., Tr.69).[106]  But jurors'

views on expert mental-health defenses, a longstanding subject of popular

criticism, went unaddressed.  See, e.g., United States v. Jones, 722 F.2d 528, 529-

30 (9th Cir. 1983) (defendant entitled to voir dire on "prejudice against the insanity

---

[106] None of the 12 seated jurors answered yes to either question.

defense," given "strong [public] feelings" on the issue) (quotation omitted);

Brooks, <u>Guilty By Reason of Insanity: Why a Maligned Defense Demands a</u>

<u>Constitutional Right of Inquiry on Voir Dire</u>, 20 Geo. Mason L. Rev. 1183, 1199

(2013) (citing research showing that such public attitudes persist).  And, while

there were inquiries about mental illness and substance abuse, jurors' experience or

familiarity with brain damage was never explored.  Some of the seated jurors may

well have been familiar with brain damage, since several said in their

questionnaires that they or family members had worked in the mental-health field,

with mentally-impaired individuals, or as nurses or doctors.  (A.1930, 1932, 1953,

2026, 2170, 2242).

 Later, at sentencing, these jurors, empaneled without any such questioning,

dismissed the central mitigating factor of Coonce's brain damage though it was

conclusively proven and acknowledged by mental-health experts for both sides.

<u>See</u> Point III, *ante*.  Thus, while Coonce need not show that any seated juror was

actually biased, <u>see</u> <u>Morgan v. Illinois</u>, 504 U.S. 719, 739 (1992); <u>United States v.</u>

<u>Cassel</u>, 668 F.2d 969, 971 n.4 (8th Cir. 1982), here, a tangible reason exists to

suspect that at least some of them were.

**B.**     **The court's unreasonable refusal to explore these important subjects on voir dire violated Coonce's Fifth Amendment right to due process and his Sixth Amendment right to an impartial jury.**

"Without an adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."  Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  See United States v. Bear Runner, 502 F.2d 908, 911 (8th Cir. 1974) ("A searching voir dire is a necessary incident to the right to an impartial jury.").

Of course, a district court enjoys broad discretion in choosing what questions to ask in jury selection, and nothing entitles a defendant to unlimited inquiry into every area of potential prejudice.[107]  See, e.g., United States v. Nelson, 347 F.3d 701, 707 (8th Cir. 2003).  But when a significant prejudice is directly relevant to the particular trial at hand and likely to be harbored in the community, the district court must, if requested, ask a question or questions reasonably assured to detect that prejudice if present in a juror.  See United States v. Wright, 536 F.3d 819, 821 (8th Cir. 2008); United States v. Cassel, 668 F.2d 969, 971 (8th. Cir.

---

[107] While decisions regarding voir dire are generally reviewed for abuse of discretion, the Court will intervene when the questioning or manner of questioning violates constitutional principles.  See Morgan v. Illinois, 504 U.S. 719, 730 (1992), citing Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).

1982).  See also Mu'Min v. Virginia, 500 U.S. 415, 431 (1991) (questioning must cover key subjects).[108]  The Supreme Court has "not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections."  Morgan, 504 U.S. at 730 (trial court must ask about jurors' reflexive support for death penalty), citing Turner v. Murray, 476 U.S. 28, 36-37 (1986) (trial court must ask about racial bias).

Here, whether jurors had close relatives or friends who worked at the Medical Center or other prisons, whether they or someone they knew had been sexually abused, whether they distrusted expert mental-health defenses, and whether they knew someone with brain damage each constituted an issue specifically material to Coonce's sentencing, and one that could readily spark bias.  Cf. Cassell, 668 F.2d at 971 (no error where denied questions did not "relate[] to specific issues or circumstances in this case").  As discussed, while the court asked about related subjects during jury selection, those questions did not clearly or directly embrace these important issues.  Moreover, no good reason supported the omission; as the defense noted, addressing these topics would have required just a

_____

[108] The requirements for voir dire are stricter in federal prosecutions, over which this Court has "supervisory power," than in state ones it reviews only in habeas corpus proceedings.  See Mu'Min, 500 U.S. at 423-24.

handful of additional, short questions.[109]  Indeed, as discussed, the court at one

point seemed to agree, but later changed course and refused them all without notice

or explanation.

Accordingly, because these voir dire rulings deprived Coonce of due process

and an impartial jury and violated the Fifth and Sixth Amendments, the Court

should set aside his death sentences and order resentencing.  See Morgan, 504 U.S.

at 739; Turner, 476 U.S. at 37.

## XIII.

**By unreasonably refusing to question veniremembers privately about their death-penalty views, the court hamstrung the defense's efforts to seat a fair and impartial jury.**

In 87% of federal death-penalty trials across the country, judges question

potential jurors individually and apart from each other, at least about capital

punishment.[110]  The Federal Judicial Center's Benchbook for United States District

Court Judges recommends this practice.  Section 3.01(A)(7), at 117 (6th ed. 2013),

http://tinyurl.com/zbnw4fc.  Another judicial guide concurs that private

---

[109] The questionnaire the court adopted from a previous case was 37 pages long and had almost 100 questions.  It could easily have added or substituted those of Coonce's it initially approved but then omitted.

[110] See Federal Death Penalty Resource Counsel Website, Declaration of Kevin McNally, at 5 (Jan. 18, 2016), http://tinyurl.com/he5sqfq.  This is an updated version of a declaration that Coonce submitted below.  (A.416-22).

questioning is "safer and fairer," diminishing the risk of contamination if a prospective juror "blurts out" something highly prejudicial.  Carter, A Practice-Oriented Guide to Complex Death Penalty Litigation, at 51 n.10 (Mar. 2-3, 2016), http://tinyurl.com/jqs2ypu.  Even the judge who presided below had employed it in a previous capital trial.  See United States v. Ortiz, 315 F.3d 873, 889 (8th Cir. 2002).

The preference for private questioning is no surprise, since it has been shown to increase juror candor and identify many biases that are missed in a group setting, where laypersons tend to remain silent or repeat what others say.  See Nietzel & Dillehay, The Effects of Variations in Voir Dire Procedures in Capital Murder Trials, 6 Law & Hum. Behav. 1, 3-4, 10 (1982) (sequestered individual questioning resulted in three to four times more excusals); Mize, On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room, Am. Judges' Ass'n, 5 Court Review 10-15 (Spring 1999) (trial judge's nine-month experiment showed that an average of three veniremembers per panel who were silent during group voir dire later revealed disqualifying information in private questioning). See also Irvin v. Dowd, 366 U.S. 717, 728 (1961) (noting that "psychological effect" of answering "before one's fellows" may diminish candor).

Perhaps more important, individual voir dire shields other jurors from "contamination" when "potentially prejudicial topics," like publicity or death-penalty opinions, are covered. 1 Jurywork Systematic Techniques, § 2:13 (Nov. 2015). See, e.g., State v. Strode, 217 P.3d 310, 317 (Wash. 2009) (defendant "established the need for private individual questioning to avoid contamination of the jury pool"); Johnson v. State, 132 So. 3d 616, 630 (Miss. App. 2013); Evans v. State, 808 So. 2d 92, 105 (Fla. 2011).

The latter problem was vividly displayed here after Coonce's counsel unsuccessfully sought sequestered questioning about capital punishment and highlighted the hazards of a group inquiry on this subject. (A.363-75, 414-15, 423, 610; 4/14/14 Tr. 14-15). Dismissing these concerns, the court serially brought groups of 35-40 veniremembers into the courtroom (A.610; 4/14/14 Tr. at 14), and quizzed each juror in the presence of the rest about his or her death-penalty attitudes. (Tr.151-270, 289-402, 514-655).

As a result, the seated jurors were exposed to numerous highly prejudicial statements, including:

- "[I]f someone is found guilty of taking a life, they don't have much regard for life, so why give them life, house them, feed them for the rest of their lives";

- It "shouldn't take so long to get to the end of death row";

- If the courts have found them guilty beyond a reasonable doubt, the sentence should be carried out . . . . once a sentence is laid down, it should be done swiftly and quickly. The citizenry . . . shouldn't have to pay for them to go ten or 20 years";

- I think our judicial system keeps people on death row alive too long . . . .We the taxpayers pay the bill for them in prison";

- "[M]y values basically say a rabid animal should be put down";

- "My daughter was stabbed by her ex-husband. He spent two days in prison and I really feel like I would be harsh on punishment because of that. I'm really bitter that he's walking the streets and was able to get visitation of his children after stabbing my daughter . . . he was found guilty, sent to prison and said he wasn't violent enough because they didn't have enough room to keep him and just set him free";

- "In this lawsuit with my mother-in-law, there has been evidence presented that the person that killed her was in the total wrong. As far as our knowledge, she has not had to pay for an attorney, miss a day's work or anything, didn't even get a ticket. I think I would not be fair. I think they all need to pay"; and

- "After watching the defendant smirking and laughing at [previous juror's] misfortune, I don't think I could be fair."

(Tr.187, 231, 322, 327, 336, 463, 468-70). After the comment about Coonce's purported smirk, which followed closely on the heels of the two comments quoted just before it, defense counsel unsuccessfully moved to dismiss the entire panel as contaminated. (Tr.473-76).

The additional time required for private questioning would have been a small price to pay for ensuring that the process was fair and complete — since, as it

stood, the court completed voir dire in just over two days, an extremely clipped pace compared with federal capital trials elsewhere.[111]

Under these circumstances, the court's refusal to question jurors privately about their death-penalty attitudes deprived Coonce of his rights to due process and an impartial jury under the Fifth and Sixth Amendments.[112]  The Court should vacate his death sentences and order resentencing.

## XIV.

**By rejecting Coonce's request for a sentencing hearing separate from his codefendant's, the court violated his Fifth and Eighth Amendment rights to due process and individualized sentencing.**

Across the country, when the federal government has sought death against codefendants, courts have traditionally either granted severance or agreed to

---

[111] See, e.g., United States v. Rodriguez, 581 F.3d 775, 785 (8th Cir. 2009) (voir dire took 21 days); United States v. Ebron, 683 F.3d 105, 121 (5th Cir. 2012) (seven days); United States v. Barnette, 2010 WL 2085312, at **9-10 (W.D.N.C. May 20, 2010) (10 days); United States v. O'Driscoll, 2003 WL 1402091, at *1 (M.D. Pa. Mar. 7, 2003) (33-plus days); Johnson v. United States, 860 F. Supp. 2d 663, 687 (N.D. Iowa 2012) (15 days); Basham v. United States, 109 F. Supp. 3d 753, 772 (D.S.C. 2013) (nine days); United States v. Sampson, 820 F. Supp. 2d 151, 157 (D. Mass. 2011) (17 days); Mitchell v. United States, 2010 WL 3895691, at *17 (D. Ariz. Sept. 30, 2010) (13 days); United States v. Fell, 2014 WL 3697810, at *2 (D. Vt. July 24, 2014) (15 days).

[112] While decisions regarding voir dire are generally reviewed for abuse of discretion, the Court will intervene when the questioning or manner of questioning violates constitutional principles.  See Morgan v. Illinois, 504 U.S. 719, 730 (1992), citing Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).

conduct separate, sequential sentencing hearings, where the government and one defendant present their cases, the jury decides his sentence, and then the process is repeated for the other defendant. Out of dozens of codefendant trials spanning two decades, courts have insisted on a joint capital sentencing in only 16% of cases. And, before Coonce's trial, only in two Texas cases had any federal defendant ever been sentenced to death under that unusual procedure.[113]

Several district courts have recognized how separate hearings protect a capital defendant's rights while maintaining the benefits of a single jury and a joint trial on guilt. Such an approach "facilitate[s] the jury's individualized consideration of each defendant," as the Eighth Amendment requires.[114] United States v. Taylor, 293 F. Supp. 2d 884, 899-900 (N.D. Ind. 2003). See also United States v. Aquart, 2010 WL 3211074, at *7 (D. Conn. Aug. 13, 2010); United States v. Henderson, 442 F. Supp. 2d 159, 162 (S.D.N.Y. 2006). It focuses each side's presentation and the jury's attention on one defendant at a time, and mitigates the risk that one defendant "will turn into a prosecutor" of his codefendant, Taylor,

---

[113] See Federal Death Penalty Resource Counsel Website, Declaration of Kevin McNally, at 5 (Aug. 10, 2015), http://tinyurl.com/h6er3b5. This is an updated version of a declaration Coonce submitted below. (A.55-59).

[114] The refusal to order sequential sentencing should be reviewed for abuse of discretion. Cf. United States v. Mason, 982 F.2d 325, 327 (8th Cir. 1993).

293 F. Supp. 2d at 899-900; Henderson, 442 F. Supp. 2d at 162, or that mitigating

arguments to the jury about one defendant will become "in effect," an argument for

"how . . . culpable his co-defendant was."  United States v. Catalan-Roman, 376 F.

Supp. 2d 96, 105-06 (D.P.R. 2005); Henderson, 442 F. Supp. 2d at 162

("[s]equential penalty phases" address risk that one defendant's mitigation case

may "place[] his co-defendant at a unique disadvantage"); Aquart, 2010 WL

3211074, at *7 (codefendant's mitigation argument could suggest that defendant

"is comparatively *more* deserving of the death penalty").

Sequential sentencings also respond to concerns that severing entire trials

would be unduly burdensome and could produce arbitrary outcomes if different

sentences resulted from the vagaries of each jury's makeup.  See Taylor, 293 F.

Supp. 2d at 899-900 (denying severance because "the same jury should decide"

each defendant's sentence, but finding sequential sentencings "a small price to

pay" for increased fairness and reliability); Catalan-Roman, 376 F. Supp. 2d at

105-06 (same); Aquart, 2010 WL 3211074, at *7 (same); Henderson, 442 F. Supp.

2d at 162 (same).  The benefits of a single jury also led the Supreme Court to reject

a constitutional claim to outright severance by two state capital defendants in

Kansas v. Carr, 136 S. Ct. 633 (2016).  The Court emphasized that having

codefendants' "fates determined by a single jury" avoids "wanton and freakish" outcomes.  Id. at 645-46.

For these same reasons, sequential sentencings have also been ordered in a number of other federal capital cases involving codefendants, including in this Circuit and district.  See Catalan-Roman, 376 F. Supp. 2d at 104, citing United States v. Ortiz, 315 F.3d 873 (8th Cir. 2002); United States v. Lee, 274 F.3d 485, 488 (8th Cir. 2001); McNally Declaration, *supra*, at 3-4 n.2.  That custom was urged below.  (See A.71: noting that "sequential penalty proceedings are the universal practice" in this district, and citing four trials in which they were ordered).  Indeed, it appears that in this Circuit, no federal defendant prior to Coonce was subjected to a joint capital-sentencing hearing.  (See id.; McNally Declaration, *supra*, at 3-5 nn.2-11).

Thus, Coonce stood on firm ground in asking for sequential sentencing as an alternative to severance.  (A.425-30; Tr.1159-61, 1429-31).  In addition to the reasons relied on in other cases, Coonce's counsel also alerted the court that "Mr. Hall ha[d] been trying to influence Mr. Coonce, both in the courtroom and during breaks," to countermand his attorneys' plans to show that Hall was the moving force behind the murder.  (Tr.1430-31; A.425-30).

Though the government viewed sequential sentencings as unnecessary (Tr.1159-61; see Tr.1428), and Hall's counsel thought that a joint hearing would not prejudice his client (Tr.1432-33), all parties agreed that, if separate hearings were ordered, Coonce's should go first.[115]  (Id.; Tr.1437-38; A.426).  Despite initially signaling an inclination to grant the request, the court ultimately denied it, saying only that a joint hearing was "the fairest and best approach."  (A.60, 389; 4/14/14 Tr.22; Tr.943, 1159-61, 1230, 1440).

On the contrary, however, the sentencing proceeding that ensued was an object lesson in every problem that other district courts have flagged with that approach.  The prosecutor commingled Hall and Coonce throughout his opening, repeatedly grouping them together (as "both defendants," "they both," *etc.*).  (Tr.1736-58).  Indeed, the prosecutor began on that very note:

> The evidence will show that the defendant Coonce has lived a life of crime both in prison and out of prison.  The evidence will also show the defendant Hall has lived a life of crime both in prison and out of prison.  The evidence will show that defendant Coonce is a violent and dangerous man, and the defendant Hall is a violent and dangerous man.  They have both threatened violence and they have both

---

[115] Hall's counsel initially requested sequential sentencings but later withdrew his request.  (A.62-63, 69-71, 424; Tr.1025, 1151, 1154-55, 1159-61).  He never explained that decision, but to the extent he hoped to use the government's sentencing evidence of Coonce's criminal history as some sort of mitigation, as he ultimately tried to do, he could just as well have done so had there been separate hearings with Coonce going first.

accomplished violence. Both defendants after they murdered Victor Castro-Rodriguez have said that they will kill again if not given the death penalty.

(Tr.1736-37).

Coonce's counsel accurately complained afterwards that the prosecutor's opening "didn't separate" each defendant, but rather repeatedly went back and forth from one to the other. Counsel warned that it would be "impossible for the jury to compartmentalize all that."[116] To no avail, Coonce renewed his request for sequential hearings. (Tr.1791-92).

While the government initially made some effort to group its case-in-chief witnesses against each defendant separately (Tr.1792-1829, 1845-1920, 1930-2023, 2050-2110), one of its most important witnesses (and its lengthiest) intermingled testimony about Coonce and Hall. (Tr.2110-2162, 2173-2246, 2265-77). And later in its case, the government alternated witnesses about Coonce with those about Hall. (Tr.2431-2505, 2517-2609).[117]

---

[116] Hall's counsel agreed that the prosecutor "could have compartmentalized his argument differently." (Tr.1792).

[117] Moreover, although Coonce went first, Hall's counsel insisted that scheduling reasons required him to call several of his witnesses out of order, thus repeatedly interrupting Coonce's case. (Tr.3062-66, 3294, 3296, 3900).

Further blurring important distinctions between the defendants, Hall's mitigation case parroted elements of Coonce's, as Hall sought to show that he, too, had suffered damaging genetic influences, a history of head trauma, and a mood disorder.[118]  (Tr.1784, 1788-89, 2520-31, 2555, 4096-97, 4119, 4170-71, 4223-40, 4256-83, 4409-51, 4719-4806, 5153-57, 5312).  The testimony of the government's psychiatrist Park Dietz was also similar or parallel, including his diagnosis that the two defendants' backgrounds, conduct, and interviews both indicated anti-social personalities.  (Tr.5028-38, 5055, 5070, 5082-85, 5131).  At one point, Dietz himself confused Coonce and Hall, ascribing a prior crime to the wrong defendant until being corrected by counsel.  (Tr.5164-65).

Moreover, two of Hall's principal mitigation defenses, that he had neither a history of sexual assault nor a sizable prison disciplinary record, became "in effect," arguments for "how . . . culpable his co-defendant was."  Catalan-Roman, 376 F. Supp. 2d at 105-06.  In his opening, his cross of prosecution psychiatrist Dietz, and his summation, Hall's counsel emphasized these twin themes.  (Tr.1789, 5150, 5158-78, 5303-06, 5311).  Both threw Coonce's prior sexual assault case and

---

[118] Coonce's counsel emphasized this risk, warning that there would be "a ton" of "overlapping and intermingled" testimony "spilling over into each defendant's theory," for example "about bipolar," which Hall's counsel had already "talk[ed] about."  (Tr.1790).

his numerous (albeit mostly minor) BOP infractions into sharply unfavorable relief. See Facts, Sections II-III, *ante*.

The prosecutors' summations only exacerbated these problems. As in their opening, they alternated back and forth between the defendants, or worse, blurred them together. The prosecutors employed the repeated theme that Coonce and Hall were a complementary set, "fire and ice" (Tr.5205-06, 5338-39) reintroducing it as they moved through each consideration in the jury's sentencing calculus and on to an appeal for a death verdict. (Tr.5205-64, 5323-40). For the most part, the prosecutors did not even discuss the defendants separately in covering each aggravating factor. (Tr.5210-29, 5235-38, 5247-51). Thus, for example, when one prosecutor introduced the cruelty and substantial-planning aggravators, he said that each applied fully "to both" defendants, and then proceeded to simply narrate the government's version of the events as a seamless whole, sprinkling in alternating references to both Coonce and Hall. (Tr.5218-29). In rebuttal, the other prosecutor did the same in arguing that, despite their troubled backgrounds, both nonetheless had "opportunities" and "choices." (Tr.5323-25).

Providing separate sentencings with Coonce going first (as all agreed he should) would have prevented unfair prejudice from Hall's defense and significantly reduced the risk of jurors' intermingling the evidence and

238

prosecutorial arguments about each defendant — as other courts have emphasized in adopting such a procedure.  Likewise, it would have imposed little inconvenience or extra cost.  It appears that all of the government's sentencing testimony went only to one defendant, and not the other; thus, separating the sentencings would not have required repeating any testimony.[119]

Jurors were cautioned several times to give each defendant individualized consideration.  (E.g., A.533, 537; Tr.2617).  But such an instruction is given in every codefendant case, and the decisions ordering separate capital sentencings suggest a need for greater protection against unfair or arbitrary outcomes.  See, e.g., Catalan-Roman, 376 F. Supp. 2d at 106 (ordering sequential sentencings even while acknowledging that "jury instructions could still aid to cure such prejudice").  Nor does it matter that the Supreme Court said such an instruction defeated the defendants' claims in Carr —because those defendants had sought severance, not separate sentencings, and, as discussed, the balance of considerations differ sharply for these two contrasting forms of relief.  Moreover, the Carr defendants claimed only that joinder exposed them to certain otherwise inadmissible evidence.  136 S.

---

[119] And while three prosecution witnesses offered sentencing testimony against both defendants, two of those were the FBI and BOP case agents who were both present and seated at counsel table for the entire proceedings.  (See Tr.691, 2110, 2654).  Accordingly, a joint hearing also was not justified by a need to avoid burdening government witnesses.

Ct. at 644-45.  Here, by contrast, Coonce's claim is quite different and much

broader, challenging how his joint proceeding led jurors to commingle the

defendants and their overall cases, and how Hall's mitigation arguments prejudiced

him.

Finally, it also does not matter that (following a day of deliberations and an

overnight recess) a short time after telling the court that they had decided on

Coonce's sentence but could not unanimously agree on Hall's, jurors returned

death sentences against both.  (Tr.5358, 5361).  <u>See</u> Facts, Section VII, *ante*.  At

most, that sequence suggests that, at the time of their note, at least one juror had a

different view of the punishment each defendant deserved.  But it is likely, on this

record, that the vast majority of the jurors had intermingled the defendants and the

evidence against them from the very start.

Accordingly, the Court should set aside Coonce's death sentences and order

resentencing.

## XV.

**The Court erroneously refused to instruct that the "reasonable doubt" standard governed jurors' decision whether aggravating factors sufficiently outweighed mitigating ones.**

Under the Fifth Amendment's grand-jury guarantee and the Sixth

Amendment jury-trial right, "any fact that increases the penalty for a crime beyond

the prescribed statutory maximum," including to a death sentence, "must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Ring v. Arizona, 536 U.S. 584, 588 (2002).

Jurors here were instructed that they could impose death if the aggravating factors "sufficiently outweigh[ed]" the mitigating ones "to justify a sentence of death." (A.533, 538, 539, 541, 543). See 18 U.S.C. § 3593(e). Coonce had unsuccessfully sought an instruction that this determination had to be made "beyond a reasonable doubt."[120] (A.433-34, 448. See also A.407).

This Court previously observed that "it makes no sense to treat the weighing process mandated by 18 U.S.C. § 3593(e) as an elemental fact" under the Fifth Amendment. United States v. Purkey, 428 F.3d 738, 749-50 (8th Cir. 2005). Nonetheless, Purkey has recently been abrogated by Hurst v. Florida, 136 S. Ct. 616 (2016).

Hurst involved Florida's statute authorizing the judge, rather than the jury, to determine both whether any aggravating circumstances existed and whether they were "sufficient" to justify death. The Supreme Court made clear that both those findings were covered by the Sixth Amendment:

---

[120] The court's refusal to give that instruction is reviewed *de novo*. See United States v. Sales, 25 F.3d 709, 711 (8th Cir. 1994), abrogated on other grounds, United States v. Aguayo-Delgado, 220 F.3d 926 (8th Cir. 2000).

Florida does not require the jury to make *the critical findings necessary to impose the death penalty*.  Rather, Florida requires a judge to find *these facts* . . . . <u>State v. Steele</u>, 921 So. 2d 538, 546 (Fla. 2005) ("The trial court alone must make detailed findings about the existence *and weight* of aggravating circumstances . . .").

As [in <u>Ring</u>], the maximum punishment . . . Hurst could have received without any judge-made findings was life in prison without parole . . . . [A] judge increased Hurst's authorized punishment based on her own factfinding.

<u>Id.</u> at 619-21 (emphasis added).  Critically, the Court further explained:

Florida concedes that Ring required a jury to find *every fact* necessary to render Hurst eligible for the death penalty . . . .

[Yet t]he State fails to appreciate the central and singular role the judge plays under Florida law . . . . [T]he Florida sentencing statute does not make a defendant eligible for death until "findings by the court that such person shall be punished by death."  Fla. Stat. § 775.082(1).  The trial court alone must find "*the facts* . . . [t]hat sufficient aggravating circumstances exist" *and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances*."  § 921.141(3); <u>see</u> <u>Steele</u>, 921 So. 2d at 546 . . . .

<u>Id.</u> at 622 (emphasis added).

<u>Hurst</u> thus treats the trial judge's weighing determination, like the determination that an aggravator exists, as covered by <u>Ring</u> and <u>Apprendi</u>, because a defendant cannot be sentenced to death without both findings.  Similarly, under the FDPA, a defendant cannot be sentenced to death until a jury finds that the aggravators sufficiently outweigh the mitigators; thus, the Fifth and Sixth Amendments also require that determination be made beyond a reasonable doubt.

242

Because Coonce was sentenced to die without the constitutionally required burden of persuasion, his death sentence should be reversed and resentencing ordered.

## XVI.

**Coonce was sentenced to death through an unconstitutionally arbitrary process impermissibly influenced by geography.**

A single circumstance of Coonce's case, unrelated to any feature of the killing or his record, dramatically elevated his likelihood of being targeted for and ultimately receiving a death sentence: geography. Coonce had the misfortune to be prosecuted in the nation's leading hot spot for the federal death penalty, the Western District of Missouri. Only 6.6% of death-eligible federal defendants nationwide are capitally tried and only about 2% are sentenced to death. But Coonce faced an almost *six times greater* likelihood of a capital trial (37%), and a more than *seven times greater* chance of a death verdict (15%) — solely because of *where* he was charged. Indeed, the overall rate of death sentencing for eligible federal inmates charged with killing another prisoner is only 4.4% nationwide; thus, being prosecuted in the Western District of Missouri is *three to four times* more predictive of a death sentence than even that aggravating consideration.

As applied to Coonce's case, the federal death penalty operated arbitrarily and capriciously, pulling from the broad pool of eligible offenders just a tiny

handful, like Coonce, who will die, based on the illegitimate factor of geography.

For that reason, his death sentences violate the Fifth Amendment's Due Process

Clause and the Eighth Amendment's prohibition on cruel and unusual

punishments, and should be set aside.[121]

A.     **The Constitution forbids imposing death sentences on "a capriciously selected random handful" out of the thousands of death-eligible offenders.**

In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court struck down

existing death-penalty laws because they operated arbitrarily and capriciously.[122]

A number of the justices relied on evidence that under those statutes, many

offenders were eligible for the death penalty, but only 15-20% ultimately received

it — without any valid basis for that disparity.

Thus, Justice Stewart went on famously to conclude that such sentences

were like "being struck by lightning," since only a handful of defendants were

selected to die, by all appearances almost at "random."  The Eighth Amendment

---

[121] Coonce preserved this issue below.  (See A.93-128, 130-37, 330-31, 333. See also A.284-90).  Because it implicates the constitutionality of a statute, it is reviewed *de novo*.  See United States v. Watts, 553 F.3d 603, 604 (8th Cir. 2009).

[122] Furman consisted of nine separate opinions, and the *per curiam* judgment that concluded "the imposition and carrying out of the death penalty in [the cases before the Court] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."  408 U.S. at 239.

forbade such a "wanton" and "freakish[]" system.  Id. at 309-10 (Stewart, J.,

concurring) (citations omitted).  Justice White agreed that a system advanced

neither deterrence nor retribution where death was imposed "with great

infrequency," even for "atrocious crimes," with no meaningful basis for

distinguishing the death verdicts from the life ones.  Id. at 313 (White, J.,

concurring).  And Justice Brennan likewise concluded that a penalty imposed in

only a "trivial number" of eligible cases was arbitrary absent proof that those

defendants were "the worst criminals" or had "commit[ted] the worst crimes."  Id.

at 293-94 (Brennan, J., concurring).  See also id. at 248 (Douglas, J., concurring).

    The obligation to select only the "worst" murders and murderers also reflects

the Eighth Amendment principle that "the culpability of the average murderer is

insufficient to justify the most extreme sanction available to the State."  Hall v.

Florida, 134 S. Ct. 1986, 1993 (2014) (quotation omitted).  Thus, after Furman,

capital-sentencing schemes have been required, through the use of aggravating

factors and other procedures, to reasonably justify inflicting a more severe

punishment on the defendant compared to others convicted of murder.  Zant v.

Stephens, 462 U.S. 862, 865, 877 (1983).

    The imperative has been to achieve capital-sentencing patterns that were no

longer arbitrary and capricious.  Four years after Furman, in approving Georgia's

new statute, a plurality of the Court observed that "[o]n their face, these procedures seem to satisfy the concerns of <u>Furman</u>." <u>Gregg v. Georgia</u>, 428 U.S. 153, 198 (1976) (Joint Opinion of Stewart, Powell & Stevens, JJ.). Justice White predicted that, with death now available only for "particularly serious" murders, defendants in "a substantial portion" of such cases would likely receive it, making capital punishment no longer wanton, freakish, or "so infrequently [imposed] that it loses its usefulness." <u>Id.</u> at 222 (White, J., concurring).

A decade later, in <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987), the Court considered whether Georgia's post-<u>Furman</u> scheme had resulted in constitutionally disproportionate sentencing patterns correlating with race. The Court noted that it had conditionally approved the statute in <u>Gregg</u> based on several features, including one "important . . . safeguard" — absent from the FDPA — a requirement that the state supreme court review the proportionality of each death sentence. And Georgia's high court had done so in McCleskey's case, finding that his death sentence "was not disproportionate to other [Georgia] death sentences" citing in support "13 cases involving generally similar murders." <u>Id.</u> at 303-306.

<u>McCleskey</u> also independently considered whether Georgia's system was "arbitrary and capricious in *application*." <u>Id.</u> at 308. It noted that, in an empirical study, McCleskey's own expert confirmed that it resulted in a "*reasonable level of*

*proportionality* among the class of [death-eligible] murderers," leaving relatively few cases where a death sentence was harder to account for.  Id. at 313 n.36 (emphasis added).  The Court deemed these disparities "a far cry" from those confronted in Furman.[123]  McCleskey, 481 U.S. at 313 & n.36 (citation omitted, emphasis added).

Thus, McCleskey confirms that this aspect of Furman remains good law, and that a death-penalty scheme producing the kinds of disparities condemned in Furman violates the Eighth Amendment.

More recently, two justices specifically recognized that a system is unconstitutionally arbitrary under Furman when "geography . . . significantly determine[s] who receives the death penalty," because geography as a sentencing factor is as "irrelevant" and "improper" as race or gender.  Glossip v. Gross, 135 S. Ct. 2726, 2760-62 (2015) (Breyer & Ginsburg, JJ., dissenting).  Justice Breyer's dissent discussed studies showing that within capital-punishment states (including Connecticut, Missouri, Colorado, California, and Arizona), whether death was

--------

[123] The First Circuit, in considering a challenge like Coonce's in United States v. Sampson, 486 F.3d 13 (1st Cir. 2007), cited McCleskey but mistakenly ignored its as-applied analysis and its finding that Georgia's post-Furman statute actually produced reasonably proportional sentences.  Sampson also unjustifiably required the defendant to account for every conceivable factual difference across thousands of death-eligible federal cases.  See id. at 24.

imposed "heavily depends on the county in which a defendant is tried." Id. See also Tucker v. Louisiana, 136 S. Ct. 1801 1802 (2016) (Breyer & Ginsburg, JJ., dissenting from denial of certiorari) (defendant may have received death "because of . . . arbitrary feature of . . . geography" where county accounted for only 5% of state's population and homicides, but half of its death sentences).

If anything, the influence of geography on death sentencing is even less tolerable in the federal system. In state systems, county-level disparities likely result significantly from longstanding political structures that vest independent prosecutorial authority in elected district attorneys. Cf. id. at 2751 (Thomas and Scalia, JJ., concurring). But in the federal system, the ultimate authority over whether to seek the death penalty rests, both legally and practically, in the hands of the Attorney General. See U.S. Attorney's Manual, § 9-10.120. Moreover, in ordinary federal sentencing, the law requires geographic consistency, see 18 U.S.C. § 3553(a)(6); Rita v. United States, 551 U.S. 338, 349 (2007), and forbids regional, state, or local variations based on differences in sentencing attitudes or practices, see, e.g., United States v. Jeremiah, 446 F.3d 805, 808 (8th Cir. 2006) (district court could not consider sentences typically imposed in Arkansas courts for comparable crimes by similarly situated defendants).

While juries rather than judges exercise sentencing authority in federal capital cases, see 18 U.S.C. § 3593, it would be perverse to protect non-capital defendants (facing far less severe punishment) from worse treatment based on where they were prosecuted, yet completely ignore substantial geographic discrimination in the administration of the death penalty. See Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (finality of death verdict entitles capital defendants to *greater* procedural protections).

**B.**     **98% of eligible federal offenders avoid the death penalty, and there is no legitimate explanation for the tiny handful of otherwise disparate death sentences, like Coonce's, that result.**

The federal death-penalty scheme creates an extremely large "pool" of capital-eligible offenders. In the decade and a half after Furman, Congress prescribed capital punishment for just a tiny set of federal crimes. See Jones v. United States, 527 U.S. 373, 407 n.3 (1999) (Ginsburg, Breyer, Stevens & Souter, JJ., dissenting). But the Anti-Drug Abuse Act (ADAA) and the FDPA, enacted in 1988 and 1994 respectively, made a myriad of offenses, under 60 different statutes, punishable by death. The scheme applies to all 50 states and U.S. territories, tribal members charged with crimes in Indian Country, crimes against U.S. nationals abroad and even certain foreign nationals outside U.S. jurisdiction, and foreign

crimes where the perpetrator is "found" within U.S. jurisdiction.[124]  In sum, the

federal death penalty covers endless factual scenarios that potentially subject

countless offenders to punishment by death.

The FDPA's requirement that a jury find at least one mental-state factor and

one aggravating factor before it may impose a death sentence does little to narrow

the eligible pool.  The mental-state factors, see 18 U.S.C. § 3591(a)(2), simply

codify the constitutional minimum floor for the death penalty.  See Tison v.

Arizona, 481 U.S. 137 (1987).  Similarly, many of the 16 statutory aggravating

factors are extraordinarily broad.  A number simply replicate elements of the

offense, apply (as judicially interpreted) to almost any murder, or hinge on

relatively minor prior criminal activity.  See 18 U.S.C. § 3592(c)(1)-(16).  In short,

as a former high-ranking federal prosecutor has acknowledged, the "generality"

and "commonality" of such aggravators expose almost any federal defendant

convicted of a "killing offense" to a potential death sentence.  Little, The Federal

Death Penalty: A History and Some Thoughts About the Department of Justice's

Role, 26 Ford. Urb. L.J. 347, 403 (1999).

---

[124] See Congressional Research Service, Capital Punishment: An Overview
of Federal Death Penalty Statutes, at 3-15 (Jan. 5, 2005),
http://tinyurl.com/zhxp2e7; U.S. Attorneys' Criminal Resource Manual, Title 9,
Capital Eligible Statutes Assigned by Section (2011), http://tinyurl.com/j47tx5j.

Not surprisingly, this expansive scheme has made a large number of offenders eligible for federal capital prosecution since the first of the modern statutes was enacted in 1988 — 3,615, by last count.  Of these cases, 3,470 have been reviewed by the Department of Justice, and 145 are pending review.  In this period, the government has authorized a capital prosecution in 503 of the 3,470 death-eligible cases.  In over half of those authorized cases, the government withdrew the death notice prior to judgment, either pursuant to a plea or unilaterally, thus ensuring the defendant a lesser sentence.  (15 additional death-authorized defendants are pending trial and may yet settle or be deauthorized).  Of the remaining 232 cases that have been capitally tried (6.6% of the eligible ones), the government obtained only 81 death verdicts (against 78 defendants, three of whom were sentenced to death twice).  Of those, 17 have been judicially vacated, and one other was commuted by the President.  Therefore, in the post-<u>Furman</u> era, the number of federal death sentences not (yet) invalidated stands at only 63.[125]

---

[125] <u>See</u> Federal Death Penalty Resource Counsel (FDPRC) Website, <u>Declaration of Kevin McNally</u> (June 17, 2016), http://tinyurl.com/jpf6gyy (this is an updated version of a declaration Coonce submitted below, <u>see</u> A.130-37); <u>id.</u>, <u>Authorized Cases</u>, http://tinyurl.com/gmq876u; Death Penalty Information Center (DPIC), <u>Federal Death Row Prisoners - Synopsis of Cases</u>, http://tinyurl.com/gte4w8c.  Of those 63 death sentences, 59 federal defendants remain under active sentence of death, three were executed (the last more than 13 years ago) and another died of natural causes on death row.  <u>See</u> <u>McNally Declaration</u>, *supra*, http://tinyurl.com/jpf6gyy.

When considered as a proportion of the pool of 3,455 federal death-eligible cases that have been resolved to date (the 3,470 total, cited above, less the 15 death-authorized cases that are pending trial), it yields a death-sentence rate of only 2.3%, even counting all 81 death verdicts — and 1.8%, counting only the 63 non-invalidated death sentences. The system in <u>Furman,</u> found unconstitutional because death sentences were "freakishly or spectacularly rare," imposed death *more than seven times* as often as today's sprawling federal death-penalty apparatus. 408 U.S. at 293 (Brennan, J., concurring). This death-sentencing rate in federal cases falls below that of any state save for Colorado. <u>See</u> Kamin & Marceau, <u>Waking the *Furman* Giant</u>, 48 U.C. Davis L. Rev. 981, 1015 (Feb. 2015).

Indeed, the present rate is actually lower than 2.3 or 1.8%, since it has declined significantly over time. From the first trials under the FDPA in 1996 through 2010, 66 death sentences were imposed — an average of about four and a half each year. But, since then, even those meager numbers have plummeted. Thus, in the last 5 1/2 years, a total of just eight death sentences (including Coonce's) were imposed, for an average of just over half a death sentence per year.[126]

---

[126] <u>See</u> DPIC, <u>Death Sentences in the United States from 1977 by State and Year</u>, http://tinyurl.com/qf9ntrn; DPIC, <u>Federal Death Penalty - Synopsis of Cases</u>, http://tinyurl.com/gte4w8c. This trend, together with the fact that the last federal

Equally important, federal death-sentencing patterns reveal "no meaningful basis" for distinguishing the few defendants who are condemned to die from the vast majority who are spared despite having committed equally "reprehensible" murders. Furman, 408 U.S. at 313 (White, J., concurring); id. at 309-10 (Stewart, J., concurring).

Space limitations and lack of access to complete information prevent comparison of Coonce's case with the thousands of death-eligible cases that did not end in a capital sentence. But even a cursory look at the 400 authorized cases that were diverted from death via either jury verdicts of life or government deauthorizations (with or without a negotiated plea) illustrates that there is nowhere close to any consistent, predictable measure for determining which defendants will be spared and which condemned. Many of the life cases included jury findings of multiple, substantial aggravating factors such as numerous victims; child or law-enforcement victims; elaborate planning; torture; terrorism; sexual

---

execution was in 2003, more than 13 years ago, also indicates that the federal death penalty violates the Eighth Amendment because it no longer comports with contemporary standards of decency. See, e.g., Roper v. Simmons, 543 U.S. 551 (2005).

assault; heading a gang or other crime organization; or serious prior violence, including previous homicides.[127]

That Coonce's case involved a prison killing does not remove it from this crazy quilt of outcomes.[128] Even for BOP murders of one federal prisoner by another, authorizations are unusual and death sentences relatively rare. Thus, out of 158 death-eligible defendants charged with such a homicide whose cases have been reviewed by DOJ in the modern era, only 13% (20) have been capitally tried, and only 4.4% (7), including Coonce, have ultimately received death sentences.[129]

In these BOP cases, many of the defendants spared by juries or the government committed murders or had criminal records seemingly more

---

[127] See FDPRC Website, Authorized Cases, http://tinyurl.com/gmq876u; id., Verdict Forms, http://tinyurl.com/h6zpua9.

[128] Nor can Coonce's case be explained away on a theory that it lacked mitigation. Even putting aside the jury's unwarranted, error-fueled refusal to consider compelling mitigating factors involving his brain damage and retardation-level IQ, see Points II-III, *ante*, most or all of the jurors found several other, weighty mitigators arising from his nightmarish upbringing. See Facts, Section I, *ante*.

[129] See FDPRC Website, Completed Federal Capital Cases Involving an Inmate (Oct. 22, 2015), http://tinyurl.com/hb7ppge; Id., Authorized Cases, http://tinyurl.com/gmq876u. (See also A.286, 464-507). Of the 20 capitally tried, 11 have been sentenced to life (9 initially and 2 more after their death sentences were set aside as unconstitutional), 7 ultimately received death sentences and await execution, and 2 were convicted of lesser offenses. Four more have been authorized and their cases are pending. See id.

aggravated than Coonce's.  They include, for example, Gary Watland (D. Co.),

Ritz Williams (M.D. Pa.), and John Milner (D. Ky.), federal inmates each with a

previous murder conviction who committed another murder in a USP; Samuel

Stone (E.D. Cal.) and Patrick Andrews (N.D. W.Va.), BOP killers each with *two*

previous murder convictions; and notorious high-ranking Aryan Brotherhood gang

leaders Barry Mills, Tyler Bingham, Wayne Bridgewater, and Henry Houston

(C.D. Cal.), who directed numerous murders from prison.[130]

## C.   The explanation for Coonce's death sentences appears to be, in large part, the happenstance of where he was prosecuted.

If any characteristic of Coonce's case *can* explain why he was selected from

among the many other comparable federal capital offenders, including ones

charged with BOP killings, it is the purely arbitrary factor of geography.  Because

he was prosecuted in the Western District of Missouri, statistically Coonce faced a

*vastly* greater likelihood both of being targeted for the death penalty and of

receiving it.

As discussed, nationally, the federal government authorizes and capitally

tries 6.6% and obtains a death sentence against only about 2% of all defendants

---

[130] See FDPRC Website, <u>Completed Federal Capital Cases Involving an Inmate</u> (Oct. 22, 2015), http://tinyurl.com/hb7ppge; <u>id.</u>, <u>Authorized Cases</u>, http://tinyurl.com/gmq876u.

255

eligible for capital punishment. But those in the Western District of Missouri face much grimmer prospects. There, out of 46 death-eligible cases, the government has sought capital punishment against 17 defendants. Of those, 16 were capitally tried to verdict (one is pending trial), of whom 7 were sentenced to death. Thus, in this district, the United States has targeted 37% of eligible offenders for capital prosecution (17 of 46), obtaining death sentences against 15% of the total pool (7 of 46).[131]

That means that the proportion of non-withdrawn authorizations to the eligible pool in the Western District of Missouri is *almost six times* greater than that nationally (37% versus 6.6%), and the rate of death sentencing *more than seven times* greater (15% versus about 2%). Although the Western District of Missouri has had only 1.3% of all the death-eligible cases in the nation (46 of 3,455), it accounts for 7% of all the capitally-tried defendants (16 of 232) and 11% of all the non-invalidated death sentences (7 of 63). In other words, the death-sentence rate in this district is almost *ten times greater* than one would expect from its share of eligible cases.

---

[131] FDPRC Website, <u>Federal Death-Eligible Cases in W.D. Mo.</u> (Dec. 2, 2015), http://tinyurl.com/gldm8nc; <u>id.</u>, <u>Authorized Cases</u>, http://tinyurl.com/gmq876u.

Indeed, the number of defendants capitally tried to verdict in this one district, 16, eclipses that in all but one of the other 94 federal judicial districts, and equals or exceeds the number capitally tried in 7 of the 11 other *circuits* outside this one.  The only district in the country with more federal death-penalty trials, the Eastern District of Virginia with 34, is not comparable since it is the default venue for cases that are national or international in nature, and thus a number of capital prosecutions there have involved crimes like espionage, piracy, and terrorism.[132] Putting it aside, no other district has had more than 13, and only two others are even in double digits.  And those districts (in California, Maryland, and New York) cover populous metropolitan areas and thus have had far more death-eligible cases than the Western District of Missouri.[133]  Whereas almost every district with a

_____

[132] See, e.g., United States v. Beyle, 782 F.3d 159 (4th Cir. 2015); United States v. Moussaoui, 591 F.3d 263 (4th Cir. 2010); United States v. Regan, 221 F. Supp. 2d 661 (E.D. Va. 2002).

[133] The number of death-eligible defendants in each district appears to correspond roughly to the total number of murders, with a far higher number of death-eligible defendants coming from districts in states with higher murder rates. See World Atlas, Murder Capital of the U.S. (2015), http://tinyurl.com/z6dd6ha (showing that states like California, Texas, and Florida have 2-4 times as many murders as Missouri, and listing a number of other states that also have more).

comparable number of death-eligible cases has seen only a handful of capital trials in the modern era, or none at all.[134]

The Western District of Missouri also stands alone when it comes to defendants sentenced to death, with 7. No other judicial district in the country has had more. (More than two-thirds of the judicial districts in the country, 63 of 94, have never imposed a federal death sentence.). Only the Eastern District of Virginia, the default jurisdiction for cases involving terrorism, piracy, and espionage has seen as many federal death sentences. Indeed, more federal defendants have been sentenced to die in the Western District of Missouri than in 9 of the 11 circuits outside the Eighth.[135]

This geographic disparity cannot be explained based on the prevalence of federal prisons or prison killings in the Western District of Missouri. Besides Coonce and Hall, none of the remaining 14 capitally-tried defendants in this district were charged with a prison homicide.[136] And, as discussed, the federal

---

[134] FDPRC Website, <u>Federal Death-Eligible Cases in W.D. Mo.</u> (Dec. 2, 2015), http://tinyurl.com/gldm8nc; <u>id.</u>, <u>Jurisdictional Chart</u> (Dec. 19, 2015), http://tinyurl.com/jqby5ps; <u>McNally Declaration</u>, *supra*, http://tinyurl.com/jpf6gyy.

[135] FDPRC Website, <u>Federal Death-Eligible Cases in W.D. Mo.</u> (Dec. 2, 2015), http://tinyurl.com/gldm8nc; <u>id.</u>, <u>Jurisdictional Chart</u> (Dec. 19, 2015), http://tinyurl.com/jqby5ps; <u>McNally Declaration</u>, *supra*, http://tinyurl.com/jpf6gyy.

[136] The 14 other cases involved a broad range of death-eligible crimes of the sort frequently seen in other districts, such as, for example, drug-related murder,

death penalty is still sought infrequently and capriciously even for inmates accused of prison killings. Moreover, these patterns of geographic discrimination are reproduced among the subgroup of BOP murder cases. Thus, in the Western District of Missouri, 100% of these cases have been authorized (3 of 3), whereas in every other district, the rate is lower, in almost all dramatically so.[137]

As discussed, the overall rate of death sentencing for eligible federal inmates charged with a prison killing is only 4.4% nationwide; thus, the arbitrary factor of being prosecuted in the Western District of Missouri is *three to four times* more predictive of a death verdict than even that legitimate aggravating consideration.[138]

---

witness killing, interstate kidnapping, and civil-rights murder. See FDPRC Website, Federal Death-Eligible Cases in W.D. Mo. (Dec. 2, 2015), http://tinyurl.com/gldm8nc; id., Authorized Cases, http://tinyurl.com/gmq876u.

[137] Those include the Middle District of Pennsylvania, at 21% (3 of 14 BOP murder cases authorized); the Eastern District of Virginia, at 16% (2 of 12); the District of Colorado, at 15% (3 of 20); the Central District of California, at 12% (5 of 40); the District of Arizona, at 0% (0 of 10); the Southern District of Indiana, at 0% (0 of 7); the Middle District of Florida, at 0% (0 of 7); and the District of Kentucky, at 0% (0 of 6). The only such district with a remotely comparable authorization rate in BOP cases is the Eastern District of Texas, at 83% (5 of 6). See FDPRC Website, Completed Federal Capital Cases Involving an Inmate (Oct. 22, 2015), http://tinyurl.com/hb7ppge; id., Authorized Cases, http://tinyurl.com/gmq876u; id., Jurisdictional Chart (Dec. 19, 2015), http://tinyurl.com/jqby5ps.

[138] See FDPRC Website, Completed Federal Capital Cases Involving an Inmate (Oct. 22, 2015), http://tinyurl.com/hb7ppge; id., Authorized Cases, http://tinyurl.com/gmq876u.

**D.** **Coonce's death sentences should be set aside because they violate the Eighth Amendment and due process, particularly given the absence of any appellate mechanism to correct for such arbitrariness.**

The evidence is plain that the federal death penalty is no more predictable than "a lottery." Furman, 408 U.S. at 293 (Brennan, J., concurring). Receiving a federal death sentence remains as rare and freakish as being "struck by lightning," id. at 309-10 (Stewart, J., concurring), and an outcome that in Coonce's case can best be explained by the illegitimate factor of geography.

Moreover, as noted, the FDPA lacks a critical mechanism for mitigating such geographical arbitrariness — comparative proportionality review. Such review, available under some state capital statutes, requires an appellate court "to determine whether, considering both the crime and the defendant, the sentence is disproportionate to that imposed in similar cases."[139] Pulley v. Harris, 465 U.S. 37, 43-44 (1984). It is a feature of Georgia's law that the Supreme Court hailed as helping guard against the sort of arbitrary sentences condemned in Furman. See Gregg v. Georgia, 428 U.S. 153, 198 (1976) (Opinion of Stewart, Powell & Stevens, JJ.). See also Proffitt v. Florida, 428 U.S. 242, 253, 258-59 (1976).

---

[139] In federal court, a variation of comparative proportionality review is a familiar component of all non-capital sentencing under 18 U.S.C. § 3553(a)(6). See, e.g., Jeremiah, 446 F.3d at 807 n.2.

In <u>Pulley</u>, the Supreme Court found that, while lacking proportionality review, California's capital statute had sufficient "checks on arbitrariness" because, among other things, it required the state supreme court not only to review each death sentence but also determine whether the evidence supported it. 465 U.S. at 51-54. The Court relied in part on <u>Jurek v. Texas</u>, 428 U.S. 262 (1976), which upheld Texas's death-penalty law despite its lack of proportionality review, because it satisfied the same concerns through "prompt judicial review of the jury's decision in a court with statewide jurisdiction." <u>Id.</u> at 276.

But the FDPA does not provide for the court of appeals to double-check a death sentence by assessing the relative weight of the aggravating and mitigating factors. And though a death-sentenced defendant can appeal to the applicable circuit, no court of nationwide jurisdiction examines each case. <u>See</u> 18 U.S.C. § 3595. Rather, further appeal to the Supreme Court is discretionary, <u>see</u> 28 U.S.C. § 1254, and is virtually never granted.[140] Such a fragmented system cannot assure "evenhanded, rational and consistent imposition" of the federal death penalty across the circuits.

---

[140] Although more than 60 federal defendants have been condemned to death since <u>Furman</u>, and three have been executed, the Supreme Court has granted plenary review in just one case. <u>See</u> <u>Jones v. United States</u>, 527 U.S. 373 (1999).

Accordingly, Coonce's death sentences are as arbitrary and capricious as the ones set aside in Furman, and therefore violate Eighth Amendment and due process. The Court should reverse them and order resentencing.

## CONCLUSION

While several of the errors Coonce raises are structural and thus require reversal *per se*, for those whose prejudice must be determined, the Court should consider them cumulatively as well as individually. See United States v. Anderson, 783 F.3d 727 (8th Cir. 2015). Moreover, it should consider the cumulative harm of plain as well as preserved errors. See United States v. Warman, 578 F.3d 320, 349 n.4 (6th Cir. 2009); United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005); United States v. Martinez, 277 F.3d 517, 532 (4th Cir. 2002).

This matters especially for the capital-sentencing errors that are the focus of Coonce's appeal, which collectively exerted a synergistic effect on the outcome, though some were unpreserved. These rulings so consistently and markedly favored the government, together they unfairly placed a thumb on the death side of the scale and courted a verdict based on emotion and fear. See also 18 U.S.C. § 3595(c)(2)(A) (court of appeals must determine whether death sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor").

At the end of the day, and in exercising its special appellate-review obligations in this federal death-penalty appeal, <u>see</u> 18 U.S.C. § 3595(b), (c), this Court should remand to the district court for an evidentiary hearing on whether Coonce is intellectually disabled and thus exempt from capital punishment under federal law, and pretermit consideration of the other claims. <u>See</u> Point I, *ante*. Alternatively, it should grant relief on those claims, reverse his death sentence, and order resentencing. <u>See</u> Points II-XVI, *ante*.

Respectfully submitted,

/s/ Shane P. Cantin, #41699 (Mo.)
Shane P. Cantin, Esq.
Erica Mynarich, Esq.
Carver, Cantin & Mynarich
901 St. Louis Street, Suite 1600
Springfield, MO 65806
(417) 831-6363 Tel.
(417) 831-7373 Fax
shane@c2glaw.com

/s/ Barry J. Fisher, #2851384 (N.Y.)
Barry J. Fisher, Esq.
Federal Public Defender Office
39 North Pearl Street, 5th Floor
Albany, NY 12207
(518) 650-9031 Tel.
(518) 436-1780 Fax
barry.fisher@fd.org

*Counsel for Defendant-Appellant*
*Wesley P. Coonce, Jr.*

# CERTIFICATE OF COMPLIANCE

This brief contains 62,283 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus complies with this Court's July 19, 2016, order, authorizing Defendant-Appellant Coonce to file a brief up to 64,500 words in length.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect X5 in Times New Roman 14.

This brief also complies with the requirements of 8th Cir. R. 28A(h), as it was generated by printing to PDF from the original word-processing file, and, with the addendum, it has been scanned for viruses and found to be virus-free.

DATED:     This, the 27th day of July, 2016.


      s/  Barry J. Fisher
Barry J. Fisher, Esq.
Federal Public Defender Office
39 North Pearl Street, 5th Floor
Albany, NY 12207
Tel. (518) 650-9031
Fax. (518) 436-1780
barry_fisher@fd.org

*Counsel for Defendant-Appellant*
*Wesley P. Coonce, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2016, I electronically filed the foregoing,

Appellant Wesley P. Coonce, Jr.'s Opening Brief, with the Clerk of Court using

the CM/ECF System, which will send notice of such filing to all registered

CM/ECF users.

                                         s/   Barry J. Fisher
                                    Barry J. Fisher, Esq.
                                    Federal Public Defender Office
                                    39 North Pearl Street, 5th Floor
                                    Albany, NY 12207
                                    Tel. (518) 650-9031
                                    Fax. (518) 436-1780
                                    barry_fisher@fd.org

                                    *Counsel for Defendant-Appellant*
                                          *Wesley P. Coonce, Jr.*